Christopher R. Belmonte
Satterlee Stephens Burke & Burke LLP
33 Wood Avenue South
6th Floor
Iselin, New Jersey 08830
(732) 603-4966
*Attorneys for Defendant JPMorgan Chase Bank N.A.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :

REGINA M. KEADY, as Executrix of the ESTATE OF  :
MICHAEL P. KEADY,                  :
                       Plaintiff,   :   Case No.: 07 CV 2755 (SRC)

     - against -               :

JPMORGAN CHASE & CO.,         :   **NOTICE OF REMOVAL**

               Defendant.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

PLEASE TAKE NOTICE THAT defendant JPMorgan Chase Bank N.A.

("Chase"), sued incorrectly herein as JPMorgan Chase & Co., by its attorneys, Satterlee Stephens

Burke & Burke LLP, hereby removes the above-entitled action, originally filed in the Superior

Court of New Jersey, Law Division: Bergen County, to the United States District Court for the

District of New Jersey, pursuant to 28 U.S.C. §§ 1441 and 1446, and 28 U.S.C. § 1332.

        1.     Plaintiff has commenced an action against Chase in the Superior Court of

New Jersey, Law Division: Bergen County, docket No. BER-L-3466-07. A true and correct

copy of Plaintiff's summons and complaint is annexed hereto as Exhibit A.

2.     On May 16, 2007, a copy of the summons and complaint was served upon Chase.

3.     Chase has not answered, moved or otherwise responded to the Complaint.

4.     Complete diversity of citizenship exists in this action because defendant Chase is a national banking association with its main office located at 111 Polaris Parkway, Columbus, Ohio 43271, while plaintiff Regina M. Keady, as Executrix of the Estate of Michael P. Keady, is an individual residing in the State of New Jersey and the Estate of Michael P. Keady is or will be admitted to probate in the State of New Jersey.

5.     In addition, the complaint seeks compensatory damages of at least $375,000.00, a sum in excess of the jurisdictional minimum of $75,000.00. See Exhibit A, ¶3.

6.     Accordingly, because there is complete diversity of citizenship between the parties and because the complaint seeks damages in excess of the jurisdictional minimum, this Court has jurisdiction over this action, pursuant to 28 U.S.C. §1332 and 28 USC § 1348.

7.     This Notice of Removal is filed within thirty (30) days of service, as required by 28 U.S.C. § 1446(b).

8.     Venue is proper for removal purposes, pursuant to 28 U.S.C § 1441(a), because the removed action has been pending in this District.

9.     Chase will promptly file a copy of this Notice of Removal with the Clerk of the Superior Court of New Jersey, Law Division: Bergen County, in which this action has been pending.

10.     The time to answer or otherwise respond to the complaint has not yet

expired.

Dated: New York, New York
        June 13, 2007

                            SATTERLEE STEPHENS BURKE & BURKE LLP

                            By: _____
                                 Christopher R. Belmonte
                            Attorneys for Defendant
                            JPMorgan Chase Bank, N.A.
                            33 Wood Avenue South, 6th Floor
                            Iselin, NJ 08830
                            (732) 603-4966
                            (732) 603-4977 (Facsimile)


TO:     COLE, SCHOTZ, MEISEL,
        FORMAN & LEONARD, P.A.
        Attorneys for Plaintiff
        Court Plaza North
        25 Main Street
        P.O. Box 800
        Hackensack, NJ 07602-0800

Exh A

Case 2:07-cv-02453-SRC-MAS Document 1-2 Filed 08/28/2007 Page 2 of 15

# CIVIL CASE INFORMATION STATEMENT
## (CIS)

Use for initial Law Division
Civil Part pleadings (not motions) under Rule 4:5-1.
**Pleading will be rejected for filing, under Rule 1:5-6(c),
if information above the black bar is not completed or
if attorney's signature is not affixed.**

| FOR USE BY CLERK'S OFFICE ONLY |
|---|
| PAYMENT TYPE:  CK  CG  CA |
| CHG / CK NO. |
| AMOUNT: |
| OVERPAYMENT: |
| BATCH NUMBER: |

| ATTORNEY/PRO SE NAME Steven I. Adler | TELEPHONE NUMBER (201) 489-3000 | COUNTY OF VENUE Bergen |
|---|---|---|

**FIRM NAME (if applicable)**
COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.

DOCKET NUMBER (WHEN AVAILABLE)
L 3466 - 07

**OFFICE ADDRESS**
Court Plaza North
25 Main Street
P. O. Box 800
Hackensack, NJ 07602-0800

DOCUMENT TYPE
Complaint

JURY DEMAND: ☐ YES  ☒ NO

**NAME OF PARTY (e.g., John Doe, Plaintiff)**
Regina M. Keady, as Executrix of the Estate of Michael P. Keady, Plaintiff

**CAPTION**
REGINA M. KEADY, as Executrix of the ESTATE OF MICHAEL P. KEADY v. J.P. MORGAN CHASE & CO.

**CASE TYPE NUMBER**
(See reverse side for listing)
599

IS THIS A PROFESSIONAL MALPRACTICE CASE? ☐ YES ☒ NO
IF YOU HAVE CHECKED "YES," SEE N.J.S.A. 2A:53A-27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT.

**RELATED CASES PENDING?** ☐ YES ☒ NO
IF YES, LIST DOCKET NUMBERS

DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence)? ☐ YES ☒ NO

NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY, IF KNOWN
☒ NONE
☐ UNKNOWN

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

A. DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP? ☒ YES ☐ NO
IF YES, IS THAT RELATIONSHIP ☒ EMPLOYER-EMPLOYEE ☐ FRIEND/NEIGHBOR ☐ OTHER (explain)
☐ FAMILIAL ☐ BUSINESS

B. DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY ☐ YES ☒ NO

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION:

DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS? ☐ YES ☒ NO
IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION:

WILL AN INTERPRETER BE NEEDED? ☐ YES ☒ NO  IF YES, FOR WHAT LANGUAGE:

ATTORNEY SIGNATURE

SUPERIOR COURT BERGEN COUNTY
FILED
MAY 10 2007

DEPUTY CLERK

Revised Effective 09.2006, CN10517

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
Use for initial pleadings (not motions) under *Rule* 4:5-1.

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

### Track I - 150 days' discovery
| | |
|---|---|
| 151 | NAME CHANGE |
| 175 | FORFEITURE |
| 302 | TENANCY |
| 399 | REAL PROPERTY (Other Than Tenancy, Contract, Condemnation, Complex, Commercial or Construction) |
| 502 | BOOK ACCOUNT |
| 505 | OTHER INSURANCE CLAIM (INCLUDING DECLARATORY JUDGMENT ACTIONS) |
| 506 | PIP COVERAGE |
| 510 | UM OR UIM CLAIM |
| 511 | ACTION ON NEGOTIABLE INSTRUMENT |
| 512 | LEMON LAW |
| 801 | SUMMARY ACTION |
| 802 | OPEN PUBLIC RECORDS ACT (SUMMARY ACTION) |
| 999 | OTHER (Briefly describe nature of action): |

### Track II - 300 days' discovery
| | |
|---|---|
| 305 | CONSTRUCTION |
| 509 | EMPLOYMENT (OTHER THAN CEPA OR LAD) |
| 599 | CONTRACT/COMMERCIAL TRANSACTION |
| 603 | AUTO NEGLIGENCE - PERSONAL INJURY |
| 605 | PERSONAL INJURY |
| 610 | AUTO NEGLIGENCE - PROPERTY DAMAGE |
| 699 | TORT - OTHER |

### Track III - 450 days' discovery
| | |
|---|---|
| 005 | CIVIL RIGHTS |
| 301 | CONDEMNATION |
| 602 | ASSAULT AND BATTERY |
| 604 | MEDICAL MALPRACTICE |
| 606 | PRODUCT LIABILITY |
| 607 | PROFESSIONAL MALPRACTICE |
| 608 | TOXIC TORT |
| 609 | DEFAMATION |
| 616 | WHISTLEBLOWER/CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES |
| 617 | INVERSE CONDEMNATION |
| 618 | LAW AGAINST DISCRIMINATION (LAD) CASES |

### Track IV - Active Case Management by Individual Judge / 450 days' discovery
| | |
|---|---|
| 156 | ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION |
| 303 | MT. LAUREL |
| 508 | COMPLEX COMMERCIAL |
| 513 | COMPLEX CONSTRUCTION |
| 514 | INSURANCE FRAUD |
| 701 | ACTIONS IN LIEU OF PREROGATIVE WRITS |

#### Mass Tort (Track IV)
| | | | | |
|---|---|---|---|---|
| 240 | REDUX/PHEN-FEN (formerly "DIET DRUG") | | 271 | ACCUTANE |
| 241 | TOBACCO | | 272 | BEXTRA/CELEBREX |
| 248 | CIBA GEIGY | | 274 | RISPERDAL/SEROQUEL/ZYPREXA |
| 264 | PPA | | 601 | ASBESTOS |
| 266 | HORMONE EPLACEMENT THERAPY (HRT) | | 619 | VIOXX |
| 268 | MANUFACTURED GAS PLANT (MGP) | | | |

**If you believe this case requires a track other than that provided above, please indicate the reason on Side 1, in the space under "Case Characteristics."**

Please check off each applicable category:

☐ Verbal Threshold      ☐ Punitive Class Action      ☐ Title 59

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P. O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Attorneys for Estate of Michael Keady, Plaintiff

| | | |
|---|---|---|
| REGINA M. KEADY, as Executrix of the ESTATE OF MICHAEL P. KEADY | : : : | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: BERGEN COUNTY DOCKET NO. BER-L-3466-07 |
| Plaintiff, | : : | Civil Action |
| v. | : : | **SUMMONS** |
| J.P. MORGAN CHASE & CO. | : : | |
| Defendant. | : : : | |

From The State of New Jersey, To The Defendant(s) Named Above: J.P. Morgan Chase & Co.

     The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (The address of each deputy clerk of the Superior Court is provided.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Clerk of the Superior Court and a completed Case Information Statement (available from the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights;

you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the LEGAL SERVICES office in the county where you live. A list of these offices is provided. If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A list of these numbers is also provided.

DATED: May 16, 2007

/s/ Theodore J. Fetter
Acting Clerk of the Superior Court

Name of Defendant(s) to be Served:        J.P. Morgan Chase & Co.

Address of the Defendant(s) to be Served:        One Chase Plaza
New York, New York 10081

**ATLANTIC COUNTY**
Deputy Clerk Of the Superior Court
Civil Division, Direct Filing
1201 Bacharach Blvd., First Floor
Atlantic City, NJ 08401

LAWYER REFERRAL
(609) 345-3444
LEGAL SERVICES
(609) 348-4200

**BERGEN COUNTY**
Deputy Clerk Of the Superior Court
Case Processing Section, Room 119
Justice Center, 10 Main Street
Hackensack, NJ 07601-0769

LAWYER REFERRAL
(201) 488-0044
LEGAL SERVICES
(201) 487-2166

**BURLINGTON COUNTY**
Deputy Clerk Of the Superior Court
Central Processing Office
Attn: Judicial Intake
First Fl., Courts Facility
49 Rancocas Road
Mt. Holly, NJ 08060

LAWYER REFERRAL
(609) 261-4862
LEGAL SERVICES
(800) 496-4570

**GLOUCESTER COUNTY**
Deputy Clerk Of the Superior Court
Civil Case Management Office
Attn: Intake
First Fl., Court House
1 North Broad Street, P. O. Box 750
Woodbury, NJ 08096

LAWYER REFERRAL
(856) 848-4589
LEGAL SERVICES
(856) 848-5360

**HUDSON COUNTY**
Deputy Clerk Of the Superior Court
Superior Court, Civil Records Dept.
Brennan Court House – 1st Floor
583 Newark Avenue
Jersey City, NJ 07306

LAWYER REFERRAL
(201) 798-2727
LEGAL SERVICES
(201) 792-6363

**HUNTERDON COUNTY**
Deputy Clerk Of the Superior Court
Civil Division
65 Park Avenue
Flemington, NJ 08862

LAWYER REFERRAL
(908) 263-6109
LEGAL SERVICES
(908) 782-7979

**OCEAN COUNTY**
Deputy Clerk Of the Superior Court
Court House, Room 119
118 Washington Street
Toms River, NJ 08754

LAWYER REFERRAL
(732) 240-3666
LEGAL SERVICES
(732) 341-2727

**PASSAIC COUNTY**
Deputy Clerk Of the Superior Court
Civil Division
Court House
77 Hamilton Street
Paterson, NJ 07505

LAWYER REFERRAL
(973) 278-9223
LEGAL SERVICES
(973) 523-2900

**SALEM COUNTY**
Deputy Clerk Of the Superior Court
92 Market St., P. O. Box 18
Salem, NJ 08079

LAWYER REFERRAL
(856) 678-8363
LEGAL SERVICES
(856) 523-2900

2

41206/0001-1477808v1

**CAMDEN COUNTY**
Deputy Clerk Of the Superior Court
Civil Processing Office
1st Fl., Hall of Records
101 S. Fifth Street
Camden, NJ 08103

LAWYER REFERRAL
(856) 964-4520
LEGAL SERVICES
(856) 964-2010

**CAPE MAY COUNTY**
Deputy Clerk Of the Superior Court
9 N. Main Street
Box DN-209
Cape May Court House, NJ 08210

LAWYER REFERRAL
(609) 463-0313
LEGAL SERVICES
(609) 465-3001

**CUMBERLAND COUNTY**
Deputy Clerk Of the Superior Court
Civil Case Management Office
Broad & Fayette Streets., P.O. Box 615
Bridgeton, NJ 08302

LAWYER REFERRAL
(856) 692-6207
LEGAL SERVICES
(856) 451-0003

**ESSEX COUNTY**
Deputy Clerk Of the Superior Court
50 West Market Street
Room 131
Newark, NJ 07102

LAWYER REFERRAL
(973) 622-6207
LEGAL SERVICES
(973) 622-1513

**MERCER COUNTY**
Deputy Clerk Of the Superior Court
Local Filing Office, Courthouse
175 South Board St., P.O. Box 8068
Trenton, NJ 08650

LAWYER REFERRAL
(609) 585-6200
LEGAL SERVICES
(609) 695-6249

**MIDDLESEX COUNTY**
Deputy Clerk Of the Superior Court
Administration Building
Third Floor
1 Kennedy Sq., P.O. Box 2633
New Brunswick, NJ 08903-2633

LAWYER REFERRAL
(732) 828-0053
LEGAL SERVICES
(732) 249-7600

**MONMOUTH COUNTY**
Deputy Clerk Of the Superior Court
Court House, 71 Monument Park
P.O. Box 1269
Freehold, NJ 07728-1262

LAWYER REFERRAL
(732) 431-5544
LEGAL SERVICES
(732) 866-0020

**MORRIS COUNTY**
Deputy Clerk Of the Superior Court
Civil Division
30 Schuyler Pl., P.O. Box 910
Morristown, NJ 07960-0910

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 285-6911

**SOMERSET COUNTY**
Deputy Clerk Of the Superior Court
Civil Division Office
New Court House, 3rd Floor
P.O. Box 3000
Somerville, NJ 08876

LAWYER REFERRAL
(908) 685-2323
LEGAL SERVICES
(908) 231-0840

**SUSSEX COUNTY**
Deputy Clerk of the Superior Court
Sussex County Judicial Center
43-47 High Street
Newton, NJ 07860

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 383-7400

**UNION COUNTY**
Deputy Clerk of the Superior Court
1st Floor, Court House
2 Broad Street
Elizabeth, NJ 07207-6073

LAWYER REFERRAL
(908) 353-4715
LEGAL SERVICES
(908) 354-4340

**WARREN COUNTY**
Deputy Clerk of the Superior Court
Civil Division Office
Court House, 413 Second Street
Belvidere, NJ 07823-1500

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 475-2010

3

SUPERIOR COURT BERGEN COUNTY

F I L E D

MAY 10 2007

*[signature]*

DEPUTY CLERK

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P. O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536  Facsimile
Attorneys for Estate of Michael Keady, Plaintiff

| | |
|---|---|
| REGINA M. KEADY, as Executrix of the ESTATE OF MICHAEL P. KEADY<br><br>Plaintiff,<br><br>v.<br><br>J.P. MORGAN CHASE & CO.<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION; BERGEN COUNTY<br>DOCKET NO. L 3466 - 07<br><br>Civil Action<br><br>**COMPLAINT** |

Plaintiff, Regina M. Keady, as Executrix of the Estate of Michael P. Keady (the "Plaintiff"), residing at 226 William Street, River Vale, New Jersey 07675, by way of Complaint, alleges and says:

## FIRST COUNT

## (Background)

1.     Michael P. Keady ("Keady") was employed by defendant, J.P. Morgan Chase & Co. ("Defendant" or "JPM"), from in or about August 2002 until on or about May 31, 2004, at which time he was terminated.

2.     By letter, dated March 31, 2004, JPM advised Keady, among other things, as follows:

A.     that Keady would receive salary and benefits during a sixty (60) day notice period (from March 31, 2004 to May 31, 2004);

B.     that in exchange for a release, Keady would receive certain severance pay and other benefits; and

C.     that pursuant to the terms of an offer letter, dated August 23, 2002, JPM or any successors would pay Keady or his heirs a payment of $375,000 on or before August 31, 2004 and another payment of equal amount on or before August 31, 2006. A copy of the March 31, 2004 letter is annexed hereto and incorporated herein as Exhibit "A."

3.     JPM paid Keady the first $375,000 payment, but defaulted on the second $375,000 payment.

4.     Keady, by and through his counsel, notified JPM of its breach of the March 31, 2004 letter agreement, but JPM refused, and continues to refuse, to pay the past due balance.

5.     On or about December 1, 2006, Keady died, and this action is brought by Plaintiff, Keady's wife, the executrix of the Estate.

2

<u>(Cause for Action)</u>

6.    As a direct and proximate result of JPM's breach of the March 31, 2004 letter

agreement, Plaintiff has suffered, and continues to suffer, substantial damages.

WHEREFORE, Plaintiff, Regina M. Keady, the Executrix of the Estate of Michael P.

Keady, demands judgment against Defendant, J.P. Morgan Chase & Co., on this the First Count

of the Complaint, as follows:

        A.    Damages;

        B.    Interest;

        C.    Reasonable attorneys' fees;

        D.    Costs of suit; and

        E.    Such further relief as this Court deems just and equitable under the

circumstances.

## SECOND COUNT

7.    Plaintiff repeats and realleges all of the allegations contained in the First Count as

if same were fully set forth herein at length.

8.    Plaintiff sues for services rendered by Keady upon the promise of JPM to pay.

9.    Keady demanded payment but JPM refused, and continues to refuse, to pay same.

10.    As a direct and proximate result thereof, Plaintiff has been damages.

WHEREFORE, Plaintiff, Regina M. Keady, as Executrix of the Estate of Michael P.

Keady, demands judgment against Defendant, J.P. Morgan Chase & Co., on this the Second

Count of the Complaint, as follows:

        A.    Damages;

        B.    Interest;

3

C.   Reasonable attorneys' fees;

D.   Costs of suit; and

E.   Such further relief as this Court deems just and equitable under the

circumstances.

## THIRD COUNT

11.   Plaintiff repeats and realleges all of the allegations contained in the First and

Second Counts as if same were fully set forth herein at length.

12.   Plaintiff sues JPM for the reasonable value of services rendered by Keady to JPM

upon the promise of JPM to pay the reasonable price for same.

13.   Payment has been demanded, but same has not been made by JPM.

14.   As a direct and proximate result thereof, Plaintiff has suffered, and continues to

suffer, substantial damages.

WHEREFORE, Plaintiff, Regina M. Keady, the Executrix of the Estate of Michael P.

Keady, demands judgment against Defendant, J.P. Morgan Chase & Co., on this the Third Count

of the Complaint, as follows:

A.   Damages;

B.   Interest;

C.   Reasonable attorneys' fees;

D.   Costs of suit; and

4

E.    Such further relief as this Court deems just and equitable under the

circumstances.

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for Plaintiff

By: _____
Steven I. Adler

DATED: May 7, 2007

## DESIGNATION OF TRIAL COUNSEL

Steven I Adler, Esq. is hereby designated as trial counsel in the above-captioned matter.

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for Plaintiff

By: _____
Steven I. Adler

DATED: May 7, 2007

## CERTIFICATION PURSUANT TO RULE 4:5-1

I certify the matter in controversy is not the subject of any other pending action in any

Court or of any pending arbitration proceeding and that no such other action or arbitration

proceeding is contemplated. I further certify that no other party need be joined in this action.

_____
Steven I. Adler

DATED: May 7, 2007

5

FROM CHASE CORP EMP S ...



**JPMorgan**
Investor Services

March 31, 2004

Michael Keady

Dear Mike:

Your position will be eliminated and your employment will be terminated on May 30, 2004. You will continue to receive salary and benefits during the 60-day notice period. Your notice period begins on March 31, 2004 and ends on May 30, 2004.

Commencing with the start of your non-working notice period, you should not conduct any business on behalf of the firm, unless authorized by your manager, nor should you perform work during this period other than at our request for assistance. During this period, the Worldwide Rules of Conduct apply to you. Please note that if you leave the firm before the 60-day notice period begins or fail to comply with requests for assistance before or during your severance period, you are not eligible for the severance benefits described in this letter or such benefits shall cease.

While I know this is a difficult time for you, I want to assure you that we are prepared to provide you with a range of support services to help you manage this transition. The following summarizes those services.

## Severance Pay and Benefits

You will receive 42 weeks of severance pay, provided that you execute and return the enclosed Release Agreement ("Release"). Please note that severance pay, career services, severance-related benefits (that is, subsidized medical and/or dental, firm-provided basic life insurance and EAP) are conditioned upon the Release. Also conditioned upon the Release is your eligibility for retiree benefits when that eligibility is determined by the event of position elimination. In addition, outstanding awards (both Restricted Stock/Units or Stock Options) under JPMorgan Chase's Long Term Incentive or Stock Option Plans granted on or after January 1, 2003 are also conditioned upon the Release unless, as of your termination date, you have satisfied the definition of "Retirement" under the terms and conditions applicable to your LTIP awards. Benefits are provided based on the terms and conditions of the Severance Pay Policy or plan applicable to you. You have 45 calendar days within which to review and return the signed and notarized Release to the human resources generalist as noted in the Release. Enclosed are three copies of the Release; return two copies and retain one copy for your own records. If you have not provided us the signed Release by Monday, May 17, 2004, you will receive your regular pay for only the 60-day notice period.

You will have an additional seven calendar days after signing and returning the Release to change your mind and revoke the Release.

### Semimonthly Severance Installments

If you execute the Release, severance will be paid in semimonthly installments for the duration of your severance period. Applicable taxes and other legally required deductions will be withheld. During the period that you receive semimonthly severance installments, you are not an employee for any purpose. Severance payments are not considered eligible compensation under the 401(k) Savings Plan or Retirement Plan, and therefore any contributions, match, and pay credits will cease as of your termination date May 30, 2004.

While you are receiving severance in semimonthly installments, you may elect to continue participating in the medical and/or dental plans at the prevailing employee rates on an after-tax basis. You are eligible to use the Employee Assistance Program. In addition, firm-provided basic life insurance will continue during the period that you receive severance in semimonthly installments. You will receive additional information under separate cover regarding benefits for which you may be eligible.



EXHIBIT
A

When you stop receiving severance in semimonthly installments, you may, if you are eligible, continue your current medical and/or dental coverage and EAP coverage for 18 months by paying the COBRA rate which is 102% of the total cost for these benefits. Please keep in mind that some medical plans may not allow the continuation of coverage for this length of time.

*Lump Sum Election*
If you execute the Release, you may elect to receive the severance for which you are eligible as a lump sum payment by completing the enclosed election form and submitting it to your human resources generalist no later than 10 calendar days prior to your termination date. Alternatively, you may elect to receive the balance of the severance for which you are eligible in a lump sum payment at any time after your semimonthly payments have commenced by calling *accessHR*. If you elect to receive a lump sum severance payment, you are not eligible for firm-provided basic life insurance and will not be able to maintain medical and/or dental coverage at the active employee rates. However, you may elect medical and/or dental coverage and EAP under COBRA (see below) for the length of your severance period or for 18 months, whichever is longer. You may also convert your basic life insurance coverage to an individual policy. Applicable taxes and other legally required deductions will be withheld from the severance payment. Taxes are withheld from lump sum severance payments at the flat tax rate.

*COBRA* – Whether or not you execute the Release, you may in most situations elect COBRA coverage, provided that you had coverage immediately before your termination date. If you elect any coverage under COBRA, you must pay for the coverage at the COBRA rate, which is 102% of the total cost for those benefits. You are eligible to change your medical and/or dental options when you elect COBRA. Please keep in mind that some medical plans may not allow the change of options and/or the continuation of coverage for this length of time. Please check with your prospective carrier to ensure that the change and/or duration of coverage is allowed. You may also continue the Health Care Spending Account through the end of the plan year by making after-tax contributions, otherwise, eligible expenses for reimbursement are those incurred through your termination date only.

*Note:* Please refer to the last page of this letter for the Summary of Eligibility for Retiree Benefits and how the Release may affect your eligibility.

**EAP**
You will be eligible for the counseling services provided by the Employee Assistance Program (EAP) for the period that you receive severance in semimonthly installments. New York City area employees may call EAP at (212) 464-2685. Outside NYC and across the country, you may call (800) 276-0760. If you have a hearing impairment, you may call the TDD number, (800) 697-0353.

**Career Services**
You will be provided assistance in making the transition to other employment provided you have executed the Release. You may begin using career services after executing the Release and continue for the duration of your active job search.

The services will include one-to-one meetings with a career counselor who will assist you with skills assessment, resume preparation, job search strategies and training in interviewing techniques. Please call (212) 623-1777 for information on career services.

**Other Pay**
You will be paid for any accrued and unused vacation, as well as any compensatory days and floating holidays you earned but did not use. Any other unused sources of paid time off are not paid out unless the laws in the state where you work require payment.

**401(k) Savings Plan and Retirement Plan**
If you participated in the 401(k) Savings Plan, you will receive information regarding your final distribution and/or deferral options from the 401(k) Savings Plan Call Center following your termination date. If you have any questions regarding your account, please contact the 401(k) Savings Plan Call Center at 866-JPMC401k (866-576-2401). The TDD number for participants with a hearing impairment is (800) 345-1833. A Retirement Plan Package will be sent to your home address within six weeks of your termination date. Questions on this benefit should be referred to *accessHR*.

## Broad-based Employee Stock Option Program Awards

If you were awarded options under JPMorgan Chase's broad-based employee stock option programs, you will have the right to exercise outstanding Success and Value Share options awarded prior to your termination date on the same terms and conditions as if you had continued working for JPMorgan Chase. Outstanding Success Shares must be exercised no later than June 14, 2004. Please contact Mellon Investor Services at (800) 982-7089 for further information. Employees with a hearing impairment may call the TDD number, (800) 231-5469.

## Long Term Incentive Plan Awards

### For LTIP Awards Granted On or After January 1, 2003

With respect to a job elimination, the terms and conditions of outstanding awards of Restricted Stock/Units or Stock Options under JPMorgan Chase's Long-Term Incentive or Stock Option Plans granted on or after January 1, 2003 require you to execute the enclosed Release. If you fail to do so, then those awards, if any, will be immediately forfeited on your termination of employment unless as of your termination date, you have satisfied the definition of "Retirement" under the terms and conditions applicable to your LTIP awards.

### For LTIP Awards Granted Before January 1, 2003

For awards granted before January 1, 2003 under such Plans, you are not required to execute the enclosed Release. Such awards will be treated in accordance with their terms and conditions applicable to a job elimination.

With respect to awards under the Long-Term Incentive Plan, including heritage-Morgan Stock Bonus or Stock Option awards, the terms and conditions for different award years and different heritage companies, vary, particularly relative to option expiration dates. (Only awards granted on or after January 1, 2003 require you to execute a release.) You should contact Executive Compensation early in your notice period to confirm the terms and conditions applicable to each grant, particularly option expiration dates. Additionally, if you have outstanding restricted stock/units that will vest as of your termination date, Executive Compensation will provide you with the Accelerated RS/U Vesting Brochure. You may contact Executive Compensation by e-mail -- internally via Lotus Notes at Executive Compensation/JPMChase and externally via the internet at Executive.Compensation@Chase.com. Please include your Global Identification Number (GID) in the e-mail message. LTIP options which are exercisable may be exercised by calling (212) 270-8558 or (212) 270-8121 and submitting exercise forms to the Options Unit located at 270 Park Avenue, 35th floor before Noon (New York time) of a business day. Please note that this information does not apply to grants made under the Value or Success Share programs.

## Deferred Compensation Program

If you are a participant in the Deferred Compensation Program, you will receive information from the Deferred Compensation Call Center after your termination. If you have questions regarding your account, please contact the Deferred Compensation Call Center at (877) 401-5242. Employees with a hearing impairment may call the TDD number (800) 682-8706.

If you have questions about any other executive benefits, you may call Nell Plaine at (212) 270-4833.

Shortly following your termination date, you will receive a termination letter and the exit booklet, *As You Leave* or *As You Retire*, which contains important additional information regarding the disposition of your benefits. You may preview the booklet online under the Benefits section of accessHR or you may receive an advance copy by calling the *access*HR contact center.

**Payments/Incentive Payments**
Pursuant to the terms of your employment offer letter dated August 23, 2002, JPMorgan Chase or any successors will make the following payments to you or your heirs: 1) on or by August 31, 2004 a payment of $375,000.00 (minus applicable deductions and withholdings); and 2) on or by August 31, 2006, a final payment of $375,000.00 (minus applicable deductions and withholdings). Additionally, pursuant to Sections 2.2 and 2.3 of the Stock Purchase Agreement for Plexus Group Inc., you shall remain entitled to share in certain incentive payments if certain cumulative revenue targets are achieved by December 31, 2004, December 31, 2005, December 31, 2006 and December 31, 2007.

Mike, we are committed to helping you make this transition. If you have any questions about severance, the Release or the services outlined in this letter, please call me at (718) 242-8750. If you have other questions, you may call *access*HR at 877-JPMChase (877-576-2427). Individuals with a hearing impairment may call the TDD number, (800) 719-9980.

I wish you every success in your future endeavors.

Sincerely yours,

Trish Jeffers

Enclosures:
Release (3)
Lump Sum Election Form

Christopher R. Belmonte
Satterlee Stephens Burke & Burke LLP
33 Wood Avenue South
6th Floor
Iselin, New Jersey 08830
(732) 603-4966
*Attorneys for Defendant JPMorgan Chase Bank N.A.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-------------------------------------------------------------------x
                              :

                              Case No.: 07 CV 2752 (SRC)

REGINA M. KEADY, as Executrix of the ESTATE OF  :
MICHAEL P. KEADY,

                Plaintiff,      :   **RULE 7.1 STATEMENT**

      - against -

JPMORGAN CHASE & CO.,

                Defendant.

-------------------------------------------------------------------x

        Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, and to enable district judges and magistrate judges of the court to evaluate possible disqualification or recusal, the undersigned counsel for JP Morgan Chase Bank, N.A., sued incorrectly herein as JPMorgan Chase & Co., certifies as follows: (i) JP Morgan Chase & Co. is the parent corporation of JP Morgan Chase Bank, N.A.; and (ii) JP Morgan Chase & Co. is the only publicly held company which owns 10% or more of the shares of JPMorgan Chase Bank, N.A.

Dated: New York, New York
       June 13, 2007

                SATTERLEE STEPHENS BURKE & BURKE LLP

                By: _____
                      Christopher R. Belmonte
                230 Park Avenue
                New York, New York 10169
                (212) 818-9200
                Attorneys of Record for Defendant
                JPMORGAN CHASE BANK, N.A.

696823_1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

REGINA M. KEADY, as Executrix of the ESTATE OF
MICHAEL P. KEADY,

                            Plaintiff,

       - against -

JPMORGAN CHASE & CO.,

                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.: 07 CV 2752 (SRC)

**AFFIDAVIT OF SERVICE
BY OVERNIGHT
DELIVERY**

STATE OF NEW YORK    )
                             ) ss.:
COUNTY OF NEW YORK  )

       The undersigned, being duly sworn, deposes and says:

       1.     I am not a party to this action, am over 18 years of age and reside in Queens, New York.

       2.     That on June 14, 2007, deponent served a true copy of the annexed NOTICE OF REMOVAL, RULE 7.1 STATEMENT and CIVIL COVER SHEET upon:

                    Steven I. Adler, Esq.
                    Cole, Schotz, Meisel, Forman & Leonard, P.A.
                    Court Plaza North
                    25 Main Street
                    Hackensack, NJ 07601
                    Attorneys for Plaintiff

by depositing a true copy thereof, enclosed in a properly addressed sealed wrapper, into the custody of Federal Express for overnight delivery, prior to that service's deadline for overnight delivery.

                                                    _Marilyn Juda_
                                                 Marilyn Juda

Sworn to before me this
14th day of June, 2007.

_Michelle Masino_
   Notary Public

MICHELLE MASINO
Notary Public, State of New York
No. 24-4780501
Qualified in Kings County
Commission Expires 7/31/09

697111_1

# ORDER ON ORAL MOTION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
                                                    :
REGINA M. KEADY, as Executrix of the ESTATE OF      :
MICHAEL P. KEADY,                                   :
                                    Plaintiff,      :   Case No.: 2:07-cv-02752-SRC-
                                                    :   CCC
                                                    :
            - against -                             :
                                                    :
                                                    :   Stipulation
                                                    :
JPMORGAN CHASE BANK N.A.,                            :
                                                    :
                                    Defendant.      :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - x

         IT IS HEREBY STIPULATED AND AGREED that the time for JPMorgan

Chase & Co. to respond to the Complaint in this matter be and hereby is adjourned to July 11,

2007.

Dated: June 19, 2007

COLE, SCHOTZ, MEISEL FORMAN &              SATTERLEE STEPHENS BURKE &
LEONARD, P.A.                              BURKE LLP

By: _____               By: _____
   Jason R. Melzer                            Walter A. Saurack
P.O. Box 800                               33 Wood Avenue South, 6th Floor
Hackensack, NJ 07602-0800                  Iselin, NJ 08830
(201) 489-3000                             (732) 603-4966
(201) 489-1536 Facsimile                   (732) 603-4977 Facsimile
Attorneys for Estate of Michael Keady,     Attorney for Defendant J.P. Morgan
Plaintiff

                    *s/Claire C. Cecchi*                    6/20/07

SO ORDERED: _____
            *Claire C. Cecchi, U.S.M.J.*

697387_1

SATTERLEE STEPHENS BURKE & BURKE LLP
33 Wood Avenue South, 6th Floor
Iselin, NJ 08830
(732) 603-4966
(732) 603-4977  (facsimile)

*Attorneys for Defendant JPMorgan Chase Bank, N.A.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – X

|  |  |
|---|---|
|  | : |
|  | :   Case No.: 2:07-cv-02752-SRC- |
| REGINA M. KEADY, as Executrix of the ESTATE OF | :   CCC |
| MICHAEL P. KEADY, | : |
| Plaintiff, | :   Hon. Stanley R. Chesler, U.S.D.J. |
|  | :   Hon. Claire C. Checci, U.S.M.J. |
| - against - | : |
|  | : |
| JPMORGAN CHASE & CO., | :   **NOTICE OF MOTION** |
|  | : |
| Defendant. | :   Return date: August 13, 2007 |
|  | :   Oral argument is requested. |
|  | : |

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – X

TO:    Cole, Schotz, Meisel, Forman & Leonard, P.A.
       25 Main Street
       P. O. Box 800
       Hackensack, New Jersey 07602-0800

PLEASE TAKE NOTICE that on August 13, 2007 at 10:00 a.m. or as soon thereafter as

counsel may be heard, defendant JPMorgan Chase Bank, N.A., sued incorrectly herein as JPMorgan

Chase & Co., will move before the Honorable Stanley D. Chesler, U.S.D.J. of the United States District

Court for the District of New Jersey, at the Clarkson S. Fisher Federal Building & U.S. Courthouse, 402

East State Street, Trenton, New Jersey 08608, for the entry of an Order dismissing plaintiff's Complaint

for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), or, in

the alternative, for the entry of an Order transferring this action, pursuant to 28 U.S.C. § 1404(a), to the

Southern District of New York.

699603_1

PLEASE TAKE FURTHER NOTICE that in support of the motion, defendant relies on the memorandum of law submitted herewith and the affidavits of Denise Boyle and Joshua M. Rubins, sworn to July 10, 2007, with exhibits, and all papers on file in this action. A proposed form of Order is submitted herewith. Oral argument is requested.

SATTERLEE STEPHENS BURKE & BURKE LLP

By: _____s/_____
        Christopher R. Belmonte (CB-2163)
33 Wood Avenue South, 6th Floor
Iselin, NJ 08830
(732) 603-4966
(732) 603-4977

*Attorneys for Defendant JPMorgan Chase Bank, N.A.*

-2-

SATTERLEE STEPHENS BURKE & BURKE LLP
33 Wood Avenue South, 6th Floor
Iselin, NJ 08830
(732) 603-4966
(732) 603-4977  (facsimile)

*Attorneys for Defendant JPMorgan Chase Bank, N.A.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — — X
                                :

|  |  |
|---|---|
|  | : Case No.: 2:07-cv-02752-SRC-CCC |
| REGINA M. KEADY, as Executrix of the ESTATE OF MICHAEL P. KEADY, | : |
| Plaintiff, | : |
|  | : Hon. Stanley R. Chesler, U.S.D.J |
| - against - | : Hon. Claire C. Cecchi, U.S.M.J. |
|  | : |
| JPMORGAN CHASE & CO., | : **PROPOSED ORDER** |
|  | : |
| Defendant. | : Return date: August 13, 2007 |
|  | : Oral argument is requested. |
|  | : |

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — — X

THIS MATTER having been brought before the Court by defendant JPMorgan Chase Bank, sued incorrectly herein as JPMorgan Chase & Co., by and through their attorneys, on application for the entry of an Order dismissing plaintiff's Complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), and the Court having considered the papers submitted in connection with this motion, and having heard the arguments of counsel, and for good cause shown,

IT IS on this _____ day of _____, 2007,

ORDERED that the motion of defendant JPMorgan Chase Bank, N.A. to dismiss plaintiff's Complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), be and hereby is, granted.

_____
  Hon. Stanley R. Chesler, U.S.D.J.

SATTERLEE STEPHENS BURKE & BURKE LLP
33 Wood Avenue South, 6th Floor
Iselin, NJ 08830
(732) 603-4966
(732) 603-4977  (facsimile)

*Attorneys for Defendant JPMorgan Chase Bank, N.A.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – X

|  |  |
|---|---|
| | : |
| | : Case No.: 2:07-cv-02752-SRC- |
| REGINA M. KEADY, as Executrix of the ESTATE OF | : CCC |
| MICHAEL P. KEADY, | : |
| Plaintiff, | : Hon. Stanley R. Chesler, U.S.D.J |
| | : Hon. Claire C. Cecchi, U.S.M.J. |
| - against - | : |
| | : |
| JPMORGAN CHASE & CO., | : **PROPOSED ORDER** |
| | : |
| Defendant. | : Return date: August 13, 2007 |
| | : Oral argument is requested. |
| | : |

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – X

THIS MATTER having been brought before the Court by defendant JPMorgan

Chase Bank, sued incorrectly herein as JPMorgan Chase & Co., by and through their attorneys, on

application for the entry of an Order transferring this action, pursuant to 28 U.S.C. § 1404(a), to the

Southern District of New York, and the Court having considered the papers submitted in connection

with this motion, and having heard the arguments of counsel, and for good cause shown,

IT IS on this _____ day of _____, 2007,

ORDERED that the motion of defendant JPMorgan Chase Bank, N.A. to transfer this

action, pursuant to 28 U.S.C. § 1404(a), to the Southern District of New York, be and hereby is, granted.

_____
Hon. Stanley R. Chesler, U.S.D.J.

699763_1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ X

| | |
|---|---|
| REGINA M. KEADY, as Executrix of the ESTATE OF MICHAEL P. KEADY, | : |
| Plaintiff, | : Case No.: 2:07-cv-02752-SRC-CCC |
| - against - | : |
| JPMORGAN CHASE & CO., | : **AFFIDAVIT OF** |
| | : **JOSHUA M. RUBINS** |
| Defendant. | : |

‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ X

JOSHUA M. RUBINS, being duly sworn, deposes and says:

1.     I am a member of the firm of Satterlee Stephens Burke & Burke LLP, attorneys for defendant JPMorgan Chase Bank, N.A. ("Chase") in the above-captioned action and make this affidavit, based on personal knowledge, in support of Chase's motion to dismiss or, in the alternative, transfer this action to the Southern District of New York.

2.     I am one of the attorneys representing Chase in an action in the Southern District of New York entitled <u>Wayne Wagner et al. v. JP Morgan Chase Bank</u>, 06 CV 3126. A true and correct copy of the complaint in that action (the "Plexus Complaint") is annexed hereto as Exhibit A. As the stamp of the Southern District indicates, the Plexus Complaint was initially filed as a public document in late April 2006.   Chase accepted service of the Plexus Complaint in late May 2006.   As the caption of the Plexus Caption indicates, one of the named plaintiffs who brought the action was the same Michael Keady whose estate is the plaintiff in the instant action. As the last page of the Plexus Complaint indicates, the firm representing Mr. Keady and the other plaintiffs in the action against Chase in the

Southern District is Cole, Schotz, Meisel, Forman & Leonard, the same firm representing the plaintiff in the instant action.

JOSHUA M. RUBINS

Sworn to before me
this 10th day of July 2007

NOTARY PUBLIC

JOAN F. RUSSO
Notary Public State of New York
No. 01RU5055074
Qualified in Queens County
Commission Expires Jan. 29, 2010

699570_1

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WAYNE WAGNER, LAWRENCE CUNEO,
MARK EDWARDS, DAVID L. HALL, IAN
SCREEN, STEVEN GLASS, MICHAEL KEADY,
TERA R. FEAD and REGINA MILLER,

                  Plaintiffs,

     v.

JP MORGAN CHASE BANK,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No.

**JUDGE LEISURE**

**06 CV 3126**

**COMPLAINT**

**RECEIVED**
APR 2 4 2006
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Wayne Wagner ("Wagner"), Lawrence Cuneo ("Cuneo"), Mark Edwards

("Edwards"), David L. Hall ("Hall"), Ian Screen ("Screen"), Steven Glass ("Glass"), Michael

Keady ("Keady"), Tera R. Fead ("Fead") and Regina Miller ("Miller") (collectively, the

"Plaintiffs"), complaining of defendant JP Morgan Chase Bank ("Defendant", "JPM" or

"Bank"), allege and say:

## JURISDICTION AND VENUE

1.     This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C.

§1332(a)(1). The parties are citizens of different states and the amount in controversy exceeds

$75,000.00, exclusive of interest and costs.

2.     Venue is proper in this district pursuant to 28 U.S.C. §1391(a)(1) because

Defendant's principal place of business is within the Southern District of New York pursuant to

28 U.S.C. §1391(c).

## INTRODUCTION

3.  Plaintiffs are the former shareholders of Plexus Group, Inc. ("Plexus"). Plaintiffs, along with the Trustee of the Plexus Group Employee Stock Ownership Plan, ("ESOP"), sold their shares in Plexus to the Bank pursuant to a Stock Purchase Agreement dated as of August 19, 2002 (the "SPA").

4.  Plexus is a consulting firm that specializes in enhancing the performance of investment managers, pension funds and securities brokers by assessing the trading process and providing insight into the competitiveness of a broker's execution skills. Plexus adds value for its clients through the customized analysis of the client's trading data and distilling its analysis into practical recommendations for improving investment returns through better trading practices.

5.  Prior to its being controlled by Plaintiffs, Plexus already had become the leader in its industry. Due to the nature of its business, however, Plexus was required to upgrade and invest in emerging technology to maintain its competitive edge. When Plaintiffs and the Bank executed the SPA, the parties recognized that the Bank would need to make material and relatively prompt technology investment to enable Plexus to maintain its market share and meet the Bank's revenue projections.

6.  Ensuring that the Bank made the necessary technology investment was of paramount importance to Plaintiffs, as a significant portion of the economic benefits due them under the SPA (in the form of subsequent purchase price installments and incentive payments) were dependent upon Plexus achieving certain revenues projections. Accordingly, Plaintiffs negotiated a provision in the SPA requiring that Defendant "spend not less than six million ($6,000,000) dollars during the twenty-four (24) month period commencing on the Closing Date to [sic] for the purpose of enhancing [Plexus'] technology platform and applications and delivery

system used by [Plexus] and may spend up to fifteen million dollars ($15,000,000) in the aggregate in such twenty-four (24) month period."

7.    Notwithstanding that express requirement, the Bank invested substantially less than the negotiated amount in Plexus.  In addition, although the Bank represented to Plaintiffs it had plans to expand Plexus' presence, platform and revenues, the Bank, <u>inter alia,</u> imposed cost cutting measures and hiring freezes, failed to invest in R&D, closed Plexus' sales and technology development offices, forced out or terminated key Plexus employees including its head of Sales and its President and CEO, and otherwise caused significant disruption in Plexus' operations and hampered Plexus' ability to meet its revenue projections.

8.    The Bank's actions constitute material breaches of the SPA, as well as the implied covenant of good faith and fair dealing.  As set forth in detail below, the Bank's actions have caused Plaintiffs tremendous economic loss well in excess of $12.5 million.

## PARTIES

9.    Wagner is a citizen of the State of California with a residence at 2201 Ocean Front Walk, Venice, California 90291.

10.    Cuneo is a citizen of the State of California with a residence at 417 Cascada Way, Bel Air, California 90049.

11.    Edwards is a citizen of the State of California with a residence at 2656 Piccadilly Circle, Thousand Oaks, California 91362.

12.    Hall is a citizen of the State of California with a residence at 5220 Ballona Lane, Culver City, California 90230.

13.    Screen is a citizen of the State of California with a residence at 145 Surf Place, Seal Beach, California 90740.

3

14.    Glass is a citizen of the State of Maryland with a residence at 8616 Irvington Avenue, Bethesda, Maryland 20817.

15.    Keady is a citizen of the State of New Jersey with a residence at 226 William Street, River Vale, New Jersey 07675.

16.    Fead is a citizen of the State of California with a residence at 2515 Armacost Avenue, Los Angeles, California 90064.

17.    Miller is a citizen of the State of California with an address of P.O. Box 641146, Los Angeles, California 90064.

18.    Defendant is a New York banking corporation having a principal place of business in New York, New York.  The Bank is a subsidiary of J.P. Morgan Chase & Co. (NYSE: JPM), is a global financial services firm with assets of $1.2 trillion and operations in more than fifty (50) countries.  J.P. Morgan Chase & Co. is incorporated in Delaware and also has its principal place of business in New York.

### FACTS COMMON TO ALL CAUSES OF ACTION

**Payments Required Under The SPA**

19.    The SPA was executed on or about August 28, 2002.  The SPA called for Plaintiffs and the ESOP to receive an initial payment of $10 million at the closing, subject to certain holdbacks specified in the SPA.

20.    The SPA also required the Bank to make subsequent payments ("Subsequent Payments") for each of the twelve-month periods ending December 31, 2003, December 31, 2004, and December 31, 2005, conditioned upon the achievement of certain revenue targets. (SPA, ¶¶ 2.1 and 2.2.)  The maximum amount of each Subsequent Payment was $1.2 million and was based on revenue targets for calendar years 2003, 2004 and 2005 of $11,834,000, $14,201,000 and $17,042,000, respectively.  If the actual revenue for a year equaled or exceeded

4

eighty (80%) percent of the revenue target for that year, a Subsequent Payment was due under the SPA.

21.     In addition, the SPA established cumulative revenue targets for each of the subject years. If Plexus achieved those cumulative revenue targets, Plaintiffs were entitled to additional payments in accordance with a schedule attached to the SPA.

22.     The SPA also called for certain incentive payments ("Incentive Payments") to be made by Defendant if certain cumulative revenue targets were achieved by December 31, 2006 and December 31, 2007. The eighty (80%) percent rule also applied to those payments. (SPA, ¶ 2.3.) The aggregate maximum amount of the Incentive Payments was $6 million.

**The Bank's Spending Requirements Under The SPA**

23.     Due to the nature of Plexus' industry, the parties understood that substantial capital expenditures in technology were required for Plexus to maintain its position as the industry leader. The Bank agreed to the payment structure in the SPA, whereby a significant portion of Plaintiffs' economic benefits were deferred and dependent upon Plexus' post-closing revenues, because the Bank committed to making the necessary technology investment in Plexus after the transaction closed.

24.     The SPA required the Bank to spend "not less than six million ($6,000,000) dollars during the twenty-four (24) month period commencing on the Closing Date. . ." That amount was to be spent by the Bank during that time period "for the purpose of enhancing the Company's [Plexus] existing technology platform and applications and delivery systems used by the Company. . ." (SPA, ¶7.2.)

25.     Additionally, ¶ 8.2 of the SPA required the Bank to:

> use its reasonable efforts to take, or cause to be taken, all actions
> and to do, or cause to be done, all things necessary. . .to
> consummate the transactions contemplated by this SPA including,

> without limitation, . . .using all commercially reasonable efforts
> to . . . perform their obligations hereunder. . .

26.    Had Defendant not breached its contractual obligation to invest the necessary and

required $6 million in Plexus after the closing, Plaintiffs would have earned all Subsequent and

Incentive Payments contemplated by the SPA.  Further evidencing the urgency of a substantial

capital contribution by the Bank following the Plexus acquisition was the reference in the SPA to

a possible "spend number" of fifteen million ($15,000,000) dollars from August 2002 to August

2004.  That figure had been mentioned in March 2002 in a letter from the Bank to Plexus, in

which the Bank stated it "expects to spend an estimated $15 million in additional IT spending

over the next two years to enhance and integrate IT platforms (no less than $7.5 million p.a.).

Thereafter, [the Bank] intends to maintain an IT development budget of $3 million p.a. over the

next three years."

### The Bank's Material Breaches Of The SPA

27.    The Bank materially breached, among other things, ¶¶ 7.2 and 8.2 of the SPA.  In

fact, Defendant's own documents pertaining to the 2003 and 2004 capital expenditures confirm

beyond peradventure that the Bank spent substantially less than the required minimum of $6

million during the twenty-four (24) month period after closing.  Indeed, the Bank's Investment

Committee did not authorize any capital spending on Plexus until sometime in 2003.

28.    The Bank's own records reflect a total capital spend of well under $3.5 million

toward Plexus' existing technology platform and applications and delivery systems as of the end

of the twenty-four (24) month period -- a far cry from what was required by the SPA.

29.    The Bank's failure to live up to its capital expenditure promise, and within the

time frame called for in the SPA, was devastating both on a business and individual

compensation level for Plaintiffs.  Through the extraordinary efforts of its key personnel, Plexus

was able to "squeak by" in 2003 and 2004 by just reaching the minimum eighty (80%) percent of revenue target necessary to earn a reduced Subsequent Payment for each year. The Bank's failure to timely and fully make its capital investment in Plexus, however, had a snowball effect that detrimentally affected Plaintiffs' rights under the SPA.

30.    Plexus fell short of the revenues necessary to earn the Subsequent Payment for 2005 and will not be able to achieve the revenues in 2006 and 2007 necessary for the Incentive Payments. Defendant's breach of ¶ 7.2 also precluded Plaintiffs from recouping at the end of 2005 the difference between the full Subsequent Payments and the reduced amount earned in 2003 and 2004. (SPA, ¶ 2.2(c).)

31.    The depressed revenue figures from 2003 to 2005 occurred during the best market conditions the industry had ever seen and a period in which its competition further widened the technology gap. In fact, Plexus lost its competitive advantage and fell to number two in the industry during a period when it should have been distancing itself even further from its competitors. Likewise, year-end bonuses during this period were similarly lower than expected, commensurate with Plexus' stagnated growth.

32.    The bargained-for capital infusion was to be used to upgrade and replace existing technology with state-of-the-art on-line technology and improved product functionality and features for its entire product set. Rather than make the necessary investment, the Bank caused Plexus to be reliant on old legacy technology and products. Without upgraded technology and products, Plexus' ability to reach its expected revenue growth was crippled. Moreover, Plexus was unable to keep promises to clients concerning its services, and sales and customer retention were impacted dramatically.

33.    It was not until May 2005 that the business requirements for Plexus' full

technology build was even partially approved. Those approvals should have been received in

2002. In addition, no new products or significant enhancements were ever completed.

34.    The Bank was well aware that underperformance would result from its failure to

make the agreed upon investment in Plexus' technology. Prior to the SPA closing, the combined

Plexus/JPM due diligence teams spoke to many Plexus clients. Each of them noted the need for

a complete overhaul of Plexus' technology. Most also expected a new set of product

capabilities.

35.    In a November 26, 2002 e-mail, John Phinney, Senior Vice President, JPM

Investor Services ("JPMIS") ("Phinney"), accurately predicted that "[a]bsent this level of

commitment and evidence that [the Bank] was indeed committed to the re-architecture and new

product development plans, many of these (Plexus) clients will opt for competing products." In

that same e-mail, Phinney stated as follows:

> I do want you to know that it is highly likely that reduced capital
> spending will increase the "Lost Business" number of $1 million
> that we have used in the 2003 Plan. Plexus Lost Business in 2002
> was roughly $1 million and resulted from the lack of technology
> investment.
>
>     The impact of reduced technology spending on morale will
> also be a significant issue. All key Plexus Managers were involved
> in the decision to "sell the company" and most of their capital
> appreciation compensation comes in the form of "Earn-Out"
> payments that come in later years. Their confidence in getting
> these payments is predicated upon the aforementioned capital
> investment and discretionary investments, particularly the first $10
> million of capital investment and the R&D Lab. Although the
> actual Purchase and Sales Contract executed between JPM and
> Plexus calls for a minimum capital investment of $3 million
> annually for two years both Plexus and JPMIS Information Product
> teams believe that anything less than what has been committed to
> the valuation model would create an immediate and negative client
> reaction. Obviously, the value of JPM's investment would begin
> to erode. (emphasis added.)

36.     On September 29, 2004, after the initial twenty-four (24) month post-closing period expired, Plaintiffs wrote to the Bank requesting an accounting of the technology spend to determine whether the Bank complied with ¶ 7.2 of the SPA. That request was ignored.

. 37.     Plaintiffs sent a follow-up letter on November 3, 2004. That letter indicated it was "a second formal request for a complete, detailed and final accounting of the mandatory 'technology spend' of $6 million that is set forth in the [SPA]." The Bank again failed to respond. To date, the Bank has not seen fit either to account for its contractual obligations or respond to Plaintiffs' reasonable requests for information in that regard.

**The Bank's Mismanagement of Plexus**

38.     In addition to the failure to make the agreed-upon technology investment in accordance with ¶ 7.2 and the other breaches of ¶8.2 of the SPA, the Bank mismanaged the Plexus business after closing on the SPA. The Bank's conduct in that regard constitutes additional breaches of the SPA as well as of the covenant of good faith and fair dealing implied therein.

39.     In addition to the technology investment contractually required by ¶ 7.2 of the SPA, the Plexus business required a reasonable budget for research and development ("R&D") to maintain its competitive edge. R&D expenditures by the Bank were to start at $1 million and grow by $250,000 per year. Instead, R&D was never funded, resulting in no new products produced.

40.     The Bank's failure and refusal to invest in Plexus also caused important strategic relationships to deteriorate. For example, after the SPA was closed, Plexus was advised that Inalytics, a United Kingdom company, would sell, promote and market Plexus' services in the European market while, at the same time, Plexus would produce reports for Inalytics' clients. It was, therefore, expected that the Inalytics relationship would contribute greatly toward Plexus

9

exceeding its revenue targets and thereby enabling Plaintiffs to earn the maximum Subsequent and Incentive Payments. Instead, Richard Di Mascio ("Di Mascio"), CEO of Inalytics, refused to use Plexus' legacy reports and technology for Inalytics' clients and demanded improved capabilities before Inalytics would market Plexus' services. Moreover, other demands of Inalytics relating to its own business were made paramount in the Information Products Group ("IPG") strategy, to the detriment of Plexus' and Plaintiffs' interests.

41.    In addition, during the SPA negotiations, the Bank gave repeated assurances of its ability to virtually guaranty Plexus 50+ custody clients that would be cross-sold Plexus' services. During the negotiations, the Bank initially proposed bringing those clients to Plexus beginning in 2006. It ultimately was agreed, however, that Plexus would be presented those customers immediately given the importance of generating revenues necessary to realize both the Subsequent Payments as well as the Incentive Payments in 2006 and 2007. Unfortunately, there was no systematic or sustained effort by the Bank to cross-sell Plexus' products, and any cross-selling was minimal, sporadic and largely ineffective.

42.    The Bank also was to include other products as part of Total Cost Management ("TCM"), such as Investars, TradeStarr, Morgan Risk and Horizon, with the expectation that TCM would boost Plexus' revenues through cross-selling. That did not occur. In fact, Plexus' consulting group spent considerable time being trained on TCM even though the product was never finished.

43.    The TCM training proved to be an unnecessary and costly distraction. It siphoned off precious resources and, in any event, those sales would not have flowed to Plexus' bottom line. Morgan Risk was disbanded in 2003. In August 2004, complimentary products of TradeStarr, Investars and Inalytics also no longer were being supported and marketed. Those

10

developments left Plexus as the only remaining part of the original plan, destroying the TCM concept, confusing the marketplace and causing Plexus to abrogate commitments to prospects and clients.

44.     The Bank's unilateral hiring freezes and office closures created further obstacles for Plexus, in breach of the Bank's obligation to act in good faith under the SPA. Almost immediately after closing on the SPA, the Bank instituted a hiring freeze with very stringent guidelines for approving any new positions. Several Plexus employees subsequently were terminated and/or left of their own volition and those positions were not replaced. That resulted in a loss of "bench strength" that compromised Plexus' position in the marketplace as well as its client servicing capabilities.

45.     As a result of Plexus' acquisition by the Bank, Plexus expected to expand its sales force and even rent additional space for its sales team. Instead, the Bank closed the Plexus sales office in New Jersey in 2003 and transferred Plexus employees to the Bank's office in Brooklyn. That transition was highly disruptive. Moreover, Keady, the head of the Plexus' sales team, was forced out. Two other important salespeople also left, as did a support staff member. That left an inexperienced and decimated sales team at Plexus.

46.     The acquisition of Plexus coincided with the Bank's overall belt-tightening, resulting in a 37% expense budget reduction in IPG (from $8.689 million to $5.45 million) in plan year 2002 and a 10% reduction in 2003, in derogation of the Bank's contractual obligation to Plexus.

47.     The Bank's 2004 Budget Plan was prepared and adopted without input from Plexus. As a consequence, tremendous confusion existed as to Plexus' travel, marketing and employee budgets, severely hampering Plexus' strategic and tactical planning. Furthermore, no

11

additional resources were allocated to afford Plexus a reasonable opportunity to generate sales. Throughout 2004, repeated requests to Avram Stein ("Stein"), who had replaced Phinney as President and CEO, for permission to sponsor or attend important industry conferences, were ignored. Stein also repeatedly delayed, ignored or refused requests for permission to replace and hire additional staff notwithstanding his and Phinney's previous promises.

48.     In February 2004, Stein announced the closure of Plexus' technology development office in California, and half of its employees were terminated in April 2004. In late June 2004, Hall, the former President and CEO of Plexus, was terminated. The remaining employees in the technology department office were terminated or reassigned in September 2004.

49.     In or about July, 2004 there was a holding company merger between J.P. Morgan Chase & Co. and Bank One Corporation and, thereafter, the Bank focused on cost containment. In April, 2005, the Bank and Inalytics terminated their relationship, effective December 31, 2005, leaving Plexus without client servicing and sales personnel in Europe.

50.     Additionally, as a result of the above, some or all of the Plaintiffs were deprived of expected year end discretionary bonuses for calendar years 2002 through 2007 in excess of $5 million dollars and have had their reputations tarnished in the industry. Those bonuses were performance based and unrelated to the Subsequent and Incentive Payments, which were to compensate Plaintiffs for the sale of their Plexus stock.

51.     The Bank's own business model, developed in conjunction with the Plexus acquisition, would have resulted in Plaintiffs receiving millions of dollars more in discretionary bonuses than the amounts actually received. Specifically, the business plan developed as part of the Plexus acquisition reflected a management bonus pool for year one (calendar year 2003) of

$751,000 for seven of the nine Plexus shareholders. That figure was expected to grow annually thereafter for the five-year period through December 31, 2007. In fact, based upon Plexus' actual historical revenue growth trends or the revenue growth trends assumed for Plexus in the Bank's business plan, it was reasonable to assume that the former Plexus shareholders' percentage bonus increases would have exceeded those of other Bank employees. The $751,000 figure does not include Wagner and Cuneo, who became JPM Sr. Vice Presidents and who reasonably expected to receive year-end bonuses for calendar years 2003, 2004 and 2005 equal to a multiple of their base salaries.

52.    On January 3, 2006, the Bank sold Plexus to Investment Technology Group, Inc. ("ITG"). The transaction was allegedly valued at $12 million. As a result of a reorganization of ITG's corporate structure inclusive of the former Plexus business, it now is virtually impossible to ascertain whether the 2006 and 2007 revenue goals relating to the Incentive Payments will be attained.

53.    In sum, the Bank materially breached its obligations under the SPA as well as the covenant of good faith and fair dealing, thereby running the business into a diminished state by: (a) failing to invest in Plexus as contractually obligated, (b) failing to spend money to improve the product and expand the product line, (c) firing key sales people and other important personnel, and (d) otherwise failing to support Plexus as promised. The Bank's actions and inactions precluded Plaintiffs from realizing the full amount of their Subsequent and Incentive Payments, as well as the maximum amount of their expected bonuses.

### COUNT I
### (Breaches Of Contract)

54.    Plaintiffs repeat and reallege all of the allegations in the preceding paragraphs of this Complaint as if fully set forth herein at length.

13

55.     Plaintiffs and the Bank entered into a legally binding and enforceable contract, the

SPA.

56.     The Bank materially breached the SPA by, inter alia, failing to make the capital

expenditures required by the terms of the SPA and by other actions and inactions as detailed

above.

57.     As a direct and proximate result of the Bank's breaches of the SPA, Plaintiffs

have suffered, and will continue to suffer, extensive damages.

## COUNT II
### (Breaches of the Implied Covenant of Good Faith and Fair Dealing)

58.     Plaintiffs repeat and reallege all of the allegations in the preceding paragraphs of

this Complaint as if fully set forth herein at length.

59.     The Bank also materially breached the covenant of good faith and fair dealing

implied in the SPA.

60.     As a direct result of the Bank's wrongful conduct, Plaintiffs have suffered, and

will continue to suffer, extensive damages.

WHEREFORE, plaintiffs Wayne Wagner, Lawrence Cuneo, Mark Edwards, David L.

Hall, Ian Screen, Steven Glass, Michael Keady, Tera R. Fead and Regina Miller each demand

judgment against defendant JP Morgan Chase Bank on all counts, awarding them:

> A.     Compensatory damages;
>
> B.     Incidental damages;
>
> C.     Consequential damages;
>
> D.     Punitive damages;
>
> E.     Interest;
>
> F.     Costs of suit;

43187/0001-1427951v4

G.    Reasonable attorneys' fees; and

H.    Such further relief as the Court deems just, proper and equitable, under the

circumstances.

DATED: April 17, 2006

                                     COLE, SCHOTZ, MEISEL,
                                     FORMAN & LEONARD, P.A.
                                     Attorneys for Plaintiffs

                                     By:_____
                                        Jason R. Melzer (JM-7941)
                                        Warren A. Usatine (WU-1187)
                                        460 Park Avenue – Eighth Floor
                                        New York, New York 10022
                                        (212) 752-8000

15

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                        :
                                        :
REGINA M. KEADY, as Executrix of the ESTATE OF    :
MICHAEL P. KEADY,                            :

                        Plaintiff,       :    Case No.: 2:07-cv-02752-SRC-
                                          :    CCC
       - against -                        :
                                        :    **AFFIDAVIT OF**
JPMORGAN CHASE & CO.,                    :    **DENISE BOYLE**
                                        :
                     Defendant.       :
                                          :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        DENISE BOYLE, being duly sworn, deposes and says:

        1.      I am a Senior Vice President for defendant JPMorgan Chase Bank, N.A.

("Chase") and make this affidavit, based on personal knowledge and/or review of Chase's records, in

support of Chase's motion to dismiss or, in the alternative, transfer this action to the Southern District of

New York. I have been at Chase since 1981 and have oversight of Worldwide Services Human

Resources.

        2.      I understand that this action involves a Notice Letter from Chase, sent to Michael

P. Keady on or about March 31, 2004, regarding Mr. Keady's termination as a Chase employee, and that

a copy of this Notice Letter is attached to the complaint. In conjunction with this Notice Letter, on or

about April 16, 2004, in connection with the termination of his employment, Mr. Keady executed a

"Release Agreement," a true and correct copy of which is annexed hereto as Exhibit A.

        3.      Michael P. Keady became a Chase employee in August 2002 pursuant to the

acquisition by Chase of Plexus Group, Inc. ("Plexus"), where Mr. Keady was already employed. A true

and correct copy of the Stock Purchase Agreement (without schedules) (the "SPA") by which Chase

acquired Plexus is annexed hereto as Exhibit B.

3.    Consistent with the SPA, Chase sent Mr. Keady a letter agreement dated August

23, 2002 (four days after the date of the SPA), referencing the SPA and setting forth some additional

specific terms of Keady's employment.  A true and correct copy of this letter is annexed hereto as

Exhibit C.

4.    Chase's principal place of business is New York City in the Southern District of

New York.  The main offices of Chase's human resources department and legal department are located

in New York City.  Chase's preparation of the Notice Letter and the Release Agreement occurred in

New York City.  Most or all of the Chase employees involved in (i) communications with Mr. Keady

concerning the termination of his employment and the payments at issues in this action, and (ii)

negotiation of the SPA, were located in New York City and, to the extent that they are still employed by

Chase, still work in New York City.

_____
DENISE BOYLE

Sworn to before me
this 10th day of July 2007

_____
NOTARY PUBLIC

MELISSA R. GOLD
Notary Public, State of New York
No. 02GO5031235
Qualified in New York County
Commission Expires August 1, 20___

-2-

# Exhibit A

# RELEASE AGREEMENT

I, Michael P. Keady, (Global ID #427145) as RELEASOR, for and in consideration of a) having the termination of my employment treated as a position elimination thereby entitling me to severance under The Severance Pay Policy of JPMorgan Chase & Co., severance-related benefits and career services as detailed in the notice letter to me dated March 31, 2004 from Patricia Jeffers (the "notice letter"); b) a sixty day paid non-working notice period to commence on March 31, 2004; and c) a payment in the amount of Twenty Five Thousand Dollars and Zero Cents ($25,000.00) to Cole, Schotz, Meisel, Forman & Leonard, which represents legal fees, and intending to be legally bound, hereby release JPMorgan Chase Bank (and any predecessor or successor entities thereof) and its and their affiliates, subsidiaries, parent corporations (including J.P. Morgan Chase & Co.) and any predecessor or successor entities thereof, any other merged entities, and all present, former and future employees, directors, officers, representatives, administrators, agents, successors, assigns, trustees, heirs, executors and any fiduciaries of any employee benefit plan (hereinafter "JPMC" or "RELEASEES") from any and all suits, claims, charges, obligations, causes of action or demands in law or in equity (including any arbitration claims) arising from or relating to my employment relationship with JPMC and/or the termination thereof, from the beginning of the world up to and including the date of execution of this RELEASE (whether known or unknown to me and including any continuing effects of any acts or practices prior to the date of execution of this RELEASE), including, but not limited to:

- any employment and/or benefit related claims under any federal, state or local law, employment law or civil rights law, including, but not limited to, the Americans with Disabilities Act, the National Labor Relations Act, the Fair Labor Standards Act and any other federal, state or local wage, wage hour or wage payment law, the Employee Retirement Income Security Act of 1974 ("ERISA") including, but not limited to, breach of fiduciary duty and equitable claims arising under §1132(a)(3) of ERISA, Title VII of the Civil Rights Act of 1964, the Vocational Rehabilitation Act of 1973, the Age Discrimination in Employment Act of 1967, including the Older Workers Benefit Protection Act of 1990, the Civil Rights Acts of 1866, 1871 and 1991, including Section 1981 of the Civil Rights Act, the Family and Medical Leave Act, the Worker Adjustment and Retraining Notification Act (all as amended); and

- any and all employment and/or benefit related claims arising under any policy, procedure or practice, or any contract, tort, common law or public policy theory (including any claim for severance under any other plan or agreement and for bonus or incentive compensation, including any such claim for performance years 2003 and 2004); and

- any and all claims of retaliation under all federal, state, local or common or other law; and

- any and all claims for any retention payment(s) pursuant to Section 2.6(c) of the stock purchase agreement dated August 19, 2002 or any other employment letter or agreement; and

1

- any and all employment and/or benefit related claims subject to or covered by any arbitration agreements or provisions.

Provided, however, the foregoing does not release:

- any statutory claims for state unemployment insurance, worker's compensation, or disability insurance benefits (other than discrimination or retaliation claims related to the pursuit of such benefits);

- any legal claims concerning non-bonus or non-incentive compensation related payments of wages earned, due and owing under any labor or wage statutes;

- any legal obligations of RELEASEES under any award of restricted stock/units ("stock/units") or options existing as of the date of execution of this RELEASE, which award(s) shall remain in effect in accordance with its terms, provided that I acknowledge that notwithstanding those terms, the delivery to me of any restricted stock/units that vest at my termination will be pursuant to JPMC's administrative and audit/control practices;

- any legal obligations of JPMC to indemnify me under applicable by-laws consistent with applicable law;

- any legal obligations of JPMC that, by their terms, are to be performed after the date of execution of this RELEASE (including, without limitation, payment of any vested benefits under any pension plan or deferred compensation plan or benefits under any employee welfare plan in which I participate, all of which shall remain in effect in accordance with their terms); or

- any legal obligations of JPMC set forth in the notice letter for so long as I adhere to the terms of that letter and of this RELEASE.

I agree that I will not file or assert or permit to be filed or asserted any civil action, suit or legal proceeding seeking equitable or monetary relief (nor will I seek or in any way obtain or accept any such relief in any civil action, suit or legal proceeding) in connection with any matter concerning my employment relationship with JPMC and/or the termination thereof arising from the beginning of the world up to and including the date of execution of this RELEASE (whether known or unknown to me and including any continuing effects of any acts or practices prior to the date of execution of this RELEASE); provided, however, that the foregoing does not affect any right to file an administrative charge with the Equal Employment Opportunity Commission (EEOC) subject to the restriction that if any such charge is filed, I agree not to violate the non-publicity and confidentiality provisions of this RELEASE or to seek or in any way obtain or accept any monetary award, recovery, settlement or relief therefrom.

I understand and recognize that I continue to be bound by portions of JPMC's Worldwide Rules of Conduct, including, but not limited to, the Intellectual Property Policy and I will continue to discharge my duty of confidentiality with respect to all trade secrets and confidential and proprietary information which I received by virtue of my employment with JPMC. Additionally, and in that regard, I have advised JPMC of all facts of which I am aware that I believe may constitute a violation of JPMC's Worldwide Rules of Conduct and/or JPMC's legal obligations.

I further represent that I have not and will not, in any way, publicize the terms of this RELEASE and agree that its terms are confidential and will not be disclosed by me except that I may discuss the terms of this RELEASE with my attorneys, financial advisors and members of my immediate family and as required by law; provided, however, that nothing in this RELEASE shall prohibit or restrict me from providing information or otherwise testifying or assisting in any governmental or regulatory investigation. I understand and agree that, unless otherwise prohibited by law, I will promptly notify JPMC, in writing sent by facsimile to the Legal Department, Office of the Managing Clerk at (212) 552-5043, of any such request for assistance or testimony.

I agree to cooperate fully with and provide full and accurate information to JPMC and its counsel with respect to any matter (including any audit, tax, tax proceeding, litigation, investigation or governmental proceeding) that relates to matters over which I may have knowledge or information, subject to reimbursement for appropriate and reasonable costs and expenses.

I understand and agree that violation of certain provisions of this RELEASE, including the notice and/or confidentiality provisions, will constitute a material breach of this RELEASE; that pursuit of both monetary and injunctive relief are appropriate; and that RELEASEES' entitlement to the remedy of injunctive relief shall be in addition to any monetary damages. I further understand that if I violate the terms or conditions of this RELEASE and/or the notice letter, my severance payments will cease and/or be due and owing to JPMC.

I agree that if any of the provisions contained in this RELEASE are declared illegal, unenforceable or ineffective by a legal forum of competent jurisdiction, such provisions shall be deemed severable, such that all other provisions shall remain valid and binding upon both parties; provided, however, that, notwithstanding this or any other provision of this RELEASE, if any portion of the waiver or release of claims or rights or the non-publicity or confidentiality terms entered into between the parties is held to be unenforceable, RELEASEES, at their option, may seek modification or severance of such portion and/or terminate the RELEASE and/or consider the RELEASE null and void. I further agree that the entire agreement between me and RELEASEES is set forth herein* and supercedes any prior agreements or understandings between the parties.

*and in the notice letter.

MK

3

I understand and agree that a) I have until April 16, 2004 to sign and return this RELEASE to Patricia Jeffers, Senior Vice President, Human Resources, 4 Chase MetroTech Center, 23rd Floor, Brooklyn, NY 11245; and b) RELEASEES will make a payment in the amount of Twenty Five Thousand Dollars and Zero Cents ($25,000.00) to Cole, Schotz, Meisel, Forman & Leonard which represents attorneys' fees, for which a form 1099-MISC will be issued to Cole, Schotz, Meisel, Forman & Leonard (whose EIN number is 22-2113414) for the payment received under this paragraph. This payment will be made on or by May 15, 2004.

I hereby certify that I have read the terms of this RELEASE, that I have been advised to discuss the RELEASE with an attorney of my choosing, and that I understand the terms and effects of this RELEASE. I hereby execute this RELEASE knowingly and voluntarily. Neither JPMC nor its agents or representatives have made, and I am not relying upon, any representations to me concerning the terms or effects of this RELEASE other than those contained herein. I have been afforded twenty one (21) days to consider signing this RELEASE and understand that I may change my mind and revoke the RELEASE within seven (7) days of signing it by delivering written notification of my intent to revoke to Patricia Jeffers, Senior Vice President, Human Resources, 4 Chase MetroTech Center, 23rd Floor, Brooklyn, NY 11245 via certified mail/return receipt requested (or by overnight courier or facsimile) within that seven day period.

Intending to be legally bound, I, Michael P. Keady, hereby execute the foregoing RELEASE this _16_ day of _April_, 2004.

_____
Michael P. Keady

STATE OF _New Jersey_ )
                                    ) ss.:
COUNTY OF _Bergen_ )

On this _16th_ day of _April_, 2004, before me personally came Michael P. Keady, known to me to be the individual described herein, and who executed the foregoing RELEASE, and duly acknowledged to me that he executed the same.

_____
Notary Public

WENDY M. ZOPPA
A Notary Public of New Jersey
My Commission Expires August 10, 2005

4

# Exhibit B

Draft of August 19, 2002

STOCK PURCHASE AGREEMENT

BY AND AMONG

JPMORGAN CHASE BANK,

AS BUYER

AND

THE SHAREHOLDERS OF

PLEXUS GROUP, INC.,

THE TRUSTEE OF THE PLEXUS GROUP EMPLOYEE STOCK OWNERSHIP PLAN,

AS THE SELLERS OF SHARES IN PLEXUS GROUP, INC.

AND

PLEXUS GROUP, INC.

DATED as of August *19* , 2002

# TABLE OF CONTENTS

I. DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   1.1 Certain Defined Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   1.2 Rules of Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II. PURCHASE AND SALE;CERTAIN OTHER PAYMENTS . . . . . . . . . . . . . . . . . . 6
   2.1 Purchase and Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   2.2 Subsequent Purchase Price Payment . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   2.3 Incentive Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   2.4 Procedures for Determining Subsequent Payments and Incentive Payments;
       Certain Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   2.5 Loan Repayment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   2.6 Retention Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   2.7 Certain Adjustments to Subsequent Payments, Incentive Payments [and
       Employee Incentive Payments] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

  2.8 Escrow Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

  2.9 Trust Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    III CLOSING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   3.1 Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   3.2 Purchase Price Allocation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   3.3 Settlement of Subsequent Payments and Incentive Payments . . . . . . . . . . . . 12
   3.4 Documents, Schedules and Certificates . . . . . . . . . . . . . . . . . . . . . . . . 13

IV. REPRESENTATIONS AND WARRANTIES OF SELLERS, THE ESOP TRUSTEE
   AND COMPANY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   4.1 Organization and Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   4.2 Current Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   4.3 Consents and Approvals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   4.4 Capitalization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   4.5 Ownership of Shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   4.6 Subsidiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   4.7 Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   4.8 Absence of Certain Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   4.9 No Undisclosed Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   4.10 Material Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
   4.11 Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
   4.12 Licenses and Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
   4.13 Compliance with Applicable Law, Orders, and Client Agreements . . . . . . . . . 19
   4.14 Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
   4.15 Intellectual Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

272152:v09

4.16 Finders' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
4.17 Employees and Benefit Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
4.18 Environmental Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
4.19 Clients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
4.20 Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
4.21 Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
4.22 Files Complete . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
4.23 Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

4.24 Registered Investment Adviser Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

V. BUYER'S REPRESENTATIONS AND WARRANTIES . . . . . . . . . . . . . . . . . . . . . . 25
5.1 Organization and Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
5.2 Current Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
5.3 Consents and Approvals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
5.4 Litigation and Regulatory Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . 26
5.5 Finders' Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

VI ADDITIONAL AGREEMENTS OF SELLERS . . . . . . . . . . . . . . . . . . . . . . . . . . 26
6.1 Conduct of the Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
6.2 Compliance with Law; Client Agreements . . . . . . . . . . . . . . . . . . . . . . . . 28
6.3 No Shop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
6.4 Access to Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
6.5 Communications with Clients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
6.6 Dividends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
6.7 Run-off Insurance Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

VII ADDITIONAL AGREEMENTS OF BUYER . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
7.1 Clients of the Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
7.2 Technology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
7.3 Corporate Headquarters, Relocation of Other Offices . . . . . . . . . . . . . . . . . . 30

VIII. AGREEMENTS OF BUYER, COMPANY, THE ESOP TRUSTEE AND
SELLERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
8.1 Notices of Certain Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
8.2 Commercially Reasonable Efforts; Further Assurances . . . . . . . . . . . . . . . . . 32
8.3 Certain Filings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
8.4 Confidentiality; Public Announcements . . . . . . . . . . . . . . . . . . . . . . . . . . 32
8.5 Certain ESOP Related Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

IX. TAXES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
9.1 Sellers' and the Company's Representations and Warranties Regarding Tax
Returns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

9.2  Seller's and the Company's Other Tax Representations and Warranties ...... 34

9.3  Tax Obligations of Buyer and Sellers ............................... 36

X    EMPLOYEES OF THE BUSINESS ................................... 37

10.1  Retention of Employees ...................................... 37

10.2  Employee Benefits .......................................... 38

XI   CONDITIONS OF CLOSING ...................................... 39

11.1  Conditions to Obligations of Buyer and Seller ...................... 39

11.2  Conditions to Obligations of Buyer ............................. 39

11.3  Conditions to Obligations of Seller and the ESOP ................... 41

XII. SURVIVAL; INDEMNIFICATION ................................. 42

12.1  Survival ................................................. 42

12.2  Indemnification ............................................ 43

12.3  Procedures ............................................... 43

12.4  Limitation of Liability ...................................... 44

12.5  Treatment of Indemnification Payments .......................... 45

XIII. TERMINATION ............................................... 45

13.1  Grounds for Termination ..................................... 45

13.2  Effect of Termination ....................................... 45

XIV. MISCELLANEOUS ............................................ 46

14.1  Notices .................................................. 46

14.2  [Section reserved ............................................ 47

14.3  Amendments and Waivers .................................... 47

14.4  Expenses ................................................. 47

14.5  Successors and Assigns ...................................... 47

14.6  Governing Law ............................................ 48

14.7  Jurisdiction ............................................... 48

14.8  Waiver of Jury Trial ........................................ 48

14.9  Counterparts; Third-Party Beneficiaries .......................... 48

14.10  Entire Agreement .......................................... 48

14.11  Captions ................................................. 48

14.12  Continuing Cooperation ..................................... 49

272152v9

# STOCK PURCHASE AGREEMENT

This Agreement, dated as of August _17_, 2002, is by and among **JP Morgan Chase Bank**, a New York banking corporation (**"Buyer"**) having its principal place of business in New York, New York, **Plexus Group, Inc.**, a California corporation (the **"Company"**) having its principal place of business at 11150 Olympic Boulevard, Los Angeles, California, the shareholders of the Company (such shareholders collectively, **"Sellers"**), and the **ESOP Trustee** (as hereinafter defined).

In consideration of the mutual promises set forth in this Agreement, Buyer and Sellers and the ESOP Trustee agree as follows:

## ARTICLE I:    DEFINITIONS

### 1.1.  Certain Defined Terms.

The following terms appearing in this Agreement are used as defined below.

**"Action"** means any action, complaint, investigation, petition, suit, arbitration or other proceeding, whether civil or criminal, at law or in equity, which is commenced, conducted or heard by or before any arbitrator, court, administrative agency or other Governmental Entity as well as any third-party claim however characterized, charge, attorney letter, or complaint letter.

**"Advisers Act"** has the meaning set forth in Section 4.24 of this Agreement.

**"Advisory Client"** has the meaning set forth in Section 4.24 of this Agreement.

**"Affiliate"** means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person.

**"Agreement"** means this Stock Purchase Agreement, including the schedules and exhibits hereto.

**"Applicable Law"** means any statute, whether federal, state, provincial or local, treaty, any other law, rule, regulation or formal interpretive letter of any Governmental Entity, any applicable common law and any Order, applicable in the United States or any other nation.

**"Business"** means the business of analyzing the costs of executing securities trades against certain standards and benchmarks employed by the Company and reporting such analysis to Clients.

**"Business Day"** means any day other than a Saturday, Sunday or legal holiday observed by the Federal Reserve Bank of New York.

**"Claim"** has the meaning set forth in Section 12.3 of this Agreement.

"**Class A Stock**" means shares of the Class A Common Stock of the Company without par value.

"**Class B Initial Payment**" has the meaning set forth in Section 2.1(b) of this Agreement.

"**Class B Stock**" means shares of the Class B Common Stock of the Company without par value.

"**Class A Shareholders**" means those Persons holding shares of Class A Stock immediately prior to the Closing Time.

"**Class B Shareholders**" means those Persons holding shares of Class B Stock immediately prior to the Closing Time.

"**Client**" means any Person using the services of the Company in connection with the Business at or before Closing or who has agreed in writing at any time prior to the Closing to use such services.

"**Client Agreement**" means a contract, agreement, instrument, arrangement or other understanding entered into by the Company with any Client pursuant to which the Client agrees to use the services of the Company in connection with the Business.

"**Client Consent**" has the meaning set forth in Section 4.24 of this Agreement.

"**Closing**" has the meaning set forth in Section 3.1(a) of this Agreement.

"**Closing Balance Sheet**" shall mean a balance sheet for the Company prepared in accordance with GAAP ( subject to the GAAP Exceptions) reflecting the financial position of the Company as of the Closing Date.

"**Closing Date**" means the date of the Closing, as defined in Section 3.1(a).

"**Closing Time**" means 12:01 AM on the Closing Date.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" means Plexus Group, Inc.

"**Employees**" means all officers and employees of the Company.

"**Employee Benefit Plan**" means any "employee benefit plan", as defined in Section 3(3) of ERISA, that (i) is subject to any provision of ERISA, (ii) is maintained, administered or contributed to by the Company, (iii) covers any Employee or former Employee of the Company and (iv) is set forth on <u>Schedule-Employee Benefit Plan</u>.

"**Environmental Laws**" means any and all federal, state, provincial and local statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, codes, plans, injunction, permits, franchises, licenses and governmental restrictions applicable in the United States or any other nation relating to the environment, the effect of the environment on human health, emissions, discharges or releases of hazardous materials into the environment, including, without limitation, ambient air, surface water, ground water, or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of hazardous materials or the clean-up or other remediation thereof.

"**Environmental Liabilities**" means any and all liabilities arising in connection with or relating to the Business or to the ownership, lease or use of properties and assets by the Company, which arise under or relate to the violation of Environmental Laws.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Escrow Account**" has the meaning set forth in Section 2.8 to this Agreement.

"**ESOP**" means the employee stock ownership plan operated by the Company for the benefit of the Employees as well as the trust holding the plan's assets.

"**ESOP Loan Repayment**" has the meaning set forth in Section 2.5 to this Agreement.

"**ESOP Payment**" has the meaning set forth in Section 2.1(b) to this Agreement.

"**ESOP Submissions**" has the meaning set forth in Section 2.1(c) of this Agreement.

"**ESOP Trustee**" means Alan M. Weissman, and any successor trustee. The "ESOP Trustee" is expressly excluded from the defined term "Sellers".

"**Financial Statements**" means the consolidated balance sheet of the Company as of June 30, 2002 prepared in accordance with GAAP, subject to the GAAP Exceptions.

"**GAAP**" means generally accepted accounting principles consistently applied as used in the United States of America as in effect on the date of this Agreement.

"**GAAP Exceptions**" means those certain exceptions to GAAP principles set forth on **Schedule–GAAP Exceptions** hereto.

"**Governmental Entity**" means any government or any agency, bureau, board, commission, court, department, ministry, official, political subdivision, taxing authority, tribunal, self regulatory organization, or other instrumentality of any government having authority in the United States or any other nation, whether federal, state, provincial, or local.

"**Inactive Employee**" means any Employee who, at or as of the Closing Date, is not actively at work (other than those who are on vacation) due to an approved medical, family, military or personal leave under the policies of the Company including, without limitation, any

Employee who is (1) receiving long-term disability benefits and (2) identified as an Inactive Employee on <u>Schedule - Employees</u>.

"**Incentive Payee**" has the meaning set forth in Section 2.3 to this Agreement.

"**Incentive Payment**" has the meaning set forth in Section 2.3 to this Agreement.

"**Incentive Payment Letter**" has the meaning set forth in Section 2.3 of this Agreement.

"**Incentive Revenue Percentage Achieved**" has the meaning set forth in Section 2.4 of this Agreement.

"**Incentive Revenue Target**" has the meaning set forth in Section 2.3 of this Agreement.

"**Initial Payment**" has the meaning set forth in Section 2.1(b) of this Agreement.

"**Indemnified Party**" has the meaning set forth in Section 12.3 of this Agreement.

"**Indemnifying Party**" has the meaning set forth in Section 12.3 of this Agreement.

"**Indemnity Cap**" has the meaning set forth in Section 12.4 of this Agreement.

"**Intellectual Property Right**" means any trademark, service mark, trade name, mask work, logo, invention, patent, trade secret, copyright, know-how (including any registrations or applications for registration of any of the foregoing) or any other similar type of proprietary intellectual property right, which in each case is used by the Company in the Business or held or being developed by the Company for use in the Business.

"**Investment Company**" has the meaning set forth in Section 4.24 of this Agreement.

"**Knowledge of Sellers**," "**Sellers' Knowledge**" or any other similar knowledge qualification in this Agreement applicable to Sellers means the actual knowledge of any officer of the Company or of any Seller. For purposes of this definition, a Seller or an officer of the Company shall be deemed to have actual knowledge of facts that would normally come to the attention of such officer or Seller in the course of the Company's usual management reporting practices.

"**Leases**" has the meaning set forth in Section 4.23 of this Agreement.

"**Lien**" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such property or asset.

"**Loss**" means any liability, loss, cost, damage, judgment, award, penalty, fine, obligation or expense of any kind whatsoever (including, without limitation, reasonable attorneys', accountants', consultants' or experts' fees and disbursements).

272152v9

"**LTD Policy**" has the meaning set forth in Section 10.2 of this Agreement.

"**Material Adverse Effect**" means a material adverse effect on the Business or the business, assets, results of operations, prospects, financial condition, or operations of the Company, taken as a whole, other than any such effect resulting from or arising in connection with, changes or conditions affecting the businesses similar to the Business generally or changes in economic, regulatory or political conditions generally.

"**Order**" means any decree, injunction, judgment, order, ruling, or writ of any Governmental Entity and any award of any arbitrator.

"**Permitted Liens**" has the meaning set forth in Section 4.14(e) of this Agreement.

"**Permitted Purpose**" means the purpose of completing the transactions contemplated by this Agreement.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"**Purchase Price**" has the meaning set forth in Section 2.1(a) to this Agreement.

"**Regulatory Action**" means any cease and desist order, written agreement, memorandum of understanding, consent agreement, commitment letter or similar undertaking with any Governmental Entity, any order, directive or extraordinary supervisory letter issued or sent by any Governmental Entity, and any board resolutions adopted at the request of any Governmental Entity.

"**Required Regulatory Approvals**" shall mean all governmental approvals required for Sellers, the ESOP Trustee and Buyer to consummate the transactions set forth in this Agreement, whether required by the New York State Banking Department, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Securities and Exchange Commission or any other regulatory authority with supervisory authority, state, federal or local, over Buyer, the Company, the ESOP Trustee or Sellers.

"**Retention Account**" has the meaning set forth in Section 2.4 of this Agreement.

"**Retention Date**" has the meaning set forth in Section 2.6(a) of this Agreement.

"**Retention Payment**" has the meaning set forth in Section 2.6(a) of this Agreement.

"**Revenue Percentage Achieved**" has the meaning set forth in Section 2.4(b) of this Agreement.

"**Revenue Targets**" has the meaning set forth in Section 2.2(a) of this Agreement.

"Rules of Conduct" has the meaning set forth in Section 2.6(b) of this Agreement.

"SEC" has the meaning set forth in Section 4.24 of this Agreement.

"Sellers' Representative" has the meaning set forth in Section 2.8 of this Agreement.

"Shares" means, collectively, shares of the Class A Stock and the Class B Stock.

"Special Retention Payment" has the meaning set forth in Section 2.6 of this Agreement.

"Straddle Period" has the meaning set forth in Section 9.3 of this Agreement.

"Subsequent Payment" has the meaning set forth in Section 2.2(a) of this Agreement.

"such Employee" has the meaning set forth in Section 4.11(a) of this Agreement.

"Taxes" means any taxes of any kind, including but not limited to, those on or measured by or with reference to income, gross receipts, capital, sales, use, *ad valorem*, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, value added, property or windfall profits taxes, customs duties, or similar fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax, or additional amounts imposed by any governmental authority, domestic or foreign.

"Tax Return" means any return, report or statement required to be filed with any government authority with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"Third Party Claim" has the meaning set forth in Section 12.3(b) of this Agreement.

"Transferred Employees" has the meaning set forth in Section 10.1(b) of this Agreement.

"Trust Account" has the meaning set forth in Section 2.9 of this Agreement.

"VCP" has the meaning set forth in Section 2.1 of this Agreement.

1.2. **Rules of Construction.**  To the extent that any accounting terms used in this Agreement are not defined in Section 1.1 of this Agreement, they shall be defined under definitions found in GAAP consistently applied.  The term "and" shall also mean "and/or" unless the context indicates to the contrary.  The term "including" shall also mean "including without limitation" unless the context indicates to the contrary.  Terms used in a gender shall also mean the other gender or no gender at all.  The definition of a term expressed in the singular also applies to that term as used in the plural in this Agreement and vice versa.

## ARTICLE II: PURCHASE AND SALE; CERTAIN OTHER PAYMENTS

## 2.1. Purchase and Sale.

(a)     Upon the terms and subject to the conditions of this Agreement, the Class B Shareholders and the ESOP Trustee on behalf of the ESOP each agree to sell to Buyer the Shares held by them free and clear of all Liens. The aggregate purchase price for the Shares (the "**Purchase Price**") shall be equal to the sum of the Initial Payment (which for this purpose shall include the Holdback Amount (as hereinafter defined)), the Subsequent Payments and the ESOP Loan Repayment, and shall be paid as follows:

(b)     An initial payment (the "**Initial Payment**") of $10,000,000, shall be paid at Closing to the Sellers and the ESOP, subject to the provisions of Section 2.8 and Section 2.9 hereof as follows:

    (i)     a payment of $5,430,316 in the aggregate to Sellers (the "**Class B Initial Payment**");

    (ii)     a payment made in accordance with Section 2.9 hereof of $4,569,684 to the ESOP Trustee (the "**Class A Share Payment**"), and

    (iii)     a payment made in accordance with Section 2.5 and Section 2.9 hereof of $2,502,546.21 (the "**ESOP Loan Repayment**").

(c)     The Company with the agreement of the Sellers and the ESOP Trustee submitted prior to the date hereof a request with the Internal Revenue Service ("**IRS**") seeking a Private Letter Ruling with regard to the conduct of the ESOP. The Company has also submitted to the IRS as part of a Federal voluntary compliance program ("**VCP**") certain documents with regard to the treatment of certain acts and omissions relating to the administration and operation of the ESOP. Within fifteen (15) days of the date of this Agreement the Company will submit to the United States Department of Labor ("**DOL**") comparable documents as part of the same voluntary compliance program. The documents submitted to the IRS and the DOL as part of said voluntary compliance programs are referred to herein collectively as the "**ESOP Submissions**". Buyer has retained from the Class B Initial Payment One Million Three Hundred Thousand Dollars ($1,300,000) (the "**Holdback Amount**") which Holdback Amount shall be paid into the Escrow Account (as hereinafter defined) on the Closing Date and shall be payable to the Class B Shareholder at such time as the IRS and the DOL have each reached a final determination as to what, if any liability, the Company has in connection with the ESOP less all amounts, if any, paid or to be paid by the Company, the ESOP or the ESOP Trustee with regard to the conduct of the ESOP to, or at the direction of, the IRS, DOL or any other regulatory agency, together with any costs and expenses related to the ESOP Submissions and the actions taken by the Company in connection with the ESOP Submissions including the costs and expenses of counsel to the ESOP Trustee, counsel to the Company and counsel to the Buyer, the substitute administrator and accountants.

The Holdback Amount shall be held in the Escrow Account described in Section 2.8 hereof. At such time as such determinations have been made the Buyer shall

272152v9

promptly implement the procedures set forth in the Escrow Agreement to cause the release from escrow and the payment to the Class B Shareholders of an amount equal to the Holdback Amount reduced by the amounts set forth in the prior paragraph subject to the terms of the Escrow Agreement.

**2.2** **Subsequent Purchase Price Payment**.

(a)    Subject to this Article II, Buyer will make additional payments to the Class B Shareholders (each, a "Subsequent Payment") for each of the twelve-month periods ending, December 31, 2003, December 31, 2004, and December 31, 2005, conditioned upon the achievement of certain cumulative revenue targets (collectively, the "Revenue Targets"). The Revenue Targets and the maximum amount of such Subsequent Payments, together with the methodology used to determine such payments are set forth on **Schedule – Subsequent Payments** hereto.

(b)    Should the Company achieve at least eighty percent (80%) of the Revenue Target specified on **Schedule – Subsequent Payments** above by December 31 of the applicable year, Buyer shall in each instance pay to each Class B Shareholder an amount determined pursuant to Section 2.4.

(c)    Notwithstanding the foregoing in this Section 2.2, if by December 31, 2005, the Company has for the period commencing on the day next following the Closing Date through and including December 31, 2005 earned cumulative revenue that equals or exceeds $43,077,000, each Class B Shareholder shall be entitled to receive his or her Percentage Share (as such term is defined in Section 2.4) of the difference between the aggregate Subsequent Payments paid during such three-year period and $3,600,000.

**2.3**    **Incentive Payments**. (a) Those Class B Shareholders whose names are set forth on **Schedule – Incentive Plan Payees** (each, an "Incentive Payee") shall be entitled to share in certain incentive payments (each, an "Incentive Payment") if certain cumulative revenue targets (each, an "Incentive Revenue Target") are achieved by December 31, 2006 and December 31, 2007. The maximum amount of such Incentive Payments and the Incentive Revenue Targets, together with the methodology used to determine such payments are set forth on **Schedule – Incentive Payments** hereto.

(b)    Should the Company achieve at least eighty percent (80%) of the Incentive Revenue Target specified on **Schedule –Incentive Payments** by December 31 of the applicable year, Buyer shall in each instance pay to each Incentive Payee an amount determined in the manner set forth on **Schedule – Incentive Payments** and in a letter to each Incentive Payee from the Company (each, an "Incentive Payment Letter ").

(c)    Notwithstanding the foregoing in this Section 2.3, if by December 31, 2007, the Company has for the period commencing on the day next following the Closing Date through and including December 31, 2007 earned cumulative revenue that equals or exceeds $94,609 ,000, each Incentive Payee shall be entitled to receive his or her Percentage Share of the difference between the aggregate Incentive Payments, if any, paid for the period ending December 31, 2006 and the Percentage Share of the maximum Incentive Payment.

**2.4   Procedures for Determining Subsequent Payments and Incentive Payments; Certain Restrictions.** (a) No Subsequent Payment or Incentive Payment shall be made for any year where the cumulative revenue of the Company is not equal in amount to at least eighty percent (80%) of the applicable Revenue Target or Incentive Revenue Target, as the case maybe.

(b)    If the Company achieves at least eighty (80%) percent of the Revenue Target set forth on **Schedule-Subsequent Payments** in any applicable year, the Class B Shareholders shall be entitled to receive in the aggregate an amount obtained by multiplying the applicable Subsequent Payment for that year by the Revenue Percentage achieved. For purposes of this Section, "**Revenue Percentage achieved**" shall mean the percentage obtained by dividing the cumulative revenues achieved for such year by the Revenue Target for such year determined in accordance with GAAP subject to the GAAP Exceptions.

(c)    If the Company achieves at least eighty percent (80%) of the Incentive Revenue Target set forth in Section 2.2, Incentive Payees shall be entitled to receive in the aggregate an amount obtained by multiplying the applicable Incentive Payment for such year by the Incentive Revenue Percentage achieved. For purposes of this Section, "**Incentive Revenue Percentage achieved**" shall mean the percentage obtained by dividing the cumulative revenues achieved for such year by the Incentive Revenue Target for such year as determined in accordance with GAAP subject to the GAAP Exceptions.

(d)    Each Class B Shareholder's share of the Subsequent Payments shall be determined by multiplying the amount of such Subsequent Payment by the percentage set forth opposite such Class B Shareholder's name on the **Schedule – Percentage Share** attached hereto (each, a "**Percentage Share**").

(e)    Each Incentive Payee's share of any Incentive Payment shall be determined by multiplying the amount of such Incentive Payment by the percentage set forth in such Incentive Payee's Incentive Payment Letter, each an "**Incentive Percentage Share**".

(f)    Notwithstanding the foregoing, in each instance where a Subsequent Payment or Incentive Payment is payable hereunder, Buyer shall pay to each Class B Shareholder and Incentive Payee an amount equal to eighty percent (80%) of the Subsequent Payment or Incentive Payment, as the case may be, as determined pursuant to Section 2.3(d) or Section 2.3(e) on the date such payment is due. Buyer shall deposit an amount equal to twenty percent (20%) of the payment earned for each such year in an account maintained with Buyer (the "**Retention Account**"), which amount shall be held by Buyer and paid by Buyer within thirty (30) days of the third anniversary of the Closing Date in the case of Subsequent Payments and within thirty (30) days of the fifth anniversary of the Closing Date in the case of Incentive Payments to the Class B Shareholders or the Incentive Payees, as the case may be.

**2.5    Loan Repayment.** In addition to the ESOP Payment, Buyer shall pay the ESOP Loan Repayment, subject to Section 2.9 hereof, to the ESOP on Closing upon the condition that the ESOP Trustee shall repay the Company all amounts loaned by the Company to the ESOP (the "**ESOP Loan**") upon the satisfaction of the conditions set forth in Section 2.9.

**2.6** **Retention Payment.** (a) Those Employees whose names are set forth on **Schedule – Retention Payment** who become Transferred Employees and who continue to be employees of the Company on December 31, 2005 (the **"Retention Date"**) shall each participate in a retention payment of $6,000,000 in the aggregate (the **"Retention Payment"**). A Retention Payment shall be paid to such Transferred Employees pursuant to the procedure set forth in **Schedule – Retention Payment**. Such Retention Payment shall not constitute a part of the Purchase Price.

(b) Should any Transferred Employee no longer be an employee of the Company on the Retention Date because such Transferred Employee voluntarily resigned, retired or has been terminated for cause, such Transferred Employee shall not be entitled to receive a Retention Payment. As used in this Agreement "for cause" shall mean a termination of employment of any Transferred Employee for a breach of the Worldwide Rules of Conduct (the **"Rules of Conduct"**) applicable to employees of Buyer, or because such Transferred Employee committed or caused to be committed any act or was responsible for any omission which act or omission constitutes gross negligence or willful misconduct. No Transferred Employee shall have his or her employment terminated by the Company for a breach of the Rules of Conduct if such breach would not have caused an employee of Buyer who was not a Transferred Employee to be terminated in like circumstances.

(c) Should any Transferred Employee no longer be an employee of the Company on the Retention Date due to the death of such Transferred Employee, or because of the disability of such Transferred Employee or the termination of such Transferred Employee other than for cause, such Transferred Employee shall (or in the case of death, the estate of such Transferred Employee) be entitled to receive a Retention Payment paid as provided for in Section 2.6(a).

**2.7** **Certain Adjustments to Subsequent Payments and Incentive Payments.** Notwithstanding the foregoing in this Article II, the Revenue Targets and the Incentive Revenue Targets may be adjusted on January 31, 2003, such adjustment to be made using the procedures set forth on **Schedule – Adjustments** hereto.

**2.8** **Escrow Account.** On the Closing Date, Buyer shall pay into an escrow account established by Buyers and Sellers (the **"Escrow Account"**) an amount equal to the Holdback Amount. The Escrow Account shall be governed by the terms of an escrow agreement (the **"Escrow Agreement"**) executed by Lawrence Cuneo, as representative of the Sellers (together with any successor, the **"Sellers' Representative"**), the Escrow agent (the **"Escrow Agent"**) and the Buyer. The Holdback Amount, less any amount to be deducted from it as provided for in Section 2.1(c), shall be released from the Escrow Account upon the joint written instruction of the Sellers' Representative and the Buyer delivered to the Escrow Agent in a manner called for in the Escrow Agreement. Should the Sellers' Representative and the Buyer be unable to reach agreement on instruction to the Escrow Agent with regard to the release of the Holdback Amount, the Escrow Agent shall not be required to release any such amounts until he receives a final order of the court of competent jurisdiction directing such release. The Escrow Agreement shall be in substantially the same form as the form of agreement annexed hereto as **Exhibit - Escrow Agreement**.

**2.9** **Trust Account**. On the Closing Date, Buyer shall deposit into an account in the name of the Trustee maintained with Buyer (the "**Trust Account**") an amount equal to the ESOP Loan Repayment and the Class A Share Payment. The Class A Share Payment together with the ESOP Loan Repayment collectively constitute the "**ESOP Related Payments**". The ESOP Trustee agrees that he will distribute promptly the funds held in the Trust Account only for the payment of the Class A Share Payment to the Class A Shareholders, and to make the ESOP Loan Repayment to the Company only after receipt of a final determination by the Relevant Agencies with regard to the ESOP Submissions and promptly after such receipt. The Trustee may maintain the ESOP Loan Repayment and the Class A Share Payment in sub-accounts within the Trust Account. The ESOP Trustee will also distribute any interest earned on such amounts while in the Trust Account at the same time as he makes the ESOP Loan Repayment and the Class A Share Payment to the Company and to the Class A Shareholders. Any instrument drawn on the Trust Account or any other written instruction relating to the Trust Account shall bear the signature of the ESOP Trustee and a representative of Buyer.

### ARTICLE III.  CLOSING

**3.1** **Closing**.

(a) The closing (the "**Closing**") of the purchase and sale of the Shares shall take place at the offices of Buyer, One Chase Manhattan Plaza, New York, New York, at 10:00 AM Eastern Time on [date], or at such other date, time or place as Buyer, the ESOP Trustee and Sellers shall agree.

(b) Each of the Class B Shareholders shall sell and deliver to Buyer, against receipt of payment of the Class B Initial Payment, certificates representing shares of the Class B Stock held by each, duly endorsed or accompanied by stock powers duly endorsed in blank, with any required transfer stamps affixed thereto, or other evidence of transfer in accordance with Applicable Law and otherwise in a form acceptable to Buyer.

(c) The ESOP Trustee shall sell and deliver to Buyer, against receipt of payment of the ESOP Related Payments in the Trust Account, certificates representing all of the shares of the Class A Stock held by the ESOP, duly endorsed or accompanied by stock powers duly endorsed in blank, with any required transfer stamps affixed thereto, or other evidence of transfer in accordance with Applicable Law and otherwise in a form acceptable to Buyer.

(d) The Shares shall, in each instance, be accompanied by such other documents as Buyer may reasonably request to evidence the transfer to Buyer of good and marketable title in and to the Shares, free and clear of all Liens.

(e) At the Closing, Buyer shall pay to Sellers the Class B Initial Payment and to the ESOP in the manner called for by Section 2.9 hereof, the ESOP Related Payments against receipt of certificates representing all of the shares of the Class A Stock and the shares of the Class B Stock respectively. The Class B Initial Payment and the ESOP Related Payments shall each be made in immediately available funds by wire transfer or credit thereof to an account of each Seller or to the Trust Account, as the case may be, designated by each Seller by notice to

Buyer, such notice to be given not later than two Business Days prior to the Closing Date (or if no account is designated, then such payments shall be made by certified or official bank check payable to the order of any Seller who does not make any such designation in such amount). All payments shall be made subject to any requirements as to Taxes, for which Sellers, or any of them, are liable.

(f)     The Holdback Amount shall be paid as provided in Sections 2.1(c) and the Escrow Agreement.

(g)     Upon receipt by the ESOP Trustee of the final determination on the ESOP Submission, the ESOP Trustee agrees to pay to the Company an amount equal to the ESOP Loan Repayment together with any interest earned on the amount of the ESOP Loan Repayment while such amount was in the Trust Account and shall pay to the Class A Shareholders the Class A Share Payment together with any interest earned while such amount was held in the Trust Account.

### 3.2.   Purchase Price Allocation.

Buyer and Sellers each acknowledge and agree that each intends that the purchase and sale of the Company be treated for all purposes (including tax and accounting) as a sale by Sellers of their interests in the Company in exchange for the Purchase Price paid to the Sellers. The parties further acknowledge and agree that they intend that the Purchase Price will be taxed as capital gain. All parties hereto agree to report the sale of the Company for all purposes in a manner consistent herewith and not to take any position for tax or financial reporting purposes that is inconsistent with this treatment.

### 3.3.   Settlement of Subsequent Payments and Incentive Payments.

(a)     Not later than fifteen Business Days following the end of the applicable twelve-month period described in Sections 2.2 and 2.3, Buyer shall deliver a proposed statement of cumulative revenue, together with supporting documentation reasonably satisfactory to the Class B Shareholders or the Incentive Payees, as the case may be, certified by an appropriate officer of Buyer, containing sufficient information to enable Class B Shareholders or the Incentive Payees, as the case may be, to verify the amount of the Subsequent Payment or Incentive Payment (if any) payable hereunder. Buyer agrees to make available to the Class B Shareholders or the Incentive Payees, as the case may be, all books, records and personnel as the Class B Shareholders or the Incentive Payees, as the case may be, may reasonably request in order to review any proposed statement of cumulative revenue.

(b)     The parties shall use their reasonable best efforts to agree promptly upon each statement of cumulative revenue. Any disagreements regarding any such statement shall be subject to the dispute resolution process set forth on **Exhibit – Dispute Resolution**.

(c)     Each Subsequent Payment and each Incentive Payment shall be paid within thirty (30) days after agreement upon or other settlement of the applicable statement of cumulative revenue. Subsequent Payments and Incentive Payments (together with all funds in the applicable Escrow Account) shall be made in immediately available funds by wire transfer or credit thereof to

an account of each Class B Shareholder with the bank designated by such Class B Shareholder or Incentive Payee, by notice to Buyer, not later than two (2) Business Days prior to the date of payment (or if not so designated, then by certified or official bank check payable to the order of those Class B Shareholders or Incentive Payees, as the case may be, not making such designation) in such amount.

### 3.4. Documents, Schedules and Certificates.

(a) At the Closing, Sellers, the ESOP Trustee and the Company shall deliver to Buyer the following:

(i) The Class B Shareholders shall deliver to Buyer certificates representing all of the existing and outstanding shares of the Class B Stock held by the Class B Shareholders, and

(ii) The ESOP Trustee shall deliver to Buyer certificates representing all of the issued and outstanding shares of the Class A Stock held in the ESOP.

(b) At the Closing, Buyer shall deliver to Sellers or deposit in the Trust Account or the Escrow Account, as the case may be:

(i) the Initial Payment;
(ii) the ESOP Related Payments;
(iii) the Holdback Amount
(iv) a receipt for the Class A shares; and
(v) a receipt for the Class B shares.

(c) In addition, the parties hereto shall provide all documentation called for in Article XII or that is reasonably required to establish compliance with the conditions set forth in this Section 3.4 or in such Article as a condition to Closing.

## ARTICLE IV: REPRESENTATIONS AND WARRANTIES OF SELLERS, THE ESOP TRUSTEE AND THE COMPANY

Each Seller and the Company makes the following representations and warranties as of the date of this Agreement and the ESOP Trustee, solely in his capacity as trustee, shall together with Seller and the Company make the representations and warranties set forth in Sections 4.2, 4.3, 4.5, 4.9 and 4.10(a)(viii).

### 4.1. Organization and Authority.

The Company is a corporation duly organized, validly existing, and in good standing under the laws of the State of California with full corporate power and corporate authority to conduct the Business as presently conducted. The Company is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where such qualification is

necessary, except for those jurisdictions where failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

## 4.2. Current Authority.

(a) The execution, delivery, and performance of this Agreement and the consummation by Sellers, the ESOP and the Company of the transactions contemplated by this Agreement has been duly authorized, in the case of the Company by all necessary corporate action by the Company, and, in the case of the ESOP all actions required to be taken by the ESOP Trustee have been duly authorized in accordance with the governing instruments of the ESOP. Upon execution and delivery by all parties hereto, this Agreement will constitute a valid and binding obligation of each of the Sellers, the ESOP and the Company, enforceable in accordance with its terms, subject to required approvals by Governmental Entities, conservatorship, receivership, other laws relating to creditors' rights, and a court's right under general principles of equity to refuse to direct specific performance.

(b) Subject to Sellers, the Company and the ESOP Trustee obtaining all Required Regulatory Approvals set forth on **Schedule-Approvals**, the performance of this Agreement by each Seller, the ESOP Trustee and the Company will not violate any Applicable Law or any material contract or instrument by which such Sellers or the ESOP is bound except for such violations which individually or in the aggregate, would not reasonably be expected to have any Material Adverse Effect or prevent the consummation of the transactions contemplated by this Agreement. Neither the Sellers nor the ESOP Trustee shall be responsible for obtaining any Required Regulatory Approval other than the approvals set forth on **Schedule-Approvals** to be obtained by it.

## 4.3. Consents and Approvals

Other than as set forth on **Schedule – Consents and Approvals**, no consent, approval, authorization or order of or filing, including, without limitation, any filing for a new license or registration (as the case may be), with any Governmental Entity is required to be obtained or accomplished by the Company or the ESOP in connection with the execution, delivery and performance by the Company, Sellers or the ESOP of the terms of this Agreement or the consummation by Sellers, the Company and the ESOP of the transactions contemplated by this Agreement.

## 4.4. Capitalization.

(a) The authorized capital stock of the Company consists of one hundred thousand (100,000) shares of Class A Stock and fifty thousand (50,000) shares of Class B Stock. As of the date of this Agreement there are twenty-four thousand three hundred twenty-six and forty-four thousandths (24,326.044) shares of Class A Stock and forty-five thousand nine hundred eighty (45,980) shares of Class B Stock issued and outstanding and such shares of Class A Stock and Class B Stock constitute all of the issued and outstanding Shares.

(b) All outstanding Shares of the Company have been duly authorized and validly issued and are fully paid and non-assessable and free of preemptive rights with no

personal liability attaching to the ownership thereof. Except as set forth on **Schedule - Shares**, there are no outstanding (i) Shares or voting securities of the Company other than Shares held by Sellers or the ESOP, (ii) securities of the Company convertible into or exchangeable for shares of capital stock or voting securities of the Company, or (iii) options or other rights to acquire from the Company, or other obligation of the Company to issue, any capital stock, voting securities or securities convertible into or exchangeable for capital stock or voting securities of the Company (the items in Sections 4.4(b)(i), 4.4(b)(ii) and 4.4(b)(iii) with respect to the Company being referred to collectively as the "**Company Securities**"). There are no outstanding obligations of the Company to repurchase, redeem or otherwise acquire any Company Securities.

### 4.5. Ownership of Shares.

Except as set forth in **Schedule – Share Ownership**, the ESOP and Sellers are the sole record and beneficial owners of the Shares and hold such Shares free and clear of any Lien, and will transfer and deliver to the Buyer at the Closing valid and marketable title to the Shares free and clear of any Liens. The stock transfer books of the Company do not contain any record of any lien or other restriction on the transfer of ownership of any Shares other than those set for on **Schedule – Share Ownership**.

### 4.6. Subsidiaries

The Company does not own any equity interest in any Person (other than interests in money market mutual funds held in the ordinary course of business for cash management purposes) or any right to acquire any such equity interest.

### 4.7. Financial Statements.

(a) The Financial Statements and the related consolidated statements of income, cash flows and changes in shareholder's equity for the year ended on June 30, 2002 fairly present, in all material respects, in conformity with GAAP subject to the GAAP Exceptions, the consolidated financial position of the Company as of June 30, 2002 and the consolidated results of operations and cash flows for the period then ended.

(b) The Company maintains its reserves for losses, if any, in accordance with its policies, as such policies were in effect on June 30, 2002. These policies conform in all material respects with GAAP subject to the GAAP Exceptions. These reserves, if any, are at a level that, in the opinion of Sellers and the Company, is adequate to provide for all known and reasonably expected losses and inherent risks in the operations of the Company and the Business.

### 4.8. Absence of Certain Changes.

Except as disclosed in **Schedule – Certain Changes**, since June 30, 2002 through the date of this Agreement, the Business has been conducted in the ordinary course consistent with past practice and there has not been:

(a) any event, occurrence or development that has had or would reasonably be expected to have a Material Adverse Effect;

(b)     any incurrence, assumption or guarantee by the Company of any indebtedness for borrowed money other than in the ordinary course of business consistent with past practice;

(c)     any making of any loan, advance or capital contributions to or investment in any Person;

(d)     any material transaction or commitment made, or any material contract or agreement entered into, by the Company relating to its assets or the Business other than transactions and commitments in the ordinary course of business consistent with past practice and those contemplated by this Agreement;

(e)     any material change in any method of accounting or accounting practice by the Company except for any such change required by reason of a concurrent change in GAAP subject to the GAAP Exceptions;

(f)     other than in the ordinary course of business consistent with past practice or pursuant to existing contractual commitments, any (i) employment, deferred compensation, severance, retirement or other similar agreement entered into with any director or Employee (or any amendment to any such existing agreement), (ii) grant of any severance or termination pay, bonus, commission, perquisite (such as company car allowances and club memberships) or stay bonus to any director, or Employee, or (iii) material change in compensation or other benefits payable to any director, or Employee including, but not limited to changes pursuant to any severance or retirement plans or policies thereof ;

(g)     any creation or other incurrence of any Lien on any assets of the Company other than in the ordinary course of business consistent with past practice;

(h)     any damage, destruction or other casualty loss affecting the Company, or the Business which, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect;

(i)     any material modifications or amendments to any Client Agreement; or

(j)     any capital expenditure except in the ordinary course of business, consistent with past practice.

## 4.9.     No Undisclosed Liabilities.

(a)     The Company does not have any material liabilities of any kind relating to the Business that would be required to be reflected or reserved against in a balance sheet of the Company prepared in accordance with GAAP subject to the GAAP Exceptions, other than:

(i)     liabilities shown on the Financial Statement or disclosed in the notes thereto;

(ii)     liabilities as set forth in **Schedule - Liabilities** or expressly identified in any other Schedule hereto, as the case may be; and

(iii)     liabilities incurred since June 30, 2002, in the ordinary course of business consistent with past practice.

(b)     To Sellers' Knowledge there are not any material liabilities of any kind relating to the Business that are not required under GAAP subject to the GAAP Exceptions to be shown on the Financial Statements solely by reason of the contingent nature thereof or the difficulty of determining the amount thereof.

(c)     Other than the ESOP Loan, no inter-company liability exists between Sellers and the ESOP on the one hand and the Company on the other hand other than liabilities incurred in the ordinary course of business that are to be discharged prior to Closing. The representations and warranties of the ESOP Trustee made in this Subsection (c) are limited solely to circumstances where the ESOP is directly involved.

   4.10.   **Material Contracts**.

(a)     Except as disclosed in **Schedule – Material Contracts**, as of the date hereof, the Company is not a party to or bound by:

(i)     any lease or contract for personal property or services providing for annual rentals or charges of $50,000 or more that cannot be terminated on not more than sixty (60) days' notice without payment by the Company of any penalty greater than $50,000;

(ii)     any agreement for the purchase of materials, supplies, goods, services, equipment or other assets providing for either (A) annual payments by the Company of $50,000 or more or (B) aggregate payments by the Company of $100,000 or more, in each case that cannot be terminated on not more than 60 days' notice without payment by the Company of any penalty;

(iii)     any sales, distribution or other similar agreement providing for the sale by the Company of materials, supplies, goods, services, equipment or other assets that provides for annual payments to the Company of $50,000 or more (other than a Client Agreement);

(iv)     any partnership, joint venture, joint marketing, or other similar agreement or arrangement;

(v)     any agreement relating to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise);

(vi)     any agreement relating to indebtedness for borrowed money or the deferred purchase price of property (in either case, whether incurred, assumed, guaranteed, secured by any asset, or unsecured) in excess of $50,000 in aggregate principal amount (or base purchase price);

272152v9

(vii)  any agreement, covenant, or understanding that limits the freedom of the Company to compete in any line of business or with any Person or in any area or otherwise restricts the business activities of the Company;

(viii)  any agreement with any Seller or the ESOP or the ESOP Trustee or any entity owned or controlled directly or indirectly by a Seller or the ESOP or the ESOP Trustee (provided that any representation and warrantee of the ESOP Trustee is limited solely to those agreements to which the ESOP Trustee is a party); or

(ix)  any other material agreement, commitment, arrangement or plan not made in the ordinary course of business.

(b)  Each agreement, contract, plan, lease, arrangement or commitment required to be disclosed or scheduled pursuant to this Section 4.10 is a valid and binding agreement of the Company, and is in full force and effect, and neither the Company (nor to the Knowledge of Sellers) any other party thereto is in default or breach in any material respect under the terms of any such agreement, contract, plan, lease, arrangement or commitment.

### 4.11. Litigation.

(a)  Except as disclosed on **Schedule - Litigation**, as of the date hereof, there is no Order nor Action or Regulatory Action pending against or, to the Knowledge of Sellers or the Company threatened against or affecting the Company or any of its properties or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement or which, if decided adversely, would reasonably be expected to have a Material Adverse Effect. Except as listed on **Schedule - Litigation**, as of the date hereof, there is no Action or Regulatory Action pending, or unresolved, made by, or on behalf of, Employees, former Employees or putative Employees of the Company (collectively "**such Employees**") seeking relief against the Business, the Company, any Seller or their Employee Benefit Plans (including pension plans, compensation arrangements, and their trustee) or its officers and directors. As of the date hereof, there is no labor strike or other industrial action pending or, to the Sellers' Knowledge threatened which may affect the Business or any such Employees. As of the date hereof, no material claim, grievance, or tribunal proceeding related to any such Employees, is pending or, to Sellers' Knowledge, threatened with respect to any collective bargaining agreement or to any civil rights, or occupational safety or other employee benefit related or labor or employment law, regulation or ordinance.

(b)  As of the date hereof, **Schedule - Litigation** lists each material written complaint made by any Client or other Person that has been addressed or referred to the Company since January 1, 2000, together with a brief description of the nature of the complaint and its resolution.

(c)  As of the date hereof, no investigation or material inquiry by any Governmental Entity of the Company is now pending or has occurred (or to Sellers' Knowledge been contemplated) at any time since January 1, 2000, other than complaints set forth on

**Schedule - Litigation** as to which the Company has fully satisfied the Governmental Entity's concerns.

(d)     As of the date hereof, there is no Action or Regulatory Action pending against the Company or any Action pending against any such Seller such that such Seller would be entitled to indemnification from the Company.

(e)     There is no Order entered against the Company that is outstanding on the date hereof.

## 4.12.   Licenses and Permits.

**Schedule – Licenses and Permits** completely, correctly and accurately sets forth each material license, franchise, permit, registration or other similar authorization held by the Company (the **"Permits"**), together with the name of the government agency or entity issuing the Permits, the term and the expiration date of each such Permit.   Except as set forth on **Schedule – Licenses and Permits**, each of the Permits is valid and in full force and effect and shall remain in full force and effect upon and following the Closing and Buyer shall not be required to take any action after the Closing Date to keep such Permits in effect other than to renew the same prior to the expiration thereof.   The Permits include all licenses, franchises, permits, registrations or other similar authorizations necessary for the conduct of the Business as conducted on the date of this Agreement.

## 4.13.   Compliance with Applicable Law, Orders, and Client Agreements.

(a)     The Company currently is not, nor has it been at any time since January 1, 1999, in violation of Applicable Law in any material respect.

(b)     The Company is not currently, nor has it been at any time since January 1, 1999 a party to any Regulatory Action nor has it been requested to enter into any Regulatory Action and, to Sellers' Knowledge, no Governmental Entity is contemplating requesting or requiring the Company to enter into a Regulatory Action.

(c)     Except as set forth in **Schedule – Compliance** and in the ESOP Submission, (i) the Company has in all material respects conducted the Business and performed its duties, responsibilities and obligations with respect to each Client in accordance with, the terms of the applicable Client Agreements, Applicable Law, its usual practices, and reasonable and customary business practice, including, without limitation, performing its duties, and responsibilities; (ii) to Sellers' Knowledge, there is neither any material breach of any Client Agreement by any Client, nor any material dispute between the Company and any Client; and (iii) there are no accounts receivable or payable with respect to any Client Agreement that have been outstanding as of June 30, 2002 for more than sixty (60) days.

## 4.14.   Properties.

The Company has good and marketable title to, or in the case of leased or licensed property and assets and has valid and sufficient leasehold interests in (or license rights to), all

property and assets (whether real, personal, tangible or intangible) reflected on the Financial Statements, acquired after June 30, 2002, or otherwise used in the conduct of the Business, except for properties and assets sold since June 30, 2002 in the ordinary course of business consistent with past practice or (except in the case of owned real property and fixtures thereto) where the failure to have such good title or valid leasehold interests would not have a Material Adverse Effect. The property and assets reflected on the Financial Statements include all property and assets necessary to the conduct of the Business. None of such property or assets is subject to any Lien, except:

(a) Liens disclosed on **Schedule - Liens**;

(b) Liens disclosed on the Financial Statements or notes thereto or securing liabilities reflected on the Financial Statements or notes thereto;

(c) Liens for taxes, assessments and similar charges that are not yet due;

(d) mechanic's, materialman's, carrier's, repairer's and other similar Liens arising or incurred in the ordinary course of business or that are not yet due and payable and which have been fully reserved on the Financial Statement or the Closing Balance Sheet; or

(e) Liens incurred in the ordinary course of business which do not and will not materially impair the operation of the Business or the use of the property subject to the Lien (paragraphs (c)-(e) of this Section 4.14 are, collectively, the **"Permitted Liens"**).

**4.15. Intellectual Property.**

(a) The Company owns or has a legally valid right to use each of the items of Intellectual Property set forth on **Schedule – Intellectual Property** and the Intellectual Property Rights set forth on such schedule are all of the Intellectual Property Rights used by the Company in the conduct of the Business.

(b) The Company is not in default in any material respect under any license, sublicense or other agreement to which the Company is a party and pursuant to which any Person is authorized to use any Intellectual Property Right, and no such Intellectual Property Right will be adversely affected in any material respect by the consummation of the transactions contemplated by this Agreement.

(c) No Intellectual Property Right is subject to any outstanding judgment, injunction, order, decree or agreement restricting the use thereof by the Company or restricting the licensing thereof (other than agreements for the licensing of any Intellectual Property Right to the Company that do not restrict its use in the conduct of the Business by the Company as presently conducted).

(d) No Person has asserted directly, or indirectly, that any Intellectual Property infringes, or may infringe, any intellectual property rights of such Person now in effect or anticipated to arise including offers to license or cross-license such Person's intellectual property.

272152v9

**4.16. Finders' Fees**.

There is no investment banker, any broker, finder or other intermediary that has been retained by or is authorized to act on behalf of any Seller, the ESOP or the Company, or is entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

**4.17. Employees and Benefit Matters.**

(a) **Schedule – Employee Matters** sets forth a complete and accurate list of the Employees as of July 31, 2002 and provides the following information for each such Employee: name, date of hire, work location, department, position held, official title, retention or stay bonus, if any, current salary grade, current salary, 2001 annual bonus and/or sales commissions amounts, (if any), 2002 annual guaranteed bonus and/or sales commission targets and/or amounts (if any) and the Company's current intentions for such bonuses for 2002, overtime earned for 2001 and overtime earned for 2002, all vacation accrued and unused, social security number, and service date for employee benefit plan purposes. The Company shall provide to Buyer a complete and accurate list of all Inactive Employees as of July 31, 2002, and will indicate, to the extent known, the date on which each such Inactive Employee is expected to return to active employment.

(b) All Employees are employees "at will" whose employment is terminable without liability to the Company therefor (other than for benefits under the Company's applicable severance policy and other employee benefit plans and programs and benefits required to be provided under Applicable Law), except for Employees listed on **Schedule – Employee Matters**. The employment contracts with the Employees listed on **Schedule – Employee Matters** are in the form disclosed to Buyer on [date] and have not since that date been amended or modified and are all of the employment contracts to which the Company is a party. The Company has not received notification of any impediment to the employment of any Employee based on the results of fingerprinting or other testing nor do the Sellers have any Knowledge of any such impediment. Except as disclosed on **Schedule – Employee Matters**, all Employees are authorized to work in accordance with the Immigration and Reform Control Act ("IRCA"), and no Employee is employed by the Company under any employer-sponsored non-resident visa. None of the Employees is covered by any union, collective bargaining or similar agreement in connection with his or her employment with the Company, and to the best of Sellers' Knowledge, no labor union is attempting to organize the Employees. Except as set forth in **Schedule – Employee Matters**, there are no contracts, other agreements or offer letters providing for stay bonuses, sign on bonuses, commissions, compensation, special monetary or vacation awards, non-compete provisions or agreements with respect to the Employees.

(c) The Company has complied in all material respects with the requirements of Executive Order 11246, if applicable.

(d) Any notices required to be given by the Company pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") with respect to events occurring

prior to the Closing have been given or will be given by the time required in such law in order to comply therewith.

(e)    To Sellers' Knowledge no Employee has been convicted of any crime in any jurisdiction (except no representations are made with respect to certain convictions in California as to which inquiries by an employer are prohibited). No Employee has received an unsatisfactory performance evaluation or a written warning or is on corrective action or is under investigation.

(f)    **Schedule - Employee Benefits** includes a true and complete list of all Employee Benefit Plans. The Company has not incurred any material liability to the Pension Benefit Guaranty Corporation ("PBGC"). The Company and Sellers have made available to Buyer copies of all applicable plan documents with respect to the Employee Benefit Plans (or, if none, any formal description thereof) and all amendments thereto and any related trust agreements together with the most recent Annual Report (Form 5500 Series) and accompanying schedules. None of the Employee Benefit Plans are subject to Title IV of ERISA. Except as expressly set forth in the above-referenced documents provided to Buyer, or as required by Applicable Law, the Company has not nor will have any severance or other liability or obligation in connection with the termination of employment of any Employee.

(g)    Except as set forth on **Schedule-ESOP Exceptions**, each Employee Benefit Plan has been administered in all material respects in accordance with its terms and all Applicable Laws, rules and regulations. The Company has not (i) engaged in, nor is it a successor or parent corporation to an entity that has engaged in, a transaction described in Sections 4069 or 4212(c) of ERISA; (ii) incurred, prior to the Closing Date, (A) any liability under Title IV of ERISA arising in connection with the termination of, or a complete or partial withdrawal from, any plan covered or previously covered by Title IV of ERISA, or (B) any accumulated funding deficiency or similar liability under Sections 412 or 4971 of the Code that in either case of (A) or (B) could become a liability of Buyer or any of its ERISA Affiliates after the Closing Date; or (iii) engaged in any nonexempt prohibited transaction (as such term is used in Section 4975 of the Code and Section 406 of ERISA) with respect to the Employee Benefit Plans.

(h)    Except as set forth on **Schedule-ESOP Exceptions**, since the date of the establishment of any Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code, there has been no event that would adversely affect such qualification. There has been no event since the date of establishment of each trust created under any such Plan that is intended to be exempt from tax under Section 501(a) of the Code there have been no events that would adversely affect such exemption.

(i)    The Company does not have any current or projected liability in respect of post-employment or post-retirement health or medical or life insurance benefits for retired, former or current Employees of the Company, except as required to avoid excise tax under Section 4980B of the Code.

272152v9

### 4.18. Environmental Matters.

There are no Environmental Liabilities.

### 4.19. Clients.

(a)    **Schedule – Client Agreements** contains a complete list of each Client Agreement, including the following information: (i) address, (ii) phone number, (iii) name of key contact and title, (iv) a description of any oral understanding which comprises any part of the Client Agreement, and (v) a description of any noncompete provisions that might materially adversely affect the Company's business post-Closing (as it is currently being conducted).

(b)    Except as described on **Schedule – Client Agreements**, no Client Agreement would subject the Company to any liability arising out of its acts or omissions or the acts or omissions of the Company's agents except to the extent that such acts or omissions are caused by the negligence or misconduct of the Company.

(c)    The Company nor any Seller has received notice from any Person (and Sellers do not otherwise have any Knowledge) that any Client Agreement has been or is to be terminated or that future business under any Client Agreement is likely to be substantially reduced, except as set forth on **Schedule – Client Agreements**

(d)    **Schedule – Client Agreements** lists all new Clients of the Business since January 1, 2002.

(e)    **Schedule – Client Agreements** lists consolidated revenue earned by the Company for the period January 1, 2002 through June 30, 2002 for each of the Clients listed therein.

(f)    Except as set forth on **Schedule – Client Agreements**, no Client Agreement contains any provision that would permit any Client or other Person to terminate or modify the terms of any Client Agreement because of any change of control of the Company, however characterized.

### 4.20. Standards.

The Company maintains policies and procedures for the Business which substantially comply with Applicable Law and has implemented appropriate compliance procedures with respect to those policies and procedures. Sellers have made copies of such policies and procedures available to Buyer. Except as set forth in **Schedule - Standards**, no material breach of any of these policies and procedures has been discovered or noted since January 1, 2002.

### 4.21. Insurance.

The Company maintains insurance and indemnity bonds providing coverage for the Company against all risks normally insured or bonded against by companies in similar lines of business as the Company. All such insurance policies and bonds, and the insurers party thereto,

are listed on **Schedule - Insurance**, and are blanket policies or bonds.  As of the date of this Agreement, each such insurance policy or bond is in full force and effect, and, as of the date of this Agreement, the Company has not received notice or any other indication from any insurer or agent of any intent to cancel any such insurance policy or bond.

### 4.22.  Files Complete .

(a)   Except as set forth in **Schedule – Files and Records** to this Agreement, the Company maintains with respect to each Client, and can readily access, all Client Agreements and all material records and documentation, or copies thereof.

(b)    The Company maintains with respect to each of the Transferred Employees files maintained in accordance with Applicable Law and in the ordinary course of the Company's business.

### 4.23.  Leases.

Each lease or occupancy agreement to which the Company is a party is set forth on **Schedule-Leases** (collectively, the "Leases").  Except as set forth on **Schedule – Leases** the Company is not party to any leases or holds any other interest in any real property whether in connection with the operation of the Business or otherwise, nor does the Company hold any right, however characterized, to obtain any right in real property.  Each of the Leases set forth on **Schedule – Leases** is in full force and effect on the date hereof and there is no condition existing under any lease which with the giving of notice or passage of time or both would constitute a default under any lease.  No Lease, except as set forth on **Schedule - Leases**, contains any requirement that the prior consent of any lessor thereon is required because of any transaction contemplated by this Agreement, including a change of ownership or control of the Company, nor does any Lease contain any provision that permits any lessor thereon to terminate or otherwise change any provision of such Lease because of any such change in control.

### 4.24.  Registered Investment Adviser Activities.

(a)   The Company conducts activities of an investment adviser, as such term is defined in Section 202(a)(11) of the Investment Advisers Act of 1940, as amended ("**Advisers Act**"), and is registered with the Securities and Exchange Commission as an investment adviser.  Since December 31, 1997, the Company has made all filings with the Securities and Exchange Commission ("**SEC**") as required by the Investment Advisers Act (including all filings on Form ADV) and has been in full compliance with all laws applicable to it or its business as an investment adviser, except for any failures to file or comply which could not be reasonably expected to have, individually or the aggregate a Material Adverse Effect.

(b)   **Schedule-Advisory Clients** contains a list, as of August 1, 2002, of all clients for whom the Company provides investment advice (each an "**Advisory Client**").  The Company has provided to Buyer copies of each investment advisory agreement entered into between the Company and an Advisory Client, and the Company has substantially complied with all terms and conditions under each investment advisory agreement.

(c)     None of the Company or any person "associated" (as defined under the Advisers Act) with the Company has been convicted of any crime or has been subject to disqualification pursuant to Section 203(e) of the Advisers Act or subject to disqualification to serve as an investment adviser or as an associated person to an investment adviser, or subject to disqualification pursuant to Rule 206(4)-3 under the Advisers Act or subject to disqualification to serve as a broker-dealer under Section 15 of the Securities Exchange Act of 1934, as amended, or the subject of a rebuttable presumption pursuant to Rule 206(4)-4(b) under the Investment Advisers Act.  None of the Company or any "affiliated person," as defined under the Investment Company Act of 1940, as amended ("**Investment Company Act**"), thereof has been convicted of a crime or has been subject to disqualification as an investment adviser or subject to disqualification to serve in any other capacity contemplated by the Investment Company Act for any investment company under Sections 9(a) and 9(b) of the Investment Company Act during the ten-year period immediately preceding the date hereof.  There is no proceeding or investigation pending, or to the knowledge of the Company or the Sellers, threatened that would reasonably be expected to become the basis for any disqualification.

(d)     As soon as practical following the date hereof, the Company shall (a) inform each Advisory Client in writing of the transaction contemplated by this Agreement and (b) request the written consent or approval of the assignment or deemed assignment of the Advisory Client's investment advisory agreement (each a "**Client Consent**").  Sellers shall (A) use reasonable best efforts to keep Buyer informed of the status of obtaining each Client Consent and (B) deliver to Buyer prior to the Closing Date copies of all executed Client Consents and make available for inspection the originals of such Client Consents prior to the Closing Date.

## ARTICLE V.     BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer makes the following representations and warranties as of the date of this Agreement:

### 5.1.  Organization and Authority.

Buyer is a bank duly organized and validly existing under the laws of the State of New York.  Buyer is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where such qualification is necessary, except for those jurisdictions where failure to be so qualified would not, individually or in the aggregate, have a material adverse effect.

### 5.2.  Current Authority.

(a)     The execution, delivery, and performance of this Agreement and the consummation by Buyer of the transactions contemplated by this Agreement have been duly authorized by all necessary corporate action on the part of Buyer.  Upon execution and delivery by the parties hereto, this Agreement will constitute a valid and binding obligation of Buyer, enforceable in accordance with its terms, subject to required approvals by Governmental Entities, conservatorship, receivership, other laws relating to creditors' rights, and a court's right under general principles of equity to refuse to direct specific performance.

(b)     The performance of this Agreement by Buyer will not violate any Applicable Law or any material contract or instrument by which Buyer is bound except for such violations which, in the aggregate, would not reasonably be expected to have any Material Adverse Effect or prevent or have a material adverse effect on the consummation of the transactions contemplated by this Agreement.

### 5.3.   Consents and Approvals.

The execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the transactions contemplated by this Agreement requires no material action by or in respect of, or filing with, any Governmental Entity other than as set forth in Schedule – Consents and Approvals or otherwise required to continue the Permits following the Closing.

### 5.4.   Litigation and Regulatory Proceedings.

There are no Actions pending or (to Buyer's knowledge) threatened against or affecting Buyer which alone, or taken in the aggregate, challenge or seek to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement or which, if decided adversely, reasonably would be expected to have any material adverse effect upon the consummation of the transactions contemplated by this Agreement.  No governmental agency has notified Buyer that it would oppose or not approve or consent to the transactions contemplated by this Agreement.

### 5.5.   Finders' Fee.

There is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Buyer or that would otherwise be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

## ARTICLE VI:   ADDITIONAL AGREEMENTS OF SELLERS

### 6.1.   Conduct of the Company.

From the date of this Agreement until the Closing Date, Sellers shall cause the Company to conduct its business in the ordinary course consistent with past practice and to use its commercially reasonable best efforts to preserve intact its business organizations and relationships with third parties and to keep available the services of the present Employees. Without limiting the generality of the foregoing, from the date of this Agreement until the Closing Date, except as otherwise contemplated by this Agreement, Sellers will not permit the Company to do any of the following without the prior written approval of Buyer:

(a)     adopt any change in its certificate of incorporation or bylaws;

(b)     merge or consolidate with any other Person or acquire assets from any other Person (except for acquisitions of immaterial amounts of assets in the ordinary course of business, consistent with past practice);

(c)     sell, lease, license or otherwise dispose of any assets or property except (i) pursuant to existing contracts or commitments which are listed on **Schedule – Contracts and Commitments** or (ii) dispositions of immaterial amounts of assets or property in the ordinary course of business consistent with past practice;

(d)     increase or establish any bonus, pension, option, incentive or deferred compensation, retirement, death, profit sharing, or similar benefits of any Employee or promote any Employee, except in accordance with past practice (including annual increases in the ordinary course) or pursuant to existing contractual commitments (the Company to provide notice of increases in compensation to Buyer prior to Closing);

(e)     hire any new Employee with an annual base salary in excess of $50,000 other than in accordance with a personnel requisition approved by Buyer, terminate the employment of any Employee without cause, or substantially alter the duties and responsibilities of any Employee, (Sellers agree to notify Buyer if prior to the Closing any Employee gives notice of resignation or retirement or if Sellers or the Company gives a notice of termination or warning to an Employee) or enter a contract of employment with any existing Employee or new Employee or extend or modify any existing contract of employment;

(f)     place upon, or permit any lien or encumbrance upon, any of the assets of the Company except in the ordinary course of business, consistent with past practice;

(g)     terminate or materially amend or modify any existing Client Agreement, (other than by expiration or prepayment in accordance with its terms) or accept any additional business that varies materially from the Company's customary profitability standards;

(h)     terminate any lease or contract listed on either **Schedule – Contracts and Commitments** or **Schedule - Leases** to this Agreement;

(i)     release any material claim or waive any material rights relating to the Business;

(j)     knowingly solicit, entertain or undertake any negotiations, discussions or contact with any Person other than Buyer and Buyer's representatives with respect to the sale, transfer or other disposition of the Business, the Company, or a material portion of the assets of any of the foregoing, or any interest, whether legal, equitable, or beneficial, in the foregoing;

(k)     adjust, split, combine or reclassify any of the Shares other than adjustments to be made with regard to Class A Shares held by the ESOP in accordance with the terms of the ESOP; make, declare or pay any dividend or make any other distribution on, or directly or indirectly redeem, purchase or otherwise acquire, any Shares of any securities or obligations convertible into or exchangeable for any Shares; grant any stock appreciation rights

272152v9

or grant any individual, corporation or other entity any right to acquire any Shares or issue any additional Shares;

(l)     settle any claim, action or proceeding involving any liability of the Company for material money damages payable by the Company;

(m)     permit the Company to change its products and services in any material way from those in effect on the date of this Agreement;

(n)     make any changes to its tax or financial accounting policies except as may be required by Applicable Law or GAAP (subject to the GAAP Exceptions) as applicable;

(o)     make any capital investment or commitments in excess of $50,000 per month in the aggregate or incur any indebtedness for borrowed money, or assume, guarantee, endorse or otherwise as an accommodation become responsible for the obligations of any other Person (other than borrowings of thirty (30) days or less made at prevailing market rates and terms);

(p)     modify, amend, or reduce the amount or scope of coverage under any insurance policy available to the Company or the Business;

(q)     enter into, extend, modify, amend, or renew any contract or arrangement for exclusive or preferential dealing affecting the Business; or

(r)     agree or commit to do any of the foregoing.

### 6.2.     Compliance with Law; Client Agreements

From the date of this Agreement through the Closing Date, the Company will comply in all material respects with Applicable Laws relating to the Business and will comply with all obligations of the Company under the Client Agreements.

### 6.3     No Shop.

Sellers will, and will cause the Company to, promptly cease and cause to be terminated any existing discussions or negotiations with any Persons conducted heretofore with respect to any matter referred to in Section 6.1(j). Sellers shall notify Buyer promptly of any offer or inquiry that it receives from any third party with respect to any matter referred to in Section 6.1.

### 6.4.     Access to Information.

(a)     Subject to the requirements of Applicable Law and to Sections 6.4(c) and 8.4(b) below, from the date of this Agreement until the Closing Date, Sellers will (i) give, and will cause the Company to give, Buyer, its counsel, financial advisers, auditors and other authorized representatives reasonable access to the offices, properties, books and records of the Company, (ii) furnish, and will cause the Company to furnish, to Buyer, its counsel, financial advisers, auditors and other authorized representatives such financial and operating data and

other information relating to the Company as such Persons may reasonably request, and (iii) instruct the Employees, counsel and financial advisers of the Company to cooperate with Buyer in its investigation of the Company. Any investigation pursuant to this Section 6.4(a) shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of the Company.

(b)  Subject to the requirements of Applicable Law and to Sections 6.4(c) and 8.4(b) below, on and after the Closing Date Sellers will provide Buyer, and its agents and representatives reasonable access to properties, books, records, Employees and auditors relating to the Business to the extent necessary for the customary operations of the Business or to permit Buyer to determine any matter relating to its rights and obligations under any Client Agreement, or other Agreement or to any matters existing in any period ending on or before the Closing Date.

(c)  Subject to the requirements of Applicable Law and to Section 8.4(b) below, on and after the Closing Date Buyer will afford promptly to Sellers and its agents and representatives reasonable access to properties, books, records and Employees relating to the Business to the extent necessary to permit Sellers to determine any matter relating to its rights and obligations hereunder or to any period ending on or before the Closing Date. Notwithstanding anything contained herein to the contrary, Buyer shall not be required to provide to Sellers any books, records or other information and materials to the extent that, in the reasonable judgment of Buyer, such provision would result in a violation of Applicable Law or, to the extent such records relate to the post-Closing period, such provision would violate Buyer's confidentiality obligations with respect to such customers or third parties. In this regard, Buyer shall retain (and shall cause its Affiliates to retain) all files, transactional records, ledgers and accounting and other books and records, whether in hard copy, electronic format or otherwise, relating to the conduct or operation of the Business in accordance with Buyer's standard record retention practices, which shall require that material records be retained for a period of at least six years from the date of the relevant event.

**6.5.  Communications with Clients.**

Promptly after the date of this Agreement, Buyer and Sellers will develop a joint customer communication program, under which (among other things) the Employees, including appropriate executives of the Company, will make introductions to an agreed-upon list of Clients and assist in responding to any questions raised and encourage Clients to maintain their relationship with the Company after the Closing and to consent thereto as necessary or advisable.

**6.6.  Dividends.**

The Company shall not pay dividends or make any other distribution to any holders of Shares with respect to their shares on or before the Closing Date.

**6.7.** **Run-off Insurance Coverage**.

Sellers, the ESOP Trustee and the Company shall cooperate with Buyer to arrange for a rider to its directors and officers liability, professional liability and errors and omissions, and employment practice liability coverages providing, in a form reasonably satisfactory to Buyer, three year "run-off" coverage effective at the Closing, and such "run-off" coverage shall be paid for after the Closing by Buyer and shall include coverage of the ESOP Trustee.

## ARTICLE VII:  ADDITIONAL AGREEMENTS OF BUYER

**7.1.** **Clients of the Company**.

Buyer shall not undertake any actions prior to Closing which affect adversely the Company's or Sellers' good relations with Clients, unless such actions are expressly required by this Agreement.

**7.2** **Technology**.

Buyer will spend not less than six million ($6,000,000) dollars during the twenty-four (24) month period commencing on the Closing Date to for the purpose of enhancing the Company's existing technology platform and applications and delivery systems used by the Company and may spend up to fifteen million dollars ($15,000,000) in the aggregate in such twenty-four month period.

**7.3** **Corporate Headquarters; Relocation of Other Offices**.

(a)  The Company's headquarters are located at 11150 Olympic Boulevard, Los Angeles, California (the "**Corporate Headquarters**"). Should Buyer move the Corporate Headquarters during the sixty-month (60) period commencing with the month in which the Closing takes place to a location that is more than five (5) miles from its location on the date hereof then, as to any Subsequent Payments or Incentive Payments payable by the terms of this Agreement after the date of such move (collectively, the "**Post Move Payments**") shall be subject to a Buyer guaranty (the "**Buyer Guaranty**"). Pursuant to the Buyer Guaranty each person entitled to any Post Move Payment shall be guaranteed that they shall not receive less than the cumulative percentage of the percentages achieved in the period prior to such move (the "**Cumulative Percentage**"). By way of illustration, if the Cumulative Percentage applicable to the three-year period prior to a move had been eighty five percent (85%) such Sellers or the Incentive Payees, as the case may be, would be guaranteed that they would not receive less than eighty five percent (85%) of the Post Move Payments. Notwithstanding the foregoing, Buyer shall have no such obligation to Sellers or the Incentive Payees, as the case may be, if (i) at the time the Corporate Headquarters was moved the Company had failed to achieve at least eighty percent (80%) of the Revenue Targets or Incentive Revenue Targets, as the case may be, in the year prior to such move, or (ii) the Company was no longer permitted to use, or it was deemed by the Company to pose material risks to use, the Corporate Headquarters due to material health or safety issues. In addition, should any person who becomes entitled to a Move Payment terminate their employment with the Company because of such removal of the Corporate

Headquarters, such termination shall be subject to Section 2.6(c) and such person shall be eligible for a Retention Payment pursuant to Section 2.6 (unless such person has already received a Retention Payment).

(b)     During the thirty-six (36) month period commencing with the month in which this Agreement is executed, the Company shall not cause any Class B Shareholder to permanently relocate to any office of the Company that is more than thirty five (35) miles from the office of the Company at which such Class B Shareholder is employed on the date hereof without the consent of such Class B Shareholder. Should the Company require such Class B Shareholder to relocate without such consent, such Class B Shareholder shall be entitled to a Post Move Payment as provided for in Section 7.3(a). In addition, in the case of any Class B Shareholder who elects not to accept any relocation of more than thirty five (35) miles and terminates employment with the Company on that basis, such termination shall be subject to Section 2.6(c) and such Class B Shareholder shall be eligible for a Retention Payment. Notwithstanding the foregoing, Buyer shall have no obligation to the Class B Shareholder if (i) at the time of such relocation the Company had failed to achieve at least eighty percent (80%) of the Revenue Targets in the year prior to such relocation, or (ii) the Company was no longer permitted to use or it was deemed by the Company to pose material risks to use the office where the relocated Class B Shareholder was employed due to material health or safety issues.

## ARTICLE VIII:     AGREEMENTS OF BUYER, COMPANY, THE ESOP TRUSTEE AND SELLERS

Buyer, the Company, Sellers and the ESOP Trustee agree that:

### 8.1.   Notices of Certain Events.

Each party shall promptly notify the others if it becomes aware of the occurrence of any of the following:

(a)     any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b)     any notice or other communication from any Governmental Entity in connection with the transactions contemplated by this Agreement;

(c)     any Actions commenced or threatened against Sellers or the Company relating to the Business that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.11, or that relate to the consummation of the transactions contemplated by this Agreement or to any Employees; and

(d)     the occurrence, or failure to occur, of any event which, in and of itself or in conjunction with other events, results in, or which is reasonably likely to result in, a Material Adverse Effect, or which might give either Buyer, the ESOP Trustee or Sellers a right to (i) terminate this Agreement, or (ii) refuse to consummate the transactions contemplated hereby.

272152v9

### 8.2. Commercially Reasonable Efforts; Further Assurances.

Subject to the terms and conditions of this Agreement, Buyer, the ESOP Trustee and each Seller will use its reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under Applicable Law to consummate the transactions contemplated by this Agreement including, without limitation, giving all required notices and using all commercially reasonable efforts to obtain prior to the Closing Date all licenses, registrations, permits, consents, approvals, authorizations, qualifications and orders of Governmental Entities in order to enable Sellers, the ESOP Trustee, the Company and Buyer respectively, to perform their obligations hereunder and so as to permit the Closing to occur as soon as practicable. Sellers for the period, prior to the Closing, and Buyer for the period, after the Closing, agree to cause the Company to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement.

### 8.3. Certain Filings

Sellers, the ESOP Trustee, the Company and Buyer shall cooperate with each other (i) in determining whether any action by or in respect of, or filing with, any Governmental Entity is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement, including the ESOP Submissions, and (ii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers. In addition to the foregoing, Sellers, the ESOP Trustee, the Company and Buyer shall cooperate with each other to take all actions necessary to ensure that each Permit shall remain in effect immediately following the Closing, and to obtain new or additional Permits as required by Applicable Law or reasonably requested by Buyer.

### 8.4. Confidentiality; Public Announcements.

(a) None of the parties to this Agreement, nor any of their Affiliates shall disclose any of the terms or conditions of this Agreement or any agreement or understanding relating to this Agreement, without the other parties' consent (which shall not be denied or withheld unreasonably), except as may be required to implement the provisions of this Agreement or by Applicable Law, including, without limitation, complying with any application to or filing with any Governmental Entity in connection with the transactions contemplated by this Agreement.

(b) Prior to the Closing Date and for a period of three years after any termination of this Agreement, Sellers and the ESOP Trustee will each hold, and will use their best efforts to cause their accountants, counsel, consultants, advisers and agents ("Sellers' Representatives") to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law (including any such disclosure necessary to obtain any regulatory approval necessary or advisable to consummate the transactions contemplated by this Agreement), all confidential documents and information concerning Buyer

and its Affiliates (in whatever format) and all memoranda, notes, summaries, analyses, computer records, and other materials prepared by Sellers, the Company, the ESOP Trustee or any of Sellers' Representatives that contain or reflect information ("**Buyer's Confidential Information**") furnished to Sellers or the Company in connection with the transactions contemplated by this Agreement or in preparation for the conduct of the Business following Closing, except to the extent that such information can be shown to have been (i) previously known on a non-confidential basis by Sellers, the ESOP Trustee or the Company, (ii) in the public domain through no fault of Sellers, the ESOP Trustee or the Company, as the case may be, (iii) later lawfully acquired on a non-confidential basis from a Person not known by Sellers, the ESOP Trustee and the Company to be subject to a duty of confidentiality with respect to such information, or (iv) independently developed by or on behalf of Sellers, the ESOP Trustee or any of its Affiliates without reference to any of Buyer's Confidential Information. Furthermore, neither Sellers nor the Company may use any of Buyer's Confidential Information for any purpose other than a Permitted Purpose. Nevertheless, Sellers, the ESOP Trustee and the Company may disclose such information to any of Sellers' Representatives for a Permitted Purpose so long as Sellers' Representatives are informed by Sellers, the ESOP Trustee or the Company, as the case may be, of the confidential nature of such information and are directed by Sellers, the ESOP Trustee, or the Company, to treat such information confidentially. Sellers and the Company shall be responsible for the unauthorized use by any of Sellers' Representatives of any of Buyer's Confidential Information and for any failure by any of Sellers' Representatives to keep confidential Buyer's Confidential Information. If this Agreement is terminated, Sellers, the ESOP Trustee and the Company will, and will cause their respective officers, directors, employees, accountants, counsel, consultants, advisers and agents to, destroy or deliver to Buyer, upon request, all of Buyer's Confidential Information, and all copies thereof and, upon request, shall certify to Buyer that Buyer's Confidential Information has been so destroyed or delivered and will not thereafter use Buyer's Confidential Information for any purpose whatsoever.

(c)     The parties agree to consult with each other before issuing any press release or making any public statement with respect to this Agreement or the transactions contemplated hereby and, except as may be required by Applicable Law or any listing agreement with any national securities exchange, will not issue any such press release or make any such public statement prior to such consultation.

**8.5     Certain ESOP Related Matters.**     Buyer and Sellers agree to develop a mutually satisfactory procedure intended to allow Sellers to seek recovery from the administrator of the ESOP and any other Person who may be liable for the matters involving the ESOP including those matters that are included in the ESOP Submissions.

## ARTICLE IX:     TAXES

**9.1.     Sellers' and the Company's Representations and Warranties Regarding Tax Returns.**  B

Sellers and the Company represent and warrant:

(a)     Except as disclosed on **Schedule - Taxes** attached hereto:

(i)     The Company has timely filed all federal and state Tax Returns that are required to be filed by, or with respect to the activities of the Company, and that were due on or prior to the Closing Date;

(ii)     The Company has paid or caused to be paid within the time frame and in the manner prescribed by law all federal and state Taxes payable by the Company as set forth on the aforementioned Tax Returns; and

(iii)     The Company has paid all federal and state Taxes whether or not shown on Tax Returns (other than those being contested in good faith) for which a notice of or assessment or demand for, payment has been received or which are otherwise due and payable.

(b)     To the best of Sellers' knowledge and subject to those matters covered by the **Schedule-ESOP Exceptions**, all federal and state Tax Returns filed by the Company were true and correct in all material respects as of the date on which they were duly filed or as subsequently amended as of the date of this Agreement. All amounts required to be collected or withheld by the Company have been so collected or withheld and such amounts required to be remitted to any taxing authority have been so remitted. Furthermore, the respective accruals and reserves for Taxes in the Financial Statements provided to Buyer are adequate in all material respects to cover any liability of the Company for Taxes.

**9.2.     Sellers' and the Company's Other Tax Representations and Warranties.**

(a)     Except as set forth to the contrary on **Schedule–Taxes and Schedule-ESOP Exceptions** and in addition to the representations made in Sections 4.17(g) and 4.17(h) above, Sellers and the Company, each make the following representations and warranties as of the date of this Agreement:

(i)     no Tax assessment or deficiency has been made or proposed against the Company other than assessments or deficiencies that have been paid in full;

(ii)     none of the Tax Returns are now being or, to the Knowledge of any Seller or the Company are proposed to be examined or audited;

(iii)     no consents or agreements waiving or extending any applicable statutes of limitations for the Tax Returns, or any Taxes required to be paid thereunder, have been filed;

(iv)     there are no tax rulings, requests for rulings, or closing agreements relating to the Company which could affect its liability for Taxes for any period after the Closing Date;

(v)     other than as set forth on **Schedule–Powers of Attorney**, no power of attorney has been granted by the Company with respect to any matter relating to Taxes of the Company that is currently in force;

272152v9

(vi)    the Company has not filed a consent under Section 341(f) of the Code or any comparable provision of state, local or foreign revenue statutes;

(vii)    the Company has not agreed to, nor is required to include in income, any adjustment pursuant to Section 481(a) of the Code (or similar provisions of other laws or regulations) by reason of a change in accounting method or otherwise, nor does the Company have any Knowledge that the Internal Revenue Service (or other taxing authority) has proposed, or is considering, any such change in accounting method;

(viii)    the Company has not disposed of property in a transaction being accounted for under the installment method pursuant to Section 453 of the Code;

(ix)    the Company has at no time been a member of an affiliated group (within the meaning of Section 1504(a) of the Code);

(x)    no taxing authority in a jurisdiction where the Company does not file Tax Returns has made a claim, assertion or threat that the Company is or may be subject to taxation by such jurisdiction;

(xi)    none of the Tax Returns of the Company filed, or to be filed before the Closing, contain, or will contain, a disclosure statement under Section 6662 of the Code or any similar provision of state, local or foreign law;

(xii)    the Company has no elections in effect for federal income tax purposes under Sections 108, 168, 338, 441, 463, 472, 1017, 1033 or 4977 of the Code; and

(xiii)    the Company has not taken any reporting position on a Tax Return, which reporting position (a) if not sustained would be reasonably likely, absent disclosure, to give rise to a penalty for substantial understatement of federal income Tax under Section 6662 of the Code (or any predecessor statute or any corresponding provision of any such predecessor statute, or state, local, or foreign Tax law), and (b) has not adequately been disclosed on such Tax Return in accordance with  Section 6662(d)(2)(B) of the Code (or corresponding provision of any such predecessor statute, or state, local, or foreign Tax law).

(b)    None of the assets of the Company are subject to any Liens in respect of Taxes (other than for current Taxes not yet due and payable).

(c)    <u>Schedule – State and Local Tax Filings</u> sets forth all states in which the Company files Tax Returns.  Except as set forth on <u>Schedule – Tax Representations</u>, complete copies of all federal and state income Tax Returns, including amended Tax Returns, for the Company that have been filed beginning on or after July 1, 1999 through June 30, 2001 have been delivered or made available to the Buyer prior to the date of this Agreement.  Prior to the date of this Agreement, the Company has made available to the Buyer copies of all revenue agents' reports and other written assertions by governmental authorities of deficiencies or other liabilities for Taxes of the Company with respect to past periods for which the limitations period has not run.

### 9.3.    Tax Obligations of Buyer and Sellers.

The following provisions shall govern the allocation of responsibility concerning certain tax matters between the Buyer and Sellers following the Closing Date:

(a) (i)   Sellers shall prepare or cause to be prepared and timely file or cause to be filed all Tax Returns for the Company for all periods ending on or prior to the Closing Date which are filed after the Closing Date. Sellers shall be responsible for and shall timely pay all Taxes with respect to all Tax periods ending on or prior to the Closing Date and shall indemnify, defend and hold harmless Buyer to the extent that such Taxes are not reflected in the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) shown on the Closing Balance Sheet of the Company. At the Closing, Sellers shall provide Buyer with a detailed listing of each and every Tax liability and the amount thereof included within the Company's reserve for Tax liability as of the Closing Date. Sellers shall take no position on such Tax Returns with respect to any material items of income, gain, expense, or loss that departs from past practice on Tax Returns filed for the two previous years;

(ii)   Buyer shall prepare or cause to be prepared and timely file or cause to be filed any Tax Returns of the Company for Tax periods which begin before the Closing Date and end after the Closing Date. Sellers shall pay to the Buyer within fifteen (15) days, after the date on which such Taxes (including, where appropriate, any Taxes arising from any determination made relating to matters that are the subject of the ESOP Submissions) are paid with respect to such periods (the "Straddle Period"), an amount equal to the portion of such Taxes which relate to the portion of such Straddle Period ending on the Closing Date to the extent that such Taxes are not reflected in the reserve for Tax Liability (rather than any reserve for deferred Income Taxes established to reflect timing differences between book and Tax income) shown on the Closing Balance Sheet of the Company. Buyer shall be liable for and shall pay all Taxes with respect to Tax periods ending after the Closing Date and shall indemnify, defend and hold harmless Sellers from and against (i) all Taxes imposed on the Company for any period that begins after the Closing Date and (ii) the portion of any Taxes imposed on the Company which relate to the portion of any Straddle Period that begins after the Closing Date and (iii) any Taxes imposed on the Company to the extent that such Taxes are reflected in the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and tax income) shown on the Closing Balance Sheet of the Company. For purposes of this Section 9.3(b), in the case of any Income Taxes that are imposed on a periodic basis and are payable for a Straddle Period that includes (but does not end on) the Closing Date, the portion of such Income Tax which relates to the portion of such Straddle Period ending on the Closing Date shall be deemed equal to the amount which would be payable if the relevant Straddle Period ended on the Closing Date. Any credits relating to a Straddle Period that begins before and ends after the Closing Date shall be taken into account as though the relevant Straddle Period ended on the Closing Date;

(iii)   Tax refunds that are received by the Buyer or the Company, and any amounts credited against Tax to which the Buyer or the Company becomes entitled, that relate to Tax periods or portions thereof, ending on or before the Closing Date shall be for the account

of Seller and Buyer shall pay over to Sellers any such refund or the amount of any such credit within fifteen (15) days after receipt or entitlement thereto;

(iv) Sellers will immediately pay to the Buyer any Tax refund (or reduction in Tax liability) received (or recognized) by the Sellers resulting from a carryback of a post-acquisition Tax attribute of the Company into the Tax Return of the Company for a period ending on or prior to the Closing, if and when such refund or reduction is received (or recognized) by the Sellers. Sellers will cooperate with the Buyer and the Company in obtaining such refund (or reduction in Tax liability), including through the filing of amended Tax Returns or refund claims;

(v) The Company, Buyer and Sellers shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the preparation and filing of all Tax Returns pursuant to this Section 9.3(e) and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the request of the other party) the provision of records and information which are reasonably required in connection with any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder;

(vi) All tax sharing agreements or similar agreements with respect to or involving the Company shall be terminated as of the Closing Date and, following the Closing Date, the Company shall not be bound thereby or have any liability thereunder; and

(vii) Any sales Taxes, transfer Taxes or recording fees payable as a result of the transactions contemplated by this Agreement shall be shared equally by the parties, and the parties shall cooperate to file all necessary Tax Returns and other documentation with respect to all such Taxes or fees.

(b) Buyer shall promptly notify Sellers in writing upon receipt by Buyer, any of its Affiliates or the Company of notice of any pending or threatened federal, state, local or foreign litigation, audits, examinations or assessments which might affect the Taxes for which Sellers may be liable pursuant to this Section 9.3.

(c) Buyer shall have the right to represent the Company's interests in any audit or administration or court proceeding relating to Taxes. Sellers and the ESOP Trustee shall be entitled to participate and employ counsel of its or his choice in any audit or administrative or court proceeding relating (in whole or in part) to Taxes for which Sellers or the ESOP Trustee may be liable pursuant to this Section 9.3. None of Buyer, any of its Affiliates or the Company may settle any claim for any Taxes for which Sellers may be liable pursuant to paragraph (a) of this Section 9.3, without the prior written consent of Sellers or the ESOP Trustee, as the case may be, which consent may not be unreasonably withheld or delayed.

## ARTICLE X:     EMPLOYEES OF THE BUSINESS

### 10.1.   Retention of Employees.

(a) The parties intend that there will be continuity of employment with respect to the Employees, subject to Section 10.1(b). Notwithstanding any other provision in this Agreement, and except as otherwise provided in the employment agreements listed on **Schedule - Employees**, each Employee's employment after the Closing shall be "at will".

(b) Sellers will assist Buyer to communicate the terms of any employment in accordance with all applicable requirements of law and on a schedule acceptable to Buyer. Each Employee who satisfies Buyer's normal employment requirements (including, without limitation, satisfactory completion of fingerprinting, drug testing, and criminal background checks) will be deemed to be a **"Transferred Employee"** as of the Closing Date provided, that Inactive Employees shall not be deemed to be Transferred Employees unless they return to active employment within twelve (12) weeks following the Closing. An Inactive Employee shall only be eligible for treatment as a Transferred Employee as of the date such individual is able to, willing to and does recommence active employment with the Company. Employees who do not satisfy Buyer's normal requirements for employment and Inactive Employees who do not return to active employment within twelve weeks of the Closing shall be subject to termination by Buyer (unless applicable law provides otherwise) and shall receive such payments for which the applicable Employee may be eligible under the Company's vacation and "paid time off" policy in effect immediately before the Closing or under an employment contract (if applicable) listed on **Schedule - Employees**, without eligibility for severance under Buyer's severance program. Sellers will cause the Company to allow Buyer to conduct drug tests, fingerprinting, criminal background checks, and other customary employment screening of the Employees during the period between the date of this Agreement and Closing.

(c) As soon as practicable after the date of this Agreement, Sellers and Buyer will communicate to the Employees, Buyer's general intention with respect to the ongoing operations of the Business.

## 10.2. Employee Benefits.

(a) (i) Subsequent to the Closing Date and following the termination of the Company's Employee Benefit Plans, Buyer will provide the Transferred Employees with benefits under employee benefit plans, programs, and arrangements that are no less favorable than those provided to similarly situated employees of Buyer;

(ii) Subject to the next succeeding sentence, for purposes of determining eligibility to participate in and vesting under any "employee benefit plan" (as defined in Section 3(3) of ERISA) of Buyer and for vacation, sickness benefits, severance benefits and other fringe benefits and banking privileges, each such Transferred Employee will be credited with the years of service he or she completed while employed by the Company for any other period or, to the extent recognized by the Company. Notwithstanding the foregoing, such service shall (i) be recognized only to the extent that it would have been recognized under Buyer's plans had it been in service with Buyer and (ii) not be recognized for purposes of (x) benefit accruals, grandfathering of benefit schedules, and/or level of salary credits based on service under Buyer's retirement plans, (y) retirement eligibility under Buyer's option and stock awards, and (z) eligibility for post-retirement, medical or life insurance; and

(iii) Buyer will waive all waiting periods and pre-existing condition limitations (if any) with respect to their medical and dental programs for the Transferred Employees. Transferred Employees (and their covered dependents) will be given credit under Buyer's medical and dental programs in which they elect to participate for applicable deductibles, co-payments and out-of-pocket expenses incurred during the portion of the plan year prior to such participation as though such amounts had been incurred in accordance with the terms and conditions of Buyer's medical and dental programs. If any Transferred Employees elect coverage under Buyer's long-term disability insurance policy (the **"LTD policy"**) immediately following their date(s) of hire, the coverage of such Transferred Employees shall be subject to the transfer provision of the LTD policy, which provides for no loss or gain in coverage for pre-existing conditions for Transferred Employees who were covered by the Company's long-term disability insurance policy or program.

(b) Without the consent of Buyer, neither Sellers nor the Company will make any promises or commitments to any Employee with regard to his or her employment status with Buyer or the terms or conditions upon which such employment might occur or be continued.

(c) Buyer shall cause the Company to provide and recognize all accrued but unused 2001 vacation as of the Closing Date.

(d) Buyer solely shall be responsible for providing any Employee or former Employee of the Company (and such Employee's "qualified beneficiaries" within the meaning of Section 4980B(f) of the Code) with the continuation of group health coverage required by the Consolidated Omnibus Budget Reconciliation Act, whether such Employee's or former Employee's "qualifying event" (within the meaning of Section 4980B(f) of the Code) occurred prior to, on or after the Closing Date.

(e) Buyer shall have the sole obligation and liability for any workers' compensation or similar workers' protection claims of any Transferred Employee, whether incurred prior to, on or after the Closing Date.

## ARTICLE XI: CONDITIONS OF CLOSING

**11.1 Conditions to Obligations of Buyer and Seller.** The obligations of the parties hereto to consummate the transactions contemplated by this Agreement are subject to the satisfaction of the following conditions as of the Closing Time:

(a) Legal Prohibition. No provision of any applicable law or regulation and no judgment, injunction, order or decree shall prohibit the consummation of the Closing.

(b) Required Regulatory Approvals. All Required Regulatory Approvals shall have been obtained and all such approvals shall be in effect on the Closing Date.

**11.2 Conditions to Obligations of Buyer.** The obligation of Buyer to consummate the transactions contemplated by this Agreement is, in addition to the conditions contained in

Section 11.1 hereof, subject to the satisfaction of the following conditions prior to or at the Closing Time:

(a) <u>Performance of this Agreement</u>. All of the terms, covenants, agreements and conditions of this Agreement to be complied with and performed by Sellers or the ESOP Trustee, or both, at or prior to the Closing Time and which are not qualified by a materiality standard shall have been complied with and performed in all material respects. All of the terms, covenants, agreements and conditions of this Agreement to be complied with and performed by Sellers or the ESOP Trustee or both, as the case may be, at or prior to the Closing Time and which are qualified by a materiality standard of any type shall have been complied with and performed in all respects.

(b) <u>Accuracy of Representations and Warranties</u>. The representations and warranties of Sellers and the ESOP Trustee set forth in this Agreement and in any certificate or other writing delivered by Sellers or the ESOP Trustee, or both, as the case may be, pursuant hereto or in connection herewith (disregarding any qualification with respect to "materiality" or "Material Adverse Effect") shall be true and correct at and as of the Closing Date as if made at and as of such date, except where the failure of such representations and warranties to be true shall not have a Material Adverse Effect or a material adverse effect on the ability of Sellers and the ESOP Trustee to consummate the transactions contemplated by this Agreement or to perform any of their material obligations hereunder.

(c) <u>Litigation</u>. No action, suit, litigation, proceeding or investigation is threatened, instituted or pending before any court, arbitrator or governmental body, agency or official that (1) in the opinion of Buyer (after consultation with its counsel) is reasonably likely to restrict, prohibit or prevent or materially alter or delay or otherwise have a material adverse effect on the consummation of any of the transactions contemplated by this Agreement or (2) seeks to restrain, prohibit or otherwise interfere with the ownership or use of the Company or the Business by a Buyer or to compel a Buyer to dispose of all or substantially all or any material portion of the Business or the Company or (3) seeks to require divestiture by either Buyer or any Affiliates of Buyer of the Business or the Company or any portion thereof.

(d) <u>Regulations</u>. No provision of any applicable law or regulation and no judgment, injunction, order or decree shall restrain, prohibit or otherwise interfere, in any event in any material respect, with the effective operation or enjoyment by Sellers of all or any portion of the Business. There shall not be any action taken, or any statute, rule, regulation, injunction, order or decree proposed, enacted, enforced, promulgated, issued or deemed applicable to the purchase of the Business, by any court, government or governmental authority or agency, domestic or foreign, that, in the reasonable judgment of Buyer would, directly or indirectly, be expected to result in any of the consequences referred to in clauses 11.2(c)(1), (2) and (3) above.

(e) <u>Documents to be Delivered by Seller</u>. Sellers shall have furnished to Sellers (1) a certificate, dated the Closing Date and signed by an authorized executive officer of Seller, to the effect that the conditions set forth in Sections 11.2(a) through 11.2(d) hereof with respect to Sellers having been satisfied and (2) all documents called for by Section 3.4 hereof.

272152v9

(f) <u>Revised Schedules</u>. Without prejudice to Buyer's rights under Sections 11.2(a), (b) and (e), Sellers shall have delivered to Buyer revised schedules to this Agreement containing information updated to the Closing Date.

(g) <u>Non-Compete Agreement</u>. A letter executed by certain of the Shareholders agreeing not to compete with the Company after the Closing Date.

(h) <u>Special Retention Payment</u>. Letters executed by each of the Shareholders regarding a special retention payment that is payable on the first anniversary of the Closing Date (the "**Special Retention Payment**").

(i) <u>Letter as Incentive Revenue Percentage</u>. A letter executed by each of the Incentive Payees acknowledging the Incentive Revenue Percentage applicable to such Incentive Payee.

(j) <u>Closing Day Balance Sheet</u>. The Closing Day Balance Sheet certified by the Company's chief financial officer.

(k) <u>Opinion of Counsel</u>. An opinion of counsel to the Company and the Sellers reasonably satisfactory in form and substance to the Buyer and its counsel.

(l) <u>Escrow Agreement</u>. A fully executed Escrow Agreement.

(m) <u>Other Documents</u>. Buyer shall have received all documents it may reasonably request relating to the authority of Sellers and the ESOP Trustee to enter into this Agreement, all in form and substance reasonably satisfactory to Buyer including the Client Consents.

(n) <u>Material Adverse Effect</u>. After the date hereof and prior to the Closing Date, there shall not have occurred any condition that would constitute a Material Adverse Effect.

(o) <u>Shareholder Equity</u>. The shareholders' equity of the Company, prepared in accordance with GAAP, subject to the GAAP Exceptions, as shown on the Closing Date Balance Sheet shall not be less than negative one million six hundred twenty-three thousand two hundred twenty (-$1,623,220) dollars.

**11.3** <u>Conditions to Obligations of Seller and the ESOP</u>. The obligation of Seller and the ESOP Trustee under this Agreement to consummate the transactions contemplated by this Agreement is, in addition to the conditions contained in Section 11.1 hereof, subject to the satisfaction of the following conditions as of the Closing Time:

(a) <u>Performance of this Agreement</u>. All of the terms, covenants, conditions and agreements of this Agreement to be complied with and performed by Buyer at or prior to the Closing Time and which are not qualified by a materiality standard in any respect shall have been complied with and performed in all material respects. All of the terms, covenants, agreements and conditions of this Agreement to be complied with and performed by Buyer at or

prior to the Closing Time and which are qualified by a materiality standard of any type shall have been complied with and performed in all respects.

(b)    Accuracy of Representations and Warranties.  The representations and warranties of Seller set forth in this Agreement or in any certificate or other writing delivered by Buyer pursuant hereto or in connection herewith (disregarding any qualification with respect to "materiality" or "Material Adverse Effect") shall be true and correct at and as of the Closing Date as if made at and as of such date, except where the failure of such representations and warranties to be true shall not have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by the Agreement or to perform its material obligations thereunder.

(c)    Documents to be Delivered by Buyer.  Buyer shall have delivered to Seller (1) a certificate dated the Closing Date and signed by an authorized executive officer of Buyer, to the effect that the conditions set forth in Sections 11.3(a) and (b) hereof have been satisfied, (2) a certificate dated as of the Closing Date, signed by the Secretary or an Assistant Secretary of Buyer certifying the incumbency of the officers or other representatives of Buyer signing this Agreement, and (3) the payments provided for in Section 2.1 hereof.

(d)    Other Documents.  Seller and the ESOP Trustee, as the case may be, shall have received all documents it may reasonably request relating to the existence of Buyer and the authority of Buyer to enter into this Agreement and the Assignment Agreement, all in form and substance reasonably satisfactory to Seller or the ESOP Trustee, or both, as the case may be.

**ARTICLE XII:     SURVIVAL;INDEMNIFICATION**

12.1.  Survival.

Except as otherwise provided in this Agreement, the covenants, agreements, representations and warranties of the parties to this Agreement contained in this Agreement or in any certificate delivered pursuant hereto or in connection herewith shall survive the Closing until the second anniversary after the Closing Date; *provided* that (i) the covenants and agreements contained in Sections 4.1, 4.2(a), 4.4,4.5, 12.2, 12.3, 12.4, 12.5 and in Article XIV shall survive forever, (ii) the representations and warranties contained in Sections 4.6, 5.1, and 5.2(a) shall survive for a period of three years following the Closing Date, (iii) the covenants and agreements contained in Section 8.3 and Article IX shall survive until expiration of the statute of limitations applicable to the matters covered thereby (giving effect to any waiver, mitigation or extension thereof), if later, and (iv) the covenants and agreements contained in Sections 5.3(b), 5.3(c), 5.4 and 5.9 shall survive for 180 days after the period of time specified therein. Notwithstanding the preceding sentence, any covenant, agreement, representation or warranty in respect of which indemnity may be sought under this Agreement shall survive the time at which it would otherwise terminate pursuant to the preceding sentence, if written notice of the inaccuracy or breach thereof giving rise to such right of indemnity shall have been given to the party against whom such indemnity may be sought prior to such time. Such written notice shall describe in reasonable detail the facts giving rise to the claim for indemnity hereunder and shall

include (if and to the extent then known) the amount or the method of computation of the amount of such claim.

### 12.2. Indemnification.

(a) Notwithstanding any due diligence investigation conducted by Buyer prior to the Closing, Sellers shall jointly and severally indemnify Buyer and its Affiliates against and agree to hold it harmless from any and all Losses incurred or suffered by Buyer or any of its Affiliates arising out of (i) any inaccuracy in or breach of any of the representations made by Sellers or the Company pursuant to this Agreement or in any certificate delivered by Sellers or the Company in connection with Closing, (ii) any breach of or failure to perform any of the covenants or agreements contained in this Agreement to be performed by Sellers or the Company or any of its Affiliates or the ESOP Trustee, or (iii) any act or omission of any Seller or the Company arising in whole or in part prior to the Closing Time.

(b) Buyer shall hereby indemnify Sellers, the ESOP Trustee and the Company against and agree to hold each of them harmless from any and all Losses incurred or suffered by Sellers, the ESOP Trustee and the ESOP arising out of (i) any inaccuracy in or breach of any of the representations made by Buyer pursuant to this Agreement or in any certificate delivered by Buyer in connection with Closing, or (ii) any breach of or failure to perform any of the covenants or agreements contained in this Agreement to be performed by Buyer or any of its Affiliates, or (iii) any act or omission of Buyer arising entirely after the Closing Time.

### 12.3. Procedures.

(a) The party seeking indemnification hereunder (the **"Indemnified Party"**) agrees to give prompt notice to the party from whom indemnity is sought (the **"Indemnifying Party"**) of the assertion of any claim, or the commencement of any suit, action or proceeding (**"Claim"**) in respect of which indemnity may be sought under such Section and will provide the Indemnifying Party such information with respect thereto that the Indemnifying Party may reasonably request. The failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder, except to the extent such failure shall have adversely prejudiced the Indemnifying Party.

(b) The Indemnifying Party shall be entitled to participate in the defense of any Claim asserted by any third party (**"Third Party Claim"**) and, subject to the limitations set forth in this Section 12.3, shall be entitled to control and appoint lead counsel for such defense, in each case at its expense. If the Indemnifying Party shall fail promptly to defend, or if after commencing or undertaking any such defense fails to prosecute or withdraws from such defense, the Indemnified Party shall have the right to undertake the defense or settlement thereof, at the Indemnifying Party's expense; provided, however, that the Indemnified Party shall act reasonably and in accordance with its good faith business judgment with respect thereto, and shall not settle or compromise any such claim or action without the consent of the Indemnifying Party, which consent shall not be unreasonably withheld.

(c) If the Indemnifying Party shall assume the control of the defense of any Third Party Claim in accordance with the provisions of this Section 12.3, (i) the Indemnifying

272152v9

Party shall consult with the Indemnified Party as to the terms of any proposed settlement, compromise or judgment and shall use all reasonable efforts to incorporate modifications to such settlement, compromise or judgment suggested by the Indemnified Party if such modifications would reduce the risk to the Indemnified Party of liability not indemnifiable pursuant to the terms of this Agreement, (ii) the Indemnifying Party shall obtain the prior written consent of the Indemnified Party (which shall not be unreasonably withheld) before entering into any settlement of such Third Party Claim, if the settlement does not release the Indemnified Party from all liabilities and obligations with respect to such Third Party Claim or the settlement imposes injunctive or other equitable relief against the Indemnified Party or would otherwise adversely affect (A) the business, financial condition or results of operations of the Indemnified Party, or (B) the Indemnified Party's method of doing business and (iii) the Indemnified Party shall be entitled to participate in the defense of such Third Party Claim and to employ separate counsel of its choice for such purpose. The fees and expenses of such separate counsel shall be paid by the Indemnified Party. Nevertheless, if counsel for any Indemnified Party, using reasonable judgment, advises the Indemnified Party in writing that there are actual conflicts of interest between the Indemnifying Party and such Indemnified Party, the Indemnified Party may retain counsel satisfactory to such Indemnified Party, and the Indemnifying Party shall pay the actual and reasonable fees and expenses of one such counsel acting for the Indemnified Party reasonably promptly.

(d)     Each party shall cooperate, and cause their respective Affiliates to cooperate, in the defense or prosecution of any Third Party Claim and shall furnish or cause to be furnished such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials or appeals, as may be reasonably requested in connection therewith.

(e)     After the giving of any notice with respect to a Claim pursuant to Section 12.3, the amount of indemnification to which an Indemnified Party shall be entitled under this Article XII shall be determined: (i) by the written agreement between the Indemnified Party and the Indemnifying Party; (ii) by a final judgment or decree of any court of competent jurisdiction; or (iii) by any other means to which the Indemnified Party and the Indemnifying Party shall agree. The judgment or decree of a court shall be deemed final when the time for appeal, if any, shall have expired and no appeal shall have been taken or when all appeals taken shall have been finally determined.

(f)     To the extent of any inconsistency between this Section 12.3 and Section 9.3(i) (relating to Tax contests), the provisions of Section 9.3(i) shall prevail with respect to Tax contests.

### 12.4.   Limitation of Liability.

(a)     Notwithstanding anything to the contrary contained in this Agreement:

(i)     no claim shall be made against any Indemnifying Party for indemnification under Section 12.2(a)(i) or Section 12.2(b)(i), as the case may be, with respect to any Loss which the Indemnified Party may suffer, incur or sustain unless: the aggregate of all such Losses of the Indemnified Party under such section shall exceed $200,000 (the "Basket"), and then only to the extent of such excess, *provided, however*, that the Basket shall not apply in

the case of any inaccuracy in or breach of any of the representations or warranties contained in Sections 3.1, 3.2(a), 3.4, 3.5, 3.6, 4.1 and 4.2(a) or as to any losses sustained in connection with Taxes; and

(ii)    the maximum aggregate amount of indemnity payments by Sellers under Section 12.2(a)(i), shall not exceed the sum of the Purchase Price, the Retention Payments and Incentive Payments (the "Indemnity Cap"), *provided, however,* that such maximum aggregate amount shall not apply in the case of any inaccuracy in or breach of any of the representations or warranties contained in Sections 4.1, 4.2(a), 4.4, 4.5, and 4.6; and

(iii)    the maximum aggregate amount of indemnity payments by Buyer under Section 11.2(b)(i) shall not exceed the Purchase Price paid, and

(iv)    in no event shall any Seller be liable under this Article XII for any aggregate amount in excess of that portion of funds paid for payments included in the Indemnity Cap received by such Seller or paid for the benefit of such Seller.

(b)    Each of the parties agrees to take all reasonable steps to mitigate their respective Losses upon and after becoming aware of any event or condition which would reasonably be expected to give rise to any Losses that are indemnifiable hereunder.

**12.5   Treatment of Indemnification Payments.**

All indemnification payments made by either party under this Agreement shall be treated as adjustments to the Purchase Price.

**ARTICLE XIII:    TERMINATION**

**13.1.   Grounds for Termination.**

This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of Sellers and Buyer;

(b)    by either Sellers or Buyer if the Closing shall not have been consummated on or before September 30, 2002 provided that the terminating party shall have complied with its obligations under Article VII of this Agreement; or

(c)    by either Sellers or Buyer if consummation of the transactions contemplated hereby would violate any non-appealable final order, decree or judgment of any court or governmental body having competent jurisdiction.

The party desiring to terminate this Agreement pursuant to clauses 13.1(b) or 13.1(c) shall give written notice of such termination to the other party.

**13.2.   Effect of Termination.**

If this Agreement is terminated as permitted by Section 13.1, such termination shall be without liability of any party (or any stockholder, director, officer, employee, agent, consultant or representative of such party) to the other parties to this Agreement; *provided* that if such termination shall result from the (i) failure of either party to fulfill a condition to the performance of the obligations of the other party, (ii) failure to perform a covenant of this Agreement, or (iii) breach by either party hereto of any representation or warranty or agreement contained herein, such party shall be fully liable for any and all Losses incurred or suffered by the other party as a result of such failure or breach. Should termination occur as provided in Section 13.1, other than for a reason set forth in the first sentence of this Section 13.2, Buyer shall remain liable for the expenses referred to in Section 14.4.

### ARTICLE XIV:  MISCELLANEOUS

#### 14.1  Notices.

All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to Buyer, to:

> JP Morgan Chase Bank
> 4 Chase MetroTech Center
> Brooklyn, New York 11245
> Attention:_____

with a copy to:

> J.P. Morgan Chase & Co.
> 1 Chase Manhattan Plaza, 25th Floor
> New York, New York 10081
> Telecopy: 212-383-0249
> Attention:  Robert M. MacAllister, Esq.

and, in the case of notices with respect to matters relating to Article VIII to:

> Manager, Tax Audits
> JP Morgan Chase Bank
> 245 Park Avenue
> New York, New York 10167

if to Sellers, to:

> _____
> _____
> _____
> Attention:_____

with a copy to:

> _____
> _____

Attention:_____

if to ESOP Trustee:

        Alan M. Weissman, as Trustee
        5306 Valley View Road
        Rancho Palos Verdes, California 90275

with a copy to:

        Winston & Strawn
        339 South Grand Avenue
        Los Angeles, California 90071-1549
        Attention: Regina Shanney-Saborsky, Esq.

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

    **14.2.** [Section reserved]

    **14.3. Amendments and Waivers**.

        (a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by Sellers, the ESOP Trustee, the Company and Buyer.

        (b) No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

    **14.4. Expenses**.

    Except as set forth on **Schedule – Approved Expenses** all costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such cost or expense. All reasonable administrative and legal expenses and expenses related to the valuation of the Class A Shares incurred by the ESOP Trustee shall be borne by the Company.

    **14.5. Successors and Assigns**.

    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and assigns; *provided* that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of each other party hereto.

272152v9

### 14.6. Governing Law.

This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to the conflict of laws rules of such state.

### 14.7. Jurisdiction.

Except as otherwise expressly provided in this Agreement, the parties to this Agreement agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby may only be brought in the United States District Court for the Southern District of New York or a New York State court sitting in New York City, and each of the parties hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the personal jurisdiction of any such court.

### 14.8. WAIVER OF JURY TRIAL.

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

### 14.9. Counterparts; Third-Party Beneficiaries.

This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party to this Agreement shall have received a counterpart of this Agreement signed by each other party hereto. This Agreement is not intended to create any right or benefit to any Person not a party hereto.

### 14.10. Entire Agreement.

This Agreement (including the exhibits and schedules to this Agreement) constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

### 14.11. Captions.

The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation of this Agreement.

272152v9

**14.12. Continuing Cooperation**.

On and after the Closing Date, each party agrees to give such further reasonable assurances and to execute, acknowledge and deliver such bills of sale, deeds, acknowledgments and other instruments of conveyance and transfer as in the other party's judgment are reasonably necessary and appropriate to effect the transactions contemplated by this Agreement.

**[Beyond this page is the signature page.]**

**IN WITNESS WHEREOF** the parties hereto have each executed this Agreement as of the day and year first above written.

JPMORGAN CHASE BANK
(Buyer)

By: _Anthony S. Mattia_
Anthony S. Mattia
Senior Vice President

PLEXUS GROUP, INC.
(the Company)

By: _David L. Hall_

SHAREHOLDERS:
(Sellers)

By: _Lawrence J. Cuneo_
Lawrence J. Cuneo
Please Print

By: _Wayn H Wagner_
Wayn H Wagner
Please Print

By: _Regina L Muller_
Regina L Muller
Please Print

By: _David L. Hall_
DAVID L. HALL
Please Print

By: _Ian Screen_
IAN SCREEN
Please Print

By: _Mark Edwards_
MARK Edwards
Please Print

By: _Tera Fead_
TERA FEAD
Please Print

By: _____
Please Print

By: _____
Please Print

Alan M. Weissman
Solely in his capacity as ESOP Trustee and
limited as to those matters that expressly relate
to the ESOP and the ESOP Trustee

272152:v09

**IN WITNESS WHEREOF** the parties hereto have each executed this Agreement as of the day and year first above written.

JPMORGAN CHASE BANK
(Buyer)

By: _Anthony S. Mattia_
    Anthony S. Mattia
    Senior Vice President

PLEXUS GROUP, INC.
(the Company)

By: _David L. Hall_

**SHAREHOLDERS:**
(Sellers)

By: _Lawrence J. Curro_
    Lawrence J. Curro
    Please Print

By: _Wayne H. Wagner_
    Wayne H. Wagner
    Please Print

By: _Regina L Miller_
    Regina L Miller
    Please Print

By: _David L. Hall_
    DAVID L. HALL
    Please Print

By: _Ian Screen_
    IAN SCREEN
    Please Print

By: _Mark Edwards_
    MARK EDWARDS
    Please Print

By: _Terri Fead_
    TERI FEAD
    Please Print

By: _____
    Please Print

By: _____
    Please Print

_Alan M. Weissman_
Alan M. Weissman
Solely in his capacity as ESOP Trustee and limited as to those matters that expressly relate to the ESOP and the ESOP Trustee

272152:v09

**IN WITNESS WHEREOF** the parties hereto have each executed this Agreement as of the day and year first above written.

JPMORGAN CHASE BANK
(Buyer)

By: _Anthony S. Mattia_
Anthony S. Mattia
Senior Vice President

PLEXUS GROUP, INC.
(the Company)

By: _David L. Hall_

SHAREHOLDERS:
(Sellers)

By: _Lawrence J. Cuneo_          By: _Ian Screen_
Lawrence J. Cuneo                 IAN SCREEN
Please Print                      Please Print

By: _Wayne H. Wagner_            By: _____
Wayne H. Wagner                   MARK EDWARDS
Please Print                      Please Print

By: _Regina Miller_              By: _____
Regina L Miller                   TERA FEAD
Please Print                      Please Print

By: _David L. Hall_              By: _____
DAVID L. HALL                     _____
Please Print                      Please Print

                                 By: _____
                                     _____
                                     Please Print

_Alan M. Weissman_
Alan M. Weissman
Solely in his capacity as ESOP Trustee and
limited as to those matters that expressly relate
to the ESOP and the ESOP Trustee

272152:v09

**IN WITNESS WHEREOF** the parties hereto have each executed this Agreement as of the day and year first above written.

JPMORGAN CHASE BANK
(Buyer)

By: _Anthony S. Mattia_
Anthony S. Mattia
Senior Vice President

PLEXUS GROUP, INC.
(the Company)

By: _David L. Hall_

SHAREHOLDERS:
(Sellers)

By: _Lawrence J. Cuneo_          By: _Ian Screen_
Lawrence J. Cuneo                 IAN SCREEN
Please Print                      Please Print

By: _Wayne H Wagner_             By: _Mark Edwards_
WAYNE H WAGNER                    MARK EDWARDS
Please Print                      Please Print

By: _Regina L Miller_            By: _Tera Fead_
Regina L Miller                   TERA FEAD
Please Print                      Please Print

By: _David L. Hall_             By: _____
DAVID L. HALL                     _____
Please Print                      Please Print

                                 By: _____
                                  _____
                                  Please Print

_Alan M. Weissman_
Alan M. Weissman
Solely in his capacity as ESOP Trustee and
limited as to those matters that expressly relate
to the ESOP and the ESOP Trustee

272152;v09

**IN WITNESS WHEREOF** the parties hereto have each executed this Agreement as of the day and year first above written.

JPMORGAN CHASE BANK
(Buyer)

By: _Anthony S. Mattia_
Anthony S. Mattia
Senior Vice President

PLEXUS GROUP, INC.
(the Company)

By: _David L. Hall_

SHAREHOLDERS:
(Sellers)

By: _Lawrence J. Cuneo_           By: _Ian Screen_
Lawrence J. Cuneo                  IAN SCREEN
    Please Print                        Please Print

By: _Wayne H. Wynn_               By: _____
Wayne H. Wynn                      MARK EDWARDS
    Please Print                        Please Print

By: _Regina L Miller_             By: _____
Regina L Miller                    TERA FEAD
    Please Print                        Please Print

By: _David L. Hall_              By: _____
DAVID L. HALL
    Please Print                     _____
                                        Please Print

                                 By: _____

                                     _____
                                        Please Print

_Alan M. Weissman_
Alan M. Weissman
Solely in his capacity as ESOP Trustee and
limited as to those matters that expressly relate
to the ESOP and the ESOP Trustee

272152:v09

AUG.-19'02(MON) 15:28   CHASE MANHATTAN BANK        TEL:718 242 6278         P.002

**IN WITNESS WHEREOF** the parties hereto have each executed this Agreement as of the day and year first above written.

JPMORGAN CHASE BANK
(Buyer)

By: _Anthony S. Mattin_
Anthony S. Mattin
Senior Vice President

PLEXUS GROUP, INC.
(the Company)

By: _David L. Hall_

SHAREHOLDERS:
(Sellers)

By: _Lawrence J. Cuneo_          By: _Ian Screen_
Lawrence J. Cuneo                 IAN SCREEN
Please Print                      Please Print

By: _Wayne H Wagner_             By: _Mark Edwards_
Wayne H Wagner                    MARK EDWARDS
Please Print                      Please Print

By: _Regina L Muir_              By: _Terra Fead_
Regina L Muir                     TERRA FEAD
Please Print                      Please Print

By: _David L. Hall_             By: _Steven Glass_
DAVID L. HALL                     STEVEN GLASS
Please Print                      Please Print

                                 By: _Michael P. Keady_
                                 Michael P. Keady
                                 Please Print

_Alan M. Weissman_
Alan M. Weissman
Solely in his capacity as ESOP Trustee and
limited as to those matters that expressly relate
to the ESOP and the ESOP Trustee

273132.v09

# Exhibit C



**Thompson M. Swayne**
Executive Vice President

August 23, 2002

Michael Keady
c/o Plexus Group
Teaneck, NJ

Dear Mike,

On behalf of my colleagues in JPMorgan Investor Services, I'd like to welcome you to JPMorgan Chase and tell you how delighted we are that you will join us after our purchase of the Plexus Group business.

Upon close of this purchase agreement, your employment with Plexus Group will transition to JPMorgan Chase. Your position will be that of Head of Business Development – Money Managers and Broker Dealers, and you will play a significant role at JPMorgan Chase. I am depending on you to use your skills and abilities to help shape the new Investor Services. In turn, as a JPMorgan Chase employee you can take advantage of the opportunities for professional and personal development that JPMorgan Chase offers, and the competitive market and performance-based compensation to which JPMorgan Chase is committed.

Employment at JPMorgan Chase is subject to the satisfactory completion of all pre-employment processing, including reference checking, fingerprinting and drug screening. Your position at JPMIS is also contingent upon your ability to establish employment eligibility for JPMorgan. New hire forms are located at **www.jpmorganchase.com/onboarding.** We ask that you access and complete the forms located under the category called "New Hires". Please bring your completed forms to the Human Resources Orientation Session which will take place on Monday, August 26, 2002, at 9:00am at JPMorgan Chase, 575 Washington Blvd, 14th Floor, Jersey City, NJ. Your contact there will be Amy Faris. She can be reached at (201) 595-5195.

You must have many questions, and we are committed to providing you with information about the transition, our client retention programs and matters that affect you personally— such as benefits, compensation, job title, and career development—on an ongoing basis. Providing you with accurate and comprehensive information as it becomes available is one of our highest priorities.

I want to take this opportunity to confirm some important information related specifically to compensation at JPMorgan Chase.

JPMorgan • 4 Metrotech Center, Floor 23, Brooklyn, NY 11245
Telephone: 718 242 8167 • Facsimile: 718 242 5823
thompson.m.swayne@chase.com

## Cash Compensation and Performance Management

From the date of your transition to JPMorgan Chase, your 2002 cash compensation will include your base salary, which is $30,000 annually. As you transition to JPMorgan, your performance and base salary will be reviewed in January following each performance year, consistent with all other colleagues in Investor Services. As we have discussed, consistent with your transition to the JPM annual discretionary incentive plan described below, your base salary will increase to $130,000 as of January 1, 2003.

You will continue to participate in the current Compensation Plan for Plexus Group Sales through December 31, 2002. Thus, commissions due through December 31, 2002 will be paid in accordance with practices currently in place at Plexus. Effective January 1, 2003, the Plexus Group Sales Compensation Plan will terminate and you will transition to the JPMIS annual discretionary award program then in effect. Estimated future commissions from new business booked prior to the Plexus Group Sales Plan termination (12/31/02) will be calculated assuming a 10% business run-off after year one and a 12% risk-adjustment factor. The definition of "new business" for purposes of this calculation will include client-signed contracts prior to January 1, 2003 that are validated by Plexus Management within six weeks following contract receipt. A lump sum amount will be determined as a buyout of estimated future commissions. It is intended that this lump sum amount will be paid in 3 equal installments over a 4-year period, with the first payment made as soon as possible after closing, calculated using new business booked as of a date prior to closing, and an estimate of new business for the remainder of 2002. Additional calculations will be made during the first quarter of 2003 based on new business as of December 31, 2002 and again in the third quarter of 2003 to verify the likelihood of new business longevity. If the estimated payment made in 2002 is less than one-third of the actual calculation conducted in the first quarter of 2003, a payment will be made in 2003 to make up the difference. The remaining two equal payments will be made on or about the second and fourth anniversaries of the closing, with the amount of these payments determined based on the third quarter 2003 calculation of new business. These two payments, plus the initial payment made upon closing in 2002 and the true-up payment made in 2003, if applicable, will equal the total amount determined in the third quarter of 2003. The final calculation of these payments will be made at the sole discretion of JPMIS management. If you resign or you are terminated for cause, you will forfeit all eligibility for future payments for which you may have been eligible. These payments will be made if JPMorgan Chase terminates you for reasons other than cause, or if your job or conditions of employment are substantially restructured as determined in the sole discretion of JPMorgan Chase.

Any future incentive payments under the JPMIS annual discretionary award program will be at the sole discretion of JPMIS management and paid in accordance with all other discretionary awards. These bonuses are payable in or around January, following each performance year, provided you are actively employed by JPMorgan Chase on the date bonuses are paid.

You will participate in the JPMorgan Chase performance management process. This process includes goal setting, development planning, performance appraisals, salary reviews and incentive compensation based on individual performance, business unit and overall corporate results and market conditions. I have every expectation that you will demonstrate excellent performance, resulting in your continuing to receive market competitive total compensation.

## Other Compensation

JPMorgan Chase offers a highly competitive compensation and benefits program including several components which may factor into your total compensation. These include a 401K plan, a retirement plan, employee recognition programs, an employee stock purchase plan and long term stock-based incentive awards.

In closing, I know that I speak for all of us when I say that we are very excited to have you join JPMorgan Investor Services. The scarcest resource in our industry is high quality people and I believe that the combination of staff from both institutions will truly make us the best in the industry.

The Investor Services team and I look forward to working with you and will keep you informed as we work through this period. If you have any questions, of course, please let us know.

Please indicate your understanding and acceptance of the terms of this letter by signing one copy of this letter below and returning to Annette Cuffley. Human Resources, 4 Metrotech Center, 22nd floor, Brooklyn, NY 11245.

Very truly yours,

Tom Swayne
Investor Services Business Executive

I have reviewed this letter and understand and accept its terms:

Michael Keady          8 /26/02
                        Date

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –  X
                                        :

REGINA M. KEADY, as Executrix of the ESTATE OF    :
MICHAEL P. KEADY,

                           Plaintiff,    :

             - against -    :

JPMORGAN CHASE & CO.,    :

                          Defendant.    :

    :
– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –  X

Case No.: 2:07-cv-02752-SRC-CCC

Hon. Stanley R. Chesler, U.S.D.J.
Hon. Claire C. Cecchi, U.S.M.J.

Return Date: August 13, 2007
Oral argument is requested

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(6) OR, IN THE ALTERNATIVE, FOR TRANSFER PURSUANT TO 28 U.S.C. 1404(a)

SATTERLEE STEPHENS BURKE & BURKE LLP
33 Wood Avenue South, 6th Floor
Iselin, NJ 08830
(732) 603-4966
(732) 603-4977 (facsimile)

*Attorneys for Defendant JP Morgan Chase Bank, N.A.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF FACTS ......................................................................................................2

      The Notice Letter............................................................................................................2

      The Release Agreement .................................................................................................3

      The Plexus Complaint and Litigation...........................................................................3

POINT I:      PLAINTIFF IS BARRED FROM RECOVERING
              UNDER THE NOTICE LETTER ......................................................................4

POINT II:     IF THE ACTION IS NOT DISMISSED AS REQUESTED IN
              POINT I, IT SHOULD, IN ACCORDANCE WITH THE PARTIES'
              FORUM SELECTION AGREEMENT, BE DISMISSED OR
              TRANSFERRED TO THE SOUTHERN DISTRICT OF NEW YORK ...............8

      A.     The Forum Selection Provision is Both Applicable and Fully Enforceable...........9

      B.     This Action Should be Dismissed or, In the Alternative, Transferred .................12

CONCLUSION...................................................................................................................16

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

American Patriot Ins. Agency, Inc. v. Mutual Risk Mgmt., Ltd.,
    364 F.3d 884 (7th Cir. 2004) ............................................................................11

In re Bayside Prison Litig.,
    190 F. Supp. 2d 755 (D.N.J. 2002) ....................................................................7

Cadapult Graphic Sys., Inc. v. Tektronix, Inc.,
    98 F. Supp. 2d 560 (D.N.J. 2000) ........................................................13, 14, 15

Coastal Steel Corp. v. Tilgham Wheelabrator, Ltd.,
    709 F.2d 190 (3d Cir.) .................................................................................11, 12

Cooper v. Borough of Wenonah,
    977 F. Supp. 305 (D.N.J. 1997) ..........................................................................6

Cuchara v. Gai-Tronics Corporation,
    2005 WL 1030466 (3rd Cir. May 4, 2005) .........................................................7

Druckers', Inc. v. Pioneer Electronics (USA), Inc.,
    1993 WL 431162 (D.N.J. Oct. 20, 1993) ..........................................................11

Frank Briscoe Company, Inc. v. The Travelers Indem. Co.,
    65 F. Supp. 2d 285 (D.N.J. 1999) .......................................................................6

Geco Corp. v. H.D. Smith Wholesale Drug Co.,
    2006 WL 3359652 (D.N.J. Nov 17, 2006) .........................................................7

International Equity Invs., Inc. v. Opportunity Equity Partners Ltd.,
    475 F. Supp. 2d 450 (S.D.N.Y. 2007) ..............................................................11

Jones v. Morris County Corr. Facility,
    2007 WL 1118342 (D.N.J. April 13, 2007).........................................................7

Jumara v. State Farm Ins. Co.,
    55 F.3d 873 (3d Cir. 1995) ................................................................12, 13, 14

Kaufman and Broad-South Bay v. Unisys Corp.,
    822 F. Supp. 1468 (N.D. Ca. 1993) ....................................................................7

Marder v. Lopez,
    450 F.3d 445 (9th Cir. 2006) ..............................................................................7

ii

Nevets C.M. Inc. v. Nissho Iwai American Corp.,
      726 F. Supp. 525 (D.N.J. 1989) ...................................................................................7

Oldroyd v. Elmira Savs. Bank, FSB,
      134 F.3d 72 (2d Cir. 1998) ........................................................................................11

Poling v. K. Hovnanian Enterps.,
      99 F. Supp. 2d 502 (D.N.J. 2000) (on 12(b)(6) ......................................................7

Roby v. Corporation of Lloyds,
      996 F.2d 1353 (2d Cir. 1993) ...................................................................................11

Salovaara v. Jackson Nat'l Life Ins. Co.,
      246 F.3d 289 (3d Cir. 2001) ...............................................................................12, 15

Schering Corp. v. First Databank, Inc.,
      479 F. Supp. 2d 468 (D.N.J. 2007) ..........................................................................11

Shore Slurry Seal. Inc. v. CMI Corp.,
      964 F. Supp. 152 (D.N.J. 1997) ...............................................................................14

Wyeth & Brother Ltd. v. CIGNA Int'l Corp.,
      119 F.3d 1070 (3d Cir. 1997) ...................................................................................10

## STATUTES

28 U.S.C. §§ 1391(a)(3) ............................................................................................13

28 U.S.C. § 1404(a) ...............................................................................1, 9, 13, 15

Fed. R. Civ. P. 12(b)6 ................................................................................................1

Fed. R. Civ. P. 56..........................................................................................................7

Defendant JPMorgan Chase Bank N.A. ("Chase"), sued incorrectly herein as JPMorgan Chase & Co., by its attorneys, Satterlee Stephens Burke & Burke LLP, submits this memorandum of law in support of its motion to dismiss the Complaint dated May 7, 2007 (herein, the "Complaint") of plaintiff Regina M. Keady, as Executrix of the Estate of Michael P. Keady ("plaintiff"), pursuant to Fed. R. Civ. P. 12(b)6), or, in the alternative, for an order transferring this action to the Southern District of New York pursuant to 28 U.S.C. § 1404(a).

## PRELIMINARY STATEMENT

This case is a straightforward and simple one that can be decided – and dismissed – solely on the basis of three documents. One of the documents is annexed to the Complaint. The other two – the Release Agreement referenced in the Complaint and the publicly filed complaint in another action involving the same parties – are submitted herewith.

Plaintiff purports to sue Chase for its failure to pay its employee, Michael P. Keady ("Mr. Keady"), $375,000 on or before August 31, 2006 pursuant to the terms of a March 31, 2004 letter from Chase to Mr. Keady (Complaint, Exh. A).[1] Although the Complaint admits that this letter provided for certain payments "in exchange for a release" (Complaint, ¶ 2B), the "Release Agreement" referenced in the letter – and executed by Mr. Keady in conjunction with the letter – is not attached to the Complaint. In fact, this Release Agreement conditioned Mr. Keady's receipt of the payment at issue on his promise never to bring any legal proceeding against Chase in connection with any matter touching on his employment relationship with Chase through April 16, 2004.

The third key document in the case – the complaint filed against Chase by Mr. Keady and several other former Chase employees in 2006 – establishes beyond any doubt that Mr. Keady

---

[1] Mr. Keady died in December 2006, and the plaintiff is his Estate.

violated the terms of the Release Agreement by bringing precisely the kind of action against Chase that he promised he would not "file or assert or permit to be filed or asserted."

Given Mr. Keady's indisputable violation of the conditions of the Release Agreement, he forfeited his right to receive the $375,000 at issue (the second of two equal payments, the first of which Mr. Keady was paid by Chase in 2004), and his estate has no right to recover that, or any, amount in this action.

In the event that the Court does not dismiss the action on this ground, Chase respectfully requests that the action be dismissed or transferred based on the broadly worded forum selection clause – naming the Southern District of New York – contained in the agreement that created the employment relationship between Chase and Mr. Keady.

The relevant facts, referenced herein, are set forth in the affidavits of Denise Boyle, sworn to July 10, 2007 ("Boyle Aff."), and Joshua M. Rubins, sworn to July 10, 2007 ("Rubins Aff."), with exhibits.

## STATEMENT OF FACTS

The only facts relevant to Point I of this motion, discussed in detail below, are the following:

**The Notice Letter**

Plaintiff sues upon a March 31, 2004 letter (the "Notice Letter") from Chase to Mr. Keady (Complaint, Exh. A) that provided for numerous payments and benefits in connection with the termination of his employment, including two lump-sum payments of $375,000, the second to be paid on or before August 31, 2006. Notice Letter at p. 4.[2] The Notice Letter states

---

[2] Although the Complaint contains three counts, all are based on the alleged promise in the Notice Letter, and no facts are alleged other than those related directly to the Notice Letter.

2

that Mr. Keady's receipt of these payments and benefits is conditioned on his execution and

return of an enclosed Release Agreement (the "Release Agreement").  Id. at 1.

**The Release Agreement**

   Mr. Keady executed the Release Agreement (Boyle Aff., Exh. A) on April 16, 2004.  The

Release Agreement provided for Mr. Keady's release of Chase from any and all liabilities to Mr.

Keady – with an exemption for the obligations undertaken by Chase in the Notice Letter.

However, this exemption was expressly conditioned upon Mr. Keady's promise to abide by all

the terms of the Release Agreement – i.e., would be effective "for so long as I adhere to the

terms of that letter and of this RELEASE."  Release Agreement at 2.  Prominent among the

terms of the Release Agreement is the following:

> I agree that I will not file or assert or permit to be filed or asserted
> any civil action, suit or legal proceeding seeking equitable or
> monetary relief (nor will I seek or in any way obtain or accept any
> such relief in any civil action, suit or legal proceeding) in
> connection with any matter concerning my employment
> relationship with [Chase] and/or the termination thereof arising
> from the beginning of the world up to and including the date of
> execution of this RELEASE (whether known or unknown to me
> and including any continuing effects of any acts or practices prior
> to the date of execution of this RELEASE) . . . .

Id.

**The Plexus Complaint and Litigation**

   In or about May 2006, Mr. Keady and several other former Chase employees in its Plexus

subsidiary brought an action against Chase in the Southern District of New York, filing a

Complaint (the "Plexus Complaint") that sought damages from Chase purportedly arising from

Chase's mismanagement – including, as discussed below, Chase's alleged misconduct in the

time period prior to April 16, 2004, including its termination of Mr. Keady.  See Rubins Aff., ¶

2; Exh. A (the "Plexus Complaint").

The facts relevant to Point II, below, are set forth in the Argument and will not be repeated here.

## POINT I

### PLAINTIFF IS BARRED FROM
### RECOVERING UNDER THE NOTICE LETTER

Mr. Keady's stark violation of the Release Agreement's clear-cut ban on commencing litigation against Chase has unquestionably caused his estate to forfeit any right it might otherwise have had to obtain monies from Chase under the Notice Letter.

Chase and Mr. Keady entered into the Release Agreement (Boyle Aff., Exh. A) on April 16, 2004 upon termination of Mr. Keady's employment with Chase, as required by the Notice Letter. Notice Letter (Complaint, Exh. A) at 1. As a general matter, the Release Agreement provided that Keady would release Chase from any and all liabilities to Mr. Keady, as consideration for Chase agreeing to provide Mr. Keady with severance payments and certain other severance-related benefits. Release Agreement at 1.

The Release Agreement did contain an exemption from this general release, applying to obligations which Chase may have owed to Mr. Keady under the Notice Letter. However, <u>the exemption for liability under the Notice Letter was expressly conditioned upon Mr. Keady's agreeing to abide by all terms of the Release Agreement itself</u>. Specifically, the Release Agreement provided that Chase was not released from:

> any legal obligation of [Chase] set forth in the notice letter for so long as [Keady] adhere[s] to the terms of that letter and of this Release.

Release Agreement at 2 (emphasis added).

Among the key terms of the Release Agreement – to which Mr. Keady was obliged to adhere if he wished to obtain monies owed under the Notice Letter – was a provision that

expressly contemplated that Mr. Keady would not bring suit against Chase after execution of the

Release.  In this regard, Mr. Keady agreed that he would not bring an action:

> in connection withy any matter concerning [Mr. Keady's]
> employment relationship with [Chase] and or the termination
> thereof arising from the beginning of the world up to and including
> the date of execution of this RELEASE (whether known or
> unknown to me and including any continuing effects of any acts or
> practices prior to the date of execution of this RELEASE) . . . .

Release Agreement at 2.

Thus, given that under the terms of the Release Mr. Keady agreed not to bring suit

against Chase, any violation of that provision by commencement of an action against Chase

would plainly cause Mr. Keady to forfeit his right to monies owed by Chase's under the Notice

Agreement.  In fact, Mr. Keady indisputably <u>did</u> bring an action against Chase – the Plexus

litigation – in direct contravention of the terms of the Release Agreement.  <u>See</u> Plexus Complaint

(Rubins Aff., Exh. A).

In the Plexus litigation, Mr. Keady – along with eight other employees and then-

shareholders of  Plexus – sought damages supposedly arising from Chase's alleged

mismanagement of Plexus in the time period following Chase's purchase of that company in

August 2002, pursuant to a Stock Purchase Agreement ("SPA") between Mr. Keady and the

other plaintiffs to the Plexus Action on the one hand and Chase on the other hand.  The Plexus

Complaint contains multiple allegations of purported Chase misconduct in connection with its

operation of Plexus <u>in the period between August 2002 and April 16, 2004</u>, including allegations

that specifically and directly pertain to Mr. Keady's employment as head of Plexus' New Jersey

sales office.  In particular, the Plexus Complaint alleges that:

> the Bank closed the Plexus sales office in 2003 and transferred
> Plexus employees to the Bank's office in Brooklyn.  That
> transition was highly disruptive.  <u>Moreover, Keady, the head of the
> Plexus' sales team, was forced out</u>.  Two other important

5

salespeople also left, as did a support staff member.  That left an
inexperienced and decimated sales team at Plexus.[3]

Plexus Complaint (Rubins Aff., Exh. A) at ¶ 45.

The Plexus litigation – with its numerous allegations of supposed Chase mismanagement
impacting Mr. Keady and other Plexus shareholder/employees, including allegations specifically
involving Mr. Keady's employment and employment termination – is exactly the kind of
litigation that the Release Agreement was designed to guard against.   Thus, by electing to
become a plaintiff in the Plexus Action, Mr. Keady unquestionably violated the terms of the
Release Agreement, thereby forfeiting all right to obtain any monies which would otherwise
have been owed him under the Notice Letter.

In New Jersey, a signed release is conclusively presumed to be valid and courts will not
hesitate to enforce the terms of such an instrument as a matter of law.  Cooper v. Borough of
Wenonah, 977 F. Supp. 305 (D.N.J. 1997) ("signed release carries considerable weight" – and it
is conclusively presumed that the signing party "read, understood and assented to its terms");
Frank Briscoe Company, Inc. v. The Travelers Indem. Co., 65 F. Supp.2d 285 (D.N.J. 1999)

---

[3]   The Plexus Complaint contains numerous other allegations of wrongful conduct by
Chase impacting Mr. Keady and the other Plexus shareholder/employees in the time period prior
to April 16, 2004 (the date of the Release Agreement), including:  (i) plaintiffs, including Mr.
Keady, were deprived of bonuses "for calendar year 2002 through 2007";  (ii) Chase failed to
make certain expenditures "during the twenty-four (24) month period after closing" – i.e., during
the two-year period beginning August 28, 2002;  (iii) Chase failed to obtain approvals for
Plexus' full technology build, as it allegedly should have, in 2002; (iv) Chase "mismanaged the
Plexus business after closing on the SPA" on August 28, 2002; (v) Chase failed to start research
and development expenditures "at $ 1 million" after the closing in August 2002 and failed to
increase this funding by $250,000 "per year"; (vi) "almost immediately after closing on the
SPA" in August 2002, Chase allegedly "instituted a hiring freeze" that alleged led to damage to
Plexus' marketplace position; (vii) Chase allegedly breached its contractual obligation to Plexus
by instituting budget reductions in 2002 and 2003; (viii) Chase's "2004 Budget Plan was
prepared" – by necessity – without input from Plexus; and (ix) in February 2004, "Stein
announced the closure of Plexus' technology development office in California, and half of its
employees were terminated in April 2004." Plexus Complaint at ¶¶ 38-39, 43-48, 50.

(enforcing general rule that signed releases are conclusively presumed valid and enforceable);

Nevets C.M. Inc. v. Nissho Iwai American Corp., 726 F. Supp. 525 (D.N.J. 1989), aff'd, 899 F.2d 1218 (3d Cir. 1990) (party entitled to enforce signed release as a matter of law).

Dismissal of an action on a Rule 12(b)(6) motion is fully appropriate where the terms of a release duly signed by plaintiff bar plaintiff from seeking recovery. See e.g. Cuchara v. Gai-Tronics Corporation, 04-CV-2268, 2005 WL 1030466 (3rd Cir. May 4, 2005) (enforcing release barring plaintiff's claim on Rule 12(b)(6) motion); Kaufman and Broad-South Bay v. Unisys Corp., 822 F. Supp. 1468 (N.D. Ca. 1993) (same); Marder v. Lopez, 450 F.3d 445 (9th Cir. 2006) (same).[4]

There is simply no legal or equitable reason why plaintiff should not be held to the letter of the bargain Mr. Keady struck with Chase in the Release Agreement. Plaintiff cannot be

---

[4] On a Rule 12(b)(6) motion, Third Circuit Courts may consider documents outside the pleadings to the extent the use of such documents would not give rise to "prejudice or surprise" by either party, including: documents attached to the complaint, documents referenced in or otherwise integral to the pleadings, and publicly filed Court documents or other matters of public record. Jones v. Morris County Corr. Facility, 06-cv-2461, 2007 WL 1118342 (D.N.J. April 13, 2007). The three documents used by Chase on this motion fall well within the ambit of this rule. The Notice Letter is an exhibit to, and part of, plaintiff's Complaint. The Release Agreement is specifically referenced in the Complaint (both at ¶ 2 and in Exhibit A, the Notice Letter) and is, in any event, obviously integral to events alleged in the Complaint – insofar as it was created in connection with Keady's employment termination at the same time as the Notice Letter on which Keady sues (and, by its express terms, is specifically intended to be enforced in conjunction with the Notice Letter). The Plexus Complaint is a publicly filed document. The authenticity of these documents has never been is in dispute, they are all familiar to plaintiff, and Chase's use of this material herein can in no sense come as a surprise. See Poling v. K. Hovnanian Enterps., 99 F. Supp. 2d 502 (D.N.J. 2000) (on 12(b)(6) motion, court may consider "exhibits attached to complaint, matters of public record and undisputedly authentic documents if the plaintiff's claims are based upon those documents"); Geco Corp. v. H.D. Smith Wholesale Drug Co., 06-CV-0685, 2006 WL 3359652 (D.N.J. Nov 17, 2006) (permitting consideration of publicly-filed litigation documents on motion to dismiss).

To the extent the Court declines to consider Chase's submissions as part of a Rule 12(b)(6) motion, which it should not, Chase respectfully requests that the Court convert Chase's motion to a motion for summary judgment pursuant to F.R.C.P. 56. See In re Bayside Prison Litig., 190 F. Supp. 2d 755 (D.N.J. 2002).

permitted to, on the one hand, reap all the benefits that accrued to Mr. Keady under the Release

Agreement (including generous severance pay and related benefits) while on the other hand

suffer no consequences for Mr. Keady's indisputable violation of the Release Agreement's clear-

cut ban on commencing litigation against Chase. The Release Agreement must be enforced

according to its terms, as the parties plainly intended – and Mr. Keady having improperly

commenced an action against Chase, his estate should now be prohibited from recovering under

the Notice Letter as the Release Agreement plainly contemplated.

In short, plaintiff has no right to enforce the Notice Letter and thus, no basis for bringing

the instant action seeking to recover under the Notice Letter. Accordingly, Chase's motion

should be granted and plaintiff's Complaint dismissed in its entirety.

**POINT II**

**IF THE ACTION IS NOT DISMISSED AS REQUESTED
IN POINT I, IT SHOULD, IN ACCORDANCE WITH THE
PARTIES' FORUM SELECTION AGREEMENT, BE DISMISSED
OR TRANSFERRED TO THE SOUTHERN DISTRICT OF NEW YORK**

The employment relationship between Chase and Mr. Keady at issue in this action was,

as detailed below, created pursuant to the August 19, 2002 Stock Purchase Agreement by which

Chase acquired Plexus Group, Inc. ("Plexus") from its shareholders, including Mr. Keady, who

was a party and signatory to the SPA. The SPA contains unambiguously broad and emphatic

provisions reflecting the parties' agreement with respect to the adjudication of any future claims:

> 14. 7.  Jurisdiction
>
> Except as otherwise provided in this Agreement, the parties to this
> Agreement agree that any suit, action or proceeding seeking to
> enforce any provision of, or based on any matter arising out or in
> connection with, this Agreement or the transactions contemplated
> hereby may only be brought in the United States District Court for
> the Southern District of New York or a New York State court
> sitting in New York City, and each of the parties hereby consents
> to the jurisdiction of such courts (and of the appropriate appellate

8

> courts therefrom) in any such suit, action or proceeding and
> irrevocably waives, to the fullest extent permitted by law, any
> objection which it may now or hereafter have to the laying of the
> venue of any such suit, action or proceeding in any such court or
> that any such suit, action or proceeding which is brought in any
> such court has been brought in an inconvenient forum. Process in
> any such suit, action or proceeding may be served on any party
> anywhere in the world, whether within or without the personal
> jurisdiction of any such court.

SPA (Boyle Aff., Exh. B), § 14.7 (emphasis added).

Thus, the forum selection agreement in the SPA is plainly applicable to this action. Accordingly, as demonstrated below, the Court should dismiss the action pursuant to Rule 12(b)(6) or, in the alternative, transfer the action to the Southern District of New York pursuant to 28 U.S.C. 1404(a).

## A.      The Forum Selection Provision is Both Applicable and Fully Enforceable

As the documentation of Mr. Keady's employment relationship confirms, this action clearly falls within the scope of the SPA's forum selection provision, which is fully enforceable under both New Jersey and New York law.

Mr. Keady, up until August 2002 an employee of Plexus, was employed by Chase pursuant to Article X of the SPA, entitled "Employees of the Business." "Employees" are defined as "all officers and employees" of Plexus. SPA at 2. Section 10.1(a) of the SPA provides: "The parties intend that there will be continuity of employment with respect to the Employees, subject to Section 10.1(b). Section 10.1(b) provides, inter alia, that "[e]ach Employee who satisfies [Chase's] normal employment requirements . . . will be deemed to be a "Transferred Employee" as of the Closing Date . . . ." SPA, § 10.1. Section 10.2 of the SPA sets forth the "Employee Benefits" that Chase must provide to the "Transferred Employees."

9

With respect to a specific group of Transferred Employees, including Mr. Keady, the SPA further provides that such Employees will share in a "Retention Payment" if they "continue to be employees" of Plexus on December 31, 2005.  SPA § 2.6.

Consistent with the SPA, Chase sent Mr. Keady a letter agreement dated August 23, 2002 (four days after the date of the SPA), referencing the SPA and setting forth some additional specific terms of Keady's employment:

> On behalf of my colleagues in JPMorgan Investor Services, I'd like to welcome you to JPMorgan Chase and tell you how delighted we are that you will join us after our purchase of the Plexus Group business.  **Upon close of this purchase agreement**, <u>your employment with Plexus Group will transition to JPMorgan Chase</u>.

Boyle Aff., Exh. C at 1 (emphasis added).  Mr. Keady countersigned this letter agreement on August 26, 2002.  <u>Id</u>. at 3.

Similarly, the Release Agreement signed by Mr. Keady in April 2004 recognizes the SPA as an "employment agreement" with respect to his employment relationship with Chase, releasing "any and all claims for any retention payment(s) pursuant to Section 2.6(c) of the <u>stock purchase agreement dated August 19, 2002 or any *other* employment letter or agreement</u> . . . . Boyle Aff., Exh. A at 1 (emphasis added).

Under the circumstances, there can be no serious dispute that the instant action is based on a "matter arising out of or in connection with" the SPA or "the transactions contemplated" by the SPA.  "[W]hether or not a forum selection clause applies depends on what the specific clause at issue says."  <u>Wyeth & Brother Ltd. v. CIGNA Int'l Corp.</u>, 119 F.3d 1070 (3d Cir. 1997). Here, unlike the standard selection-clause language that merely refers to disputes "arising under the Agreement," the clause refers to disputes "arising out of or in connection with" not only the agreement but also "the transactions contemplated" by the agreement.  SPA, § 14.7.  Among the

10

transactions provided for and contemplated by the SPA was the creation of an employment relationship between Chase and Mr. Keady, and this matter plainly arises out of or in connection with that employment relationship.

It is well-settled that forum selection clauses may encompass claims beyond breach of the contract containing the clause, particularly when, as here, the clause is explicitly broadened. For example, in Schering Corp. v. First Databank, Inc., 479 F. Supp.2d 468, 470-71 (D.N.J. 2007), the Court held that the forum selection clause was applicable to defamation claims because of "broadly worded" language referring not only to disputes concerning the agreement itself but to any dispute concerning the products referenced in the agreement. See also, e.g., Coastal Steel Corp. v. Tilgham Wheelabrator, Ltd., 709 F.2d 190 (3d Cir.), cert. denied, 464 U.S. 938 (1983) (forum selection clause applied where "there is no evidence suggesting that the clause was not intended to apply to all claims growing out of the contractual relationship") (emphasis added); American Patriot Ins. Agency, Inc. v. Mutual Risk Mgmt., Ltd., 364 F.3d 884, 888-89 (7th Cir. 2004) (forum-selection clause in Shareholder Agreement applies to claims concerning other, related contracts that do not contain forum-selection clause); Oldroyd v. Elmira Savs. Bank, FSB, 134 F.3d 72, 76 (2d Cir. 1998) ("in connection with" language is "broad"); Roby v. Corporation of Lloyds, 996 F.2d 1353, 1361 (2d Cir. 1993), cert. denied., 510 U.S. 945 (1993) (forum selection clause not restricted to breach of agreement but cover related securities and antitrust claims); Druckers', Inc. v. Pioneer Electronics (USA), Inc., 93-CV-1931, 1993 WL 431162 (D.N.J. Oct. 20, 1993), at *6 (clause using "transactions contemplated" language applied to claims "derivative of the contractual relationship," rejecting argument that claims were independent of original relationship); International Equity Invs., Inc. v. Opportunity Equity

Partners Ltd., 475 F. Supp. 2d 450, 453-54 (S.D.N.Y. 2007) (interpreting "transactions contemplated" language to include claims that "touch matters" covered by the agreement)

Finally, there is no conceivable basis for invalidating or declining to enforce the forum selection clause here. In diversity cases, the "effect to be given a contractual forum selection clause . . . is determined by federal not state law." Jumara v. State Farm Ins. Co., 55 F.3d 873, 877 (3d Cir. 1995). A forum selection clause is presumptively valid unless the resisting party can establish: "(1) that it is the result of fraud or overreaching, (2) that enforcement would violate a strong public policy of the forum, or (3) that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable." Coastal Steel Corp., supra, 709 F.2d at 202.

None of these factors could possibly be demonstrated in this case. Indeed, it is beyond dispute that the SPA was an extensively negotiated document, with skillful legal representation on behalf of all parties. The notion of "overreaching" is patently incongruous in this context, especially since, on its face, there is nothing onerous about a party residing in northern New Jersey agreeing to litigate in the Southern District of New York. Moreover, as discussed further below, the fact that the very same plaintiff in this action is at this moment actively litigating in the Southern District – represented by the very same counsel as plaintiff's counsel in this action – negates any possible argument based on inconvenience. See Rubins Aff., ¶ 2; Exh. A (Plexus Complaint).

**B.**     **This Action Should be Dismissed or, In the Alternative, Transferred**

The Third Circuit has held that "a 12(b)(6) dismissal is a permissible means of enforcing a forum selection clause that allows suit to be filed in another federal forum." Salovaara v. Jackson Nat'l Life Ins. Co., 246 F.3d 289, 298 (3d Cir. 2001). Thus, Chase respectfully requests that this action be dismissed.

12

699642_2

In the alternative, Chase requests transfer of this action to the Southern District of New York pursuant to 28 U.S.C. § 1404. Courts of this Circuit have frequently held that, when, as here, venue is proper in both plaintiff's chosen forum and in the forum named in an enforceable selection clause, it makes "better sense" to transfer rather than dismiss, although "when a defendant moves under Rule 12, a district court retains the judicial power to dismiss notwithstanding its consideration of § 1404." Id. at 299.[5]

Section 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).

A valid forum selection clause is understood to be "a manifestation of the parties' preferences as to a convenient forum," and is entitled to "substantial consideration." Jumara, supra, 55 F.3d at 880. The courts' usual deference to a plaintiff's choice of forum is therefore negated by the clause, since the "plaintiff has already freely contractually chosen an appropriate venue." Id. Indeed, the plaintiff's choice of forum is given no weight, since any deference to the filing forum "would only encourage parties to violate their contractual obligations." Cadapult Graphic Sys., Inc. v. Tektronix, Inc., 98 F. Supp. 2d 560, 568 (D.N.J. 2000) (internal citation omitted). The plaintiff thus bears the burden of "demonstrating why they should not be bound by their contractual choice of forum." Jumara, 55 F.3d at 880. Only by demonstrating that the other factors considered on a § 1404(a) motion "weigh strongly against transfer" can the plaintiff

---

[5] Venue here is proper in both New York and New Jersey, since Chase is deemed a resident for venue purposes of any district where it does sufficient business to be subject to personal jurisdiction. See 28 U.S.C. §§ 1391(a)(3), 1391(c). Moreover, "a substantial part of the events" giving rise the claim in this action occurred at Chase's offices in New York City, providing another basis for venue in the Southern District. See 28 U.S.C. § 1391(a)(2).

overcome enforcement of the forum selection clause. Shore Slurry Seal. Inc. v. CMI Corp., 964 F. Supp. 152, 158 (D.N.J. 1997).

Here, plaintiff cannot show that any of the "private interest" or "public interest" § 1404(a) factors weigh at all against, let alone strongly against, transfer. The private factors include: (1) the parties' forum preferences; (2) the location where the events occurred; (3) the convenience of the parties; (4) the convenience of the witnesses; and (5) the ease of access to sources of proof. Jumara, 55 F.3d at 879.

Where there is a valid forum selection clause, plaintiff's forum choice is given no weight and defendant's forum preference "is accorded significant weight because it is consistent with the forum selection clause." Shore Slurry Seal, supra, 964 F. Supp. at 157. The events at issue – Chase's preparation of the agreements at issue and its alleged failure in 2006 to pay the amount demanded by Mr. Keady – occurred substantially at Chase's offices in New York City. Boyle Aff., ¶ 4. All of the other private factors also favor transfer, given that – to the extent any additional evidence is required – most of the witnesses (non-party and otherwise) and documents are likely to be found in New York City. Any claim by plaintiff that it is inconvenient to litigate in the nearby Southern District would be implausible – and belied by the fact that this plaintiff, represented by the same counsel as in this action, is already litigating against Chase in another, related case in the Southern District. See Rubins Aff., Exh. A at 15. Indeed, Manhattan is substantially closer to Bergen County, where the offices of plaintiff's counsel are located (and where the executrix of Mr. Keady's estate resides), than is Trenton. In any event, even if plaintiff could demonstrate some inconvenience, the courts discount such claims when transfer is based on a forum selection clause. See, e.g., Cadapult, supra, 98 F. Supp.2d at 568 (by executing forum selection clause, parties agree to "bear the risks of such inconvenience").

14

Similarly, plaintiff will be unable to prove that the public interest factors provide any basis whatsoever for overcoming enforcement of the forum selection clause. The first factor – the enforceability of a judgment – is plainly forum-neutral. The next three factors – the relative congestion of the fora, their ability to resolve the case expeditiously, and the foras' interest in deciding the case – also favor neither forum. There is no significant difference in the congestion of the forums.[6] Both are busy but can plainly handle this simple case with efficiency and economy, and both have an interest in the contractual relationship between Chase (a major bank whose principal place of business is New York) and Mr. Keady, who was a New Jersey resident. Finally, as to the public policy of the forum, New Jersey public policy weighs in favor of upholding the validity of forum-selection clauses. See, e.g., Cadapult, supra, 98 F. Supp. 2d at 568.

In sum, plaintiff will not be able to meet its heavy burden of demonstrating that the §1404(a) factors so disfavor transfer as to compel this Court to refuse enforcement of a valid forum selection clause. Thus, if this action is not dismissed, either on the grounds set forth in Point I, or in accordance with Salovaara, supra, transfer to the Southern District of New York – where plaintiff is already engaged in litigation with Chase – is clearly appropriate.

---

[6] Indeed, according to the 2006 Annual Report of the Director on Judicial Business of the U.S. Courts, the median time interval in months from filing to disposition of civil cases is 8.3 months in the Southern District and a virtually identical 8.2 months in the District of New Jersey. See www.uscourts.gov/judbus2006/appendices/c5.pdf.

15

**CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed or, in the alternative, this

action transferred to the Southern District of New York.

Dated:    July 11, 2007

                                              Respectfully submitted,

                                              SATTERLEE STEPHENS BURKE & BURKE LLP


                                              By: _____s/_____
                                                    Christopher R. Belmonte (CB-2163)
                                              33 Wood Avenue South, 6th Floor
                                              Iselin, NJ 08830
                                              (732) 603-4966
                                              (732) 603-4977  (facsimile)
                                              *Attorneys for Defendant JPMorgan Chase Bank, N.A.*

16

SATTERLEE STEPHENS BURKE & BURKE LLP
33 Wood Avenue South, 6th Floor
Iselin, NJ 08830
(732) 603-4966
(732) 603-4977 (facsimile)

*Attorneys for Defendant JPMorgan Chase Bank, N.A.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
– – – – – – – – – – – – – – – – – – – – – – – – – – – –  X
                                                         :
                                                         :
REGINA M. KEADY, as Executrix of the ESTATE OF           :
MICHAEL P. KEADY,                                        :   Case No.: 2:07-cv-02752-SRC-
                                      Plaintiff,         :   CCC
                                                         :
             - against -                                 :
                                                         :   Hon. Stanley R. Chesler, U.S.D.J.
JPMORGAN CHASE & CO.,                                    :   Hon. Claire C. Cecchi, U.S.M.J.
                                                         :
                                      Defendant.         :
                                                         :
                                                         :   Return Date:  August 13, 2007
                                                         :   Oral argument is requested
– – – – – – – – – – – – – – – – – – – – – – – – – – – –  X
```

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, and to enable district judges and magistrate judges of the court to evaluate possible disqualification or recusal, the undersigned counsel for JP Morgan Chase Bank, N.A., sued incorrectly herein as JPMorgan Chase & Co., certifies as follows:  (i) JP Morgan Chase & Co. is the parent corporation of JP Morgan Chase Bank, N.A.; and (ii) JP Morgan Chase & Co. is the only publicly held company which owns 10% or more of the shares of JPMorgan Chase Bank, N.A.

Dated:  New York, New York
        July 11, 2007

SATTERLEE STEPHENS BURKE & BURKE LLP

By:_____s/_____
            Christopher R. Belmonte (CB-2163)
33 Wood Avenue South, 6th Floor
Iselin, NJ 08830
(732) 603-4966
(732) 603-4977 (facsimile)
Attorneys for Defendant
JPMORGAN CHASE BANK, N.A.

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**Chambers of**
## Claire C. Cecchi
**United States Magistrate Judge**

**Martin Luther King Jr, Federal Bldg.**
**& U.S. Courthouse**
**50 Walnut Street, Room 2064**
**Newark, NJ 07102**
**(973) 645-6664**

July 18, 2007

To: All counsel of record

## LETTER ORDER PURSUANT TO RULE 16.1

RE: **Regina M. Keady v. J.P. Morgan Chase & Co.**
**Civil Action No. 07-2752 (SRC)**

Dear Counsel:

An initial scheduling conference by telephone shall be conducted before the Undersigned at **4:30 p.m.** on **October 18, 2007**. Plaintiff's counsel is to initiate telephone conference.

Counsel are advised that the early disclosure requirements of Fed. R. Civ. P. 26 will be enforced. Therefore, counsel shall immediately exchange the following information without a formal discovery request:

- identities of individuals likely to have knowledge of discoverable facts;

- documents and things in the possession of counsel or the party;

- identities of experts and their opinions;

- insurance agreements in force; and

- statement of the basis for any damages claimed.

At least fourteen (14) days prior to the conference scheduled herein, counsel shall personally meet and confer pursuant to Fed. R. Civ. P. 26(f), and **shall submit a discovery plan to the Undersigned not later than 72 hours prior to the conference with the Court**. The discovery plan shall include (1) a brief summary of the claims and defenses; and (2) a proposed schedule for completing fact and expert discovery. The discovery plan may include a summary of the status of settlement negotiations. (THE DISCOVERY PLAN SHALL BE IN THE FORM ATTACHED AND SHALL BE SUBMITTED JOINTLY.)

At the conference, the Court will address scheduling of all motions. You may submit unopposed applications for *pro hac vice* admission with my Chambers. Please obtain consent of your adversary prior to filing your application, advising both in your cover letter and proposed Order that you have consent.

The parties shall immediately serve interrogatories, limited to twenty-five (25) single questions, and requests for production of documents (no limit).

At the conference, all parties who are not appearing <u>pro se</u> must be represented by counsel who shall have full authority to bind their clients in all pre-trial matters. <u>Counsel shall also be prepared to discuss the merits of the case and have settlement authority</u>. Clients or persons with authority over the matter shall be available by telephone. See <u>L.Civ.R.</u> 16.1(a).

Counsel for plaintiff(s) shall notify any party, who hereafter enters an appearance, of the above conference, and forward to that party a copy of this Order.

The parties must advise this Court immediately if this action has been settled or terminated so that the above conference may be canceled.

Failure to comply with the terms herein may result in the imposition of sanctions.

**SO ORDERED this 18th day of July, 2007.**


      s/ Claire C. Cecchi
      CLAIRE C. CECCHI
      United States Magistrate Judge


Orig:   Clerk
cc:      Counsel of Record
         File

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | Civil Action No. |
| Plaintiff(s), | : | Hon. |
| v. | : | JOINT DISCOVERY PLAN |
| | : | |
| Defendant(s). | : | |

1.  Set forth a factual description of the case.  Include the causes of action and affirmative defenses asserted.

2.  Have settlement discussions taken place?  Yes _____ No _____

    If so, when?  _____

    (a)   What was plaintiff's last demand?

        (1)   Monetary demand: $ _____
        (2)   Non-monetary demand: _____

    (b)   What was defendant's last offer?

        (1)   Monetary offer:  $ _____
        (2)   Non-monetary offer: _____

3.  The parties [have _____ -have not _____] exchanged the information required by Fed. R. Civ. P. 26(a)(1).  If not, state the reason therefor.

4.  Describe any discovery conducted other than the above disclosures.

5.  Generally, dispositive Motions cannot be filed until the completion of discovery. Describe any Motions any party may seek to make prior to the completion of discovery. Include any jurisdictional Motions and Motions to Amend.

6.  The parties proposed the following:

    (a)   Discovery is needed on the following subjects:

    (b)   Should discovery be conducted in phases?  If so, explain.

    (c)    Number of  Interrogatories by each party to each other party: _____

(d)    Number of Depositions to be taken by each party: _____

(e)    Plaintiff's expert report due on _____.

(f)    Defendant's expert report due on _____.

(g)    Motions to Amend or to Add Parties to be filed by _____.

(h)    Dispositive motions to be served within _____days of completion of discovery.

(i)    Factual discovery to be completed by _____.

(j)    Expert discovery to be completed by _____.

(k)    Set forth any special discovery mechanism or procedure requested, including data preservation orders or protective orders:

(l)    A pretrial conference may take place on _____.

(m)   Trial by jury or non-jury Trial?

(n)    Trial date: _____.

7.    Do you anticipate any discovery problem(s)?  Yes _____ No _____
If so, explain.

8.    Do you anticipate any special discovery needs (i.e., videotape/telephone depositions, problems with out-of state witnesses or documents, etc.)?  Yes _____ No _____
If so, explain.

9.    State whether this case is appropriate for voluntary arbitration (pursuant to <u>L. Civ. R.</u> 201.1 or otherwise), mediation (pursuant to <u>L. Civ. R.</u> 301.1 or otherwise),  appointment of a special master or other special procedure.  If not, explain why and state whether any such procedure may be appropriate at a later time (i.e., after exchange of pretrial disclosures, after completion of depositions, after disposition of dispositive motions, etc.).

10.    Is this case appropriate for bifurcation? Yes _____ No _____

11.    We [do _____ do not  _____] consent to the trial being conducted by a Magistrate Judge.

_____
Attorney(s) for Plaintiff(s)

_____
Attorney(s) for Defendant(s)



**United States District Court for the District of New Jersey**

**NOTICE**
**November 2004**

Dear Bar Member:

The United States District Court for the District of New Jersey implemented electronic case filing on January 5, 2004. The Case Management/Electronic Case Filing (CM/ECF) system is browser-based and accessible over the Internet. We are excited about the benefits this technology offers to the court and the bar, especially being able to file and view documents 24 hours a day from the convenience of your office or home.

Training is essential to utilize the full capabilities of this system. Attorneys are encouraged to participate in training and register to become e-filers. For your convenience, we are providing three methods of ECF training. Hands-on training classes are offered at each of our three courthouses. You can register for these classes on our web site at **pacer.njd.uscourts.gov**. There is a self-paced ECF tutorial that is accessible from our web site as well. We also offer on-site training that can be arranged at your firm depending on the number of attendees and the availability of suitable facilities by calling (973)-645-4439.

ECF registration forms can be obtained from any of our three offices or completed electronically on our website. It is strongly suggested that you familiarize yourself with the Policies and Procedures that govern the use of this System. The Electronic Case Filing Policies and Procedures are available on our web site, along with our ECF User's Guide and other useful information.

In addition to ECF access, it is recommended that a PACER (Public Access to Electronic Records) account is obtained. A PACER account will provide Filing Users with querying capabilities. PACER is a fee-for-use service offered by the Administrative Office of the United States Courts. Contact the PACER Service Center at (800)676-6856 or on-line at http://pacer.psc.uscourts.gov.

***Please be advised that documents not  filed electronically but filed in the traditional manner on paper must be accompanied by a floppy diskette or a CD containing the document(s) in PDF format. Each PDF document must not exceed 2MB or 2048KB. If the paper document contains an original signature, then the electronic version  contained on the diskette or CD must include a signature line with "s/" (e.g., s/Jennifer Doe).***

The real success of this system is a function of the number of lawyers who become registered e-filing users. Upon receipt of your ECF login and password, the court expects you to file electronically. Please take advantage of the CM/ECF training opportunities and become a registered e-filer before e-filing becomes mandatory. Beginning **January 31, 2005**, electronic case filing will be mandatory for all civil and criminal cases other than pro se cases.

Sincerely,

William T. Walsh
Clerk

## ALTERNATIVE DISPUTE RESOLUTION
## IN THE
## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Mediation is the Alternative Dispute Resolution ( "ADR") program in this Court. Mediation is governed by Local Civil Rule 301.1. The mediation program under this rule is supervised by a judicial officer (at present United States Magistrate Judge Ronald J. Hedges) who is available to answer any questions about the program.

Any district judge or magistrate judge may refer a civil action to mediation. This may be done without the consent of the parties. However, the Court encourages parties to confer among themselves and consent to mediation. Moreover, you are reminded that, when counsel confer pursuant to Rule 26(f) of the Federal Rules of Civil Procedure and Local Civil Rule 26.1, one of the topics that must be addressed is the eligibility of a civil action for participation in ADR.

A civil action may be referred to mediation at any time. However, one of the advantages of mediation is that, if successful, it enables parties to avoid the time and expense of discovery and trial. Accordingly, the Court encourages parties to consent to mediation prior to or at the time that automatic disclosures are made pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure.

If parties consent to mediation, they may choose a mediator either from the list of certified mediators maintained by the Court or by the selection of a private mediator. If a civil action is referred to mediation without consent of the parties, the judicial officer responsible for supervision of the program will select the mediator.

Mediation is non-judgmental. The role of the mediator is to assist the parties in reaching a resolution of their dispute. The parties may confer with the mediator on an ex parte basis. Anything said to the mediator will be deemed to be confidential and will not be revealed to another party or to others without the party's consent. The first six hours of a mediator's time is free. The mediator's hourly rate thereafter is $150.00, which is borne equally by the parties.

If you would like further information with regard to the mediation program please review the Guidelines for Mediation, which are available on the Court's Web Site "pacer.njd.uscourts.gov" and appear as Appendix Q to the Local Civil Rules. You may also make inquiries of the judicial officer responsible for supervision of the program.

Civil actions in which there are *pro se* parties (incarcerated or not) are not eligible for mediation.



# COLE SCHOTZ

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Attorneys at Law                    A Professional Corporation

COURT PLAZA NORTH
25 MAIN STREET
P.O. BOX 800
HACKENSACK, NJ 07602-0800
201.489.3000   201.489.1536 FAX

**Jason R. Melzer**
ASSOCIATE
ADMITTED IN NJ AND NY

**Reply to New Jersey Office**
WRITER'S DIRECT LINE: 201-525-6313
WRITER'S DIRECT FAX: 201-678-6313
WRITER'S E-MAIL: JMelzer@coleschotz.com

900 THIRD AVENUE, 16TH FLOOR
NEW YORK, NY 10022-4728
212.752.8000   212.752.8393 FAX

August 20, 2007

**VIA ELECTRONIC CASE FILING**
Honorable Stanley R. Chesler, U.S.D.J.
United States District Court, District of New Jersey Newark
Frank R. Lautenberg U.S. P.O. & Courthouse
P.O. Box 999
Newark, NJ 07101-0999

   Re:   **Keady v. J.P. Morgan Chase & Co.**
      **Case No. 2:07-CV-02752-SRC, CCC**

Dear Judge Chesler:

   This office represents the plaintiff in the above referenced matter. Pursuant to Local Civil Rule 7.1(d)(5), please accept this letter as plaintiff's request for an automatic fourteen-day extension to file its opposition to defendant's motion to dismiss, currently due to be filed by plaintiff on August 27, 2007. The hearing date for defendant's motion is currently set for September 10, 2007. In the event that the Court grants plaintiff the automatic fourteen-day extension, the new hearing date, subject to the Court's availability, will be September 24, 2007.

   The Court's courtesies in granting this automatic extension are greatly appreciated.

       Respectfully submitted,

       COLE, SCHOTZ, MEISEL,
       FORMAN & LEONARD, P.A.

       Jason R. Melzer

JRM:fmm
cc:   Christopher R. Belmonte, Esq. - Via Facsimile 732-603-4977
    Steven I. Adler, Esq.

41206/0001-1489613v1



**COLE SCHOTZ**
Cole, Schotz, Meisel, Forman & Leonard, P.A.
Attorneys at Law            A Professional Corporation

COURT PLAZA NORTH
25 MAIN STREET
P.O. BOX 800
HACKENSACK, NJ 07602-0800
201.489.3000  201.489.1536 FAX

Jason R. Melzer
ASSOCIATE
ADMITTED IN NJ AND NY

Reply to New Jersey Office
WRITER'S DIRECT LINE: 201-525-6333
WRITER'S DIRECT FAX: 201-678-6333
WRITER'S E-MAIL: JMelzer@coleschotz.com

900 THIRD AVENUE, 16TH FLOOR
NEW YORK, NY 10022-4728
212.752.8000  212.752.8393 FAX

August 20, 2007

**VIA ELECTRONIC CASE FILING**
Honorable Stanley R. Chesler, U.S.D.J.
United States District Court, District of New Jersey Newark
Frank R. Lautenberg U.S. P.O. & Courthouse
P.O. Box 999
Newark, NJ 07101-0999

    Re:    **Keady v. J.P. Morgan Chase & Co.**
            **Case No. 2:07-CV-02752-SRC, CCC**

Dear Judge Chesler:

    This office represents the plaintiff in the above referenced matter. Pursuant to Local Civil Rule 7.1(d)(5), please accept this letter as plaintiff's request for an automatic fourteen-day extension to file its opposition to defendant's motion to dismiss, currently due to be filed by plaintiff on August 27, 2007. The hearing date for defendant's motion is currently set for September 10, 2007. In the event that the Court grants plaintiff the automatic fourteen-day extension, the new hearing date, subject to the Court's availability, will be September 24, 2007.

    The Court's courtesies in granting this automatic extension are greatly appreciated.

                    Respectfully submitted,

                    COLE, SCHOTZ, MEISEL,
                    FORMAN & LEONARD, P.A.

                    Jason R. Melzer

JRM:fmm
cc:    Christopher R. Belmonte, Esq. - Via Facsimile 732-603-4977
       Steven I. Adler, Esq.

**SO ORDERED**

WWW.COLESCHOTZ.COM

41206/0001-1489613v1

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P. O. Box 800
Hackensack, New Jersey  07602-0800
(201) 489-3000
(201) 489-1536  Facsimile
Steven I. Adler
Attorneys for Regina M. Keady, as Executrix of the Estate of Michael P. Keady, Plaintiff

|  |  |
|---|---|
| REGINA M. KEADY, as Executrix of the ESTATE OF MICHAEL P. KEADY | : <br> : UNITED STATES DISTRICT COURT <br> : FOR THE DISTRICT OF NEW JERSEY <br> : CIVIL ACTION NO. 2:07-CV-02752-SRC-<br> : CCC |
| Plaintiff, | : |
| v. | : <br> : Civil Action <br> : |
| JP MORGAN CHASE & CO. | : <br> : |
| Defendant. | : <br> : |

---

**BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO
F.R.C.P. 12(B)(6) OR, IN THE ALTERNATIVE, FOR TRANSFER PURSUANT TO 28
U.S.C. 1404(a)**

---

Of counsel and on the brief:

    Steven I. Adler

On the brief:

    Jason R. Melzer

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................................................ii

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS........................................................................................ 2

LEGAL ARGUMENT .............................................................................................. 6

    I.      THE COURT SHOULD EITHER REFUSE TO CONSIDER THE
            EVIDENCE SUBMITTED AS MATTERS OUTSIDE THE PLEADINGS
            OR TREAT CHASE'S MOTION AS ONE FOR SUMMARY
            JUDGMENT ..................................................................................... 6

    II.     KEADY'S CLAIMS IN THE PLEXUS LITIGATION DO NOT
            VIOLATE THE TERMS OF THE RELEASE AGREEMENT AND, IN
            ANY EVENT, HAVE NO BEARING ON CHASE'S INSTANT
            APPLICATION. ................................................................................ 8

    III.    IN THE EVENT THE COURT DOES EXCLUDE THE EXTRANEOUS
            EVIDENCE SUBMITTED BY CHASE YET CONSIDERS CHASE'S
            MOTION AS A MOTION TO DISMISS, KEADY HAS
            SUFFICIENTLY PLEAD ALL CLAIMS ASSERTED IN THE
            COMPLAINT, WARRANTING A DENIAL OF CHASE'S MOTION. ............ 11

    IV.    THE FORUM SELECTION CLAUSE CONTAINED IN THE SPA
            DOES NOT APPLY TO KEADY'S CLAIMS IN THIS ACTION AND,
            THEREFORE, VENUE SHOULD NOT BE TRANSFERRED. ........................ 12

    V.     VENUE SHOULD NOT BE TRANSFERRED PURSUANT TO 28
            U.S.C. § 1404. .............................................................................. 14

          A.      Private Interests....................................................................... 15

          B.      Public Interests........................................................................ 16

41206/0001-1491356v1

## TABLE OF AUTHORITIES

### CASES                                                                    PAGES

American Tel. & Tel. Co. v. MCI Communications, 736 F. Supp. 1294
(D.N.J. 1990).................................................................................................. 14, 15, 16

Coffey v. Van Dorn Iron Works, 796 F.2d 217 (7th Cir. 1986)................................................ 14

Drucker's, Inc. v. Pioneer Electronics (USA), Inc., 93-CV-1931, 1993 WL 431162 ................. 12

Fagin v. Gilmartin, 432 F.3d 276 (3rd Cir. 2005) ......................................................... 6

Gibbs & Hell, Inc. v. Harbert Intern, Inc., 745 F. Supp. 993 (S.D.N.Y. 1990) ........................... 15

Heller Financial, Inc. v. Midway Powder Co., Inc., 883 F.2d 1286 (7th Cir. 1989)................... 14

Neitzke v. Williams, 490 U.S. 319, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989) ........................ 11

Schering Corp. v. First Databank, Inc., 479 F. Supp. 2d 468 (D.N.J. 2007) .............................. 12

Security Savings Bank, S.L.A. v. Green Tree Acceptance, 703 F. Supp. 350
(D.N.J. 1989)............................................................................................................... 14

Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181 (3d Cir. 2006)............................................ 11

United States v. Gaubert, 499 U.S. 315, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991) ................. 11

Wagner, et als. v. JP Morgan Chase Bank, Civil Action No. 1:06-CV-3126 (KMK)................... 3

### STATUTES

20 U.S.C.A. § 1391(a).............................................................................................................. 14

28 U.S.C. 1404(a) ............................................................................................................. 1, 14

F.R.C.P. 12(b)(6) ......................................................................................................................... 1

41206/0001-1491356v1

# PRELIMINARY STATEMENT

Without engaging in any discovery, or presenting any admissible evidence, Defendant, JP Morgan Chase Bank, ("Chase") essentially asks this Court to grant summary judgment, dismissing Plaintiff, Regina M. Keady, as Executrix of the Estate of Michael P. Keady's ("Keady") complaint, with prejudice.  Chase's motion must be denied because, although presented as a motion to dismiss, the motion is truly one for summary judgment.  There are, however, numerous issues of fact, which preclude summary judgment at this pre-discovery juncture.  Even if the Court were to treat Chase's motion as a motion to dismiss, the motion must still be denied because the complaint pleads *prima facie* contract claims under New Jersey Law.

Initially, it should be noted that Chase's motion to dismiss is more properly characterized as a motion for summary judgment.  Indeed, Chase offers as evidence documents that are not attached to the complaint, nor even referred to therein.  When viewing the present motion as one for summary judgment, the motion must be denied in light of the fact that no discovery has been exchanged and there are genuine disputes as to the material facts of this case.

Even if the Court were to refuse to consider the outside evidence submitted by Chase, and treat the motion as a motion to dismiss, the motion must still be denied.  Keady has sufficiently pled contract claims, which requires the denial of Chase's motion to dismiss.  Specifically, the Complaint alleges that pursuant to an agreement entered into by the parties, Chase was obligated to make a payment in the amount of $375,0000.00 to Keady on or before August 31, 2006 and that Chase has refused to make that payment.  Since the complaint alleges *prima facie* contract claims, the motion to dismiss must be denied.

# STATEMENT OF FACTS

## Background.

This matter arises out of Chase's failure to make a $375,000.00 payment to Keady in breach of a letter agreement dated March 31, 2004 (the "Letter Agreement").

Keady was employed by Chase pursuant to the terms of an offer letter executed by Chase on or about August 23, 2002 and by Keady on or about August 26, 2002 (the "Offer Letter"). After a year and a half into his employment by Chase, on or about March 31, 2004, Keady received the Letter Agreement informing Keady of his termination and advising him of, among other things, the following:

A.   Keady would receive salary and benefits during a sixty day (60) day notice period (from March 31, 2004 to May 31, 2004);

B.   That in exchange for a release of claims arising before the signing of the release, Keady would receive certain severance pay and other benefits; and

C.   That pursuant to the terms of the Offer Letter, Chase or any successors would pay Keady or his heirs a payment of $375,000.00 on or before August 31, 2004 and another payment of equal amount on or before August 31, 2006.

Pursuant to the terms of the Letter Agreement, Keady executed a release on or about April 16, 2004 (the "Release Agreement") (a copy of the Release Agreement is annexed as Exhibit A to the Affidavit of Denise Boyle dated July 10, 2007, submitted in support of Chase's motion (the "Boyle Affidavit")).

## The Stock Purchase Agreement and the Plexus Litigation

This firm represents Keady, along with co-plaintiffs Wayne Wagner ("Wagner"), Lawrence Cuneo ("Cuneo"), Mark Edwards ("Edwards"), David L. Hall ("Hall"), the Estate of Ian Screen ("Screen"), Steven Glass ("Glass"), Tera R. Fead ("Fead") and Regina Miller

2

("Miller") (collectively, the "Plexus Plaintiffs") in connection with a separate and unrelated action currently pending in the United States District Court for the Southern District of New York entitled <u>Wagner, et als. v. JP Morgan Chase Bank</u>, Civil Action No. 1:06-CV-3126 (KMK) (the "Plexus Litigation").

The Plexus Plaintiffs are the former shareholders of Plexus Group, Inc. ("Plexus"). Plaintiffs, along with the Trustee of the Plexus Group Employee Stock Ownership Plan, ("ESOP"), sold their shares in Plexus to Chase pursuant to a Stock Purchase Agreement dated as of August 19, 2002 (the "SPA") (a copy of the SPA is annexed as Exhibit B to the Boyle Affidavit.

Plexus was a consulting firm that specialized in enhancing the performance of investment managers, pension funds and securities brokers by assessing the costs involved in the trading process and providing insight into the competitiveness of a broker's execution skills. (<u>See</u> the complaint (the "Plexus Complaint") annexed as Exhibit A to the Affidavit of Joshua M. Rubins dated July 10, 2007 submitted in support of Chase's motion (the "Rubins Affidavit") at ¶ 4).) Plexus added value for its clients through the customized analysis of each client's trading data and distilled its analysis into practical recommendations for improving investment returns through better trading practices. (<u>See</u> Plexus Complaint at ¶ 4.)

Prior to being sold by Plaintiffs, Plexus already had become the leader in its industry. Due to the nature of its business, however, Plexus needed to upgrade and invest in emerging technology to maintain its competitive edge. (<u>See</u> Plexus Complaint at ¶ 5.) Rather than make such a large capital infusion, Plaintiffs decided to sell Plexus to Chase. (<u>See</u> Plexus Complaint at ¶ 5.) When Plaintiffs and Chase executed the SPA, the parties recognized that Chase would need

3

to make a material and relatively prompt technology investment to enable Plexus to maintain its market share and meet the Chase's revenue projections. (See Plexus Complaint at ¶ 5.)

Ensuring that Chase made the necessary technology investment was of paramount importance to Plaintiffs, as a significant portion of the economic benefits due them under the SPA (in the form of subsequent purchase price installments and incentive payments) were dependent upon Plexus achieving certain revenues. (See Plexus Complaint at ¶ 6.) Accordingly, Plaintiffs negotiated a provision in the SPA requiring that Chase "spend not less than six million ($6,000,000) dollars during the twenty-four (24) month period commencing on the Closing Date to [sic] for the purpose of enhancing [Plexus'] technology platform and applications and delivery system used by [Plexus] and may spend up to fifteen million dollars ($15,000,000) in the aggregate in such twenty-four (24) month period." (See Plexus Complaint at ¶ 6.)

Notwithstanding that express $6 million requirement, Chase invested substantially less than the negotiated amount. (See Plexus Complaint at ¶ 7.) In addition, although Chase represented to Plaintiffs it had plans to expand Plexus' presence, platform and revenues, Chase, among other things, imposed cost cutting measures and hiring freezes, failed to invest in R&D, closed Plexus' sales and technology development offices, forced out or terminated key Plexus employees, including Keady, and otherwise caused significant disruption in Plexus' operations and hampered Plexus' ability to meet its revenue projections. (See Plexus Complaint at ¶ 7.)

On September 29, 2004, after Keady signed the Release Agreement and after the initial twenty-four (24) month post-closing period expired, the Plexus Plaintiffs wrote to Chase requesting an accounting of the technology spend to determine whether Chase complied with ¶ 7.2 of the SPA. (See Plexus Complaint at ¶ 36.) That request was ignored. the Plexus Plaintiffs sent a follow-up letter on November 3, 2004. That letter indicated it was "a second

4

formal request for a complete, detailed and final accounting of the mandatory 'technology spend' of $6 million that is set forth in the [SPA]."  Chase again failed to respond.  In fact, Chase never saw fit either to account for its contractual obligations or respond to Plaintiffs' reasonable requests for information in that regard.  (See Plexus Complaint at ¶ 37.)

In February 2004, Chase announced the closure of Plexus' technology development office in California, and half of its employees were terminated in April 2004.  (See Plexus Complaint at ¶ 48.)  In late June 2004, Hall, the former President and CEO of Plexus, was terminated.  The remaining employees in the technology department office were terminated or reassigned in September 2004.  (See Plexus Complaint at ¶ 48.)

In or about July, 2004 there was a holding company merger between J.P. Morgan Chase & Co. and Bank One Corporation and, thereafter, Chase focused on cost containment.  (See Plexus Complaint at ¶ 49.)  In April, 2005, Chase terminated its relationship with the company it chose to sell, promote and market Plexus' services in the European market, effective December 31, 2005, leaving Plexus without client servicing and sales personnel in Europe.  (See Plexus Complaint at ¶ 49.)

Finally, on January 3, 2006, Chase sold Plexus to another company, known as ITG.  (See Plexus Complaint at ¶ 52.)

The Plexus Plaintiffs allege that Chase's actions constitute material breaches of the SPA, as well as the implied covenant of good faith and fair dealing.  The Plexus Plaintiffs claim that Chase's actions caused Plaintiffs tremendous economic loss well in excess of $12.5 million.

## LEGAL ARGUMENT

### I.  THE COURT SHOULD EITHER REFUSE TO CONSIDER THE EVIDENCE SUBMITTED AS MATTERS OUTSIDE THE PLEADINGS OR TREAT CHASE'S MOTION AS ONE FOR SUMMARY JUDGMENT

Although Chase has filed the present motion pursuant to F.R.Civ.P. 12(b)(6), Chase relies almost exclusively on documents that are not attached to nor referenced in the Complaint.  In spite of this, Chase goes to great, but unpersuasive lengths, to convince the Court that the motion is truly a motion to dismiss.  As Chase's reliance upon outside evidence and attempts to contest the allegations in the complaint highlight, Chase is effectively seeking summary judgment prior to engaging in any discovery.

In support of its motion, Chase submits as evidence three documents which have no bearing on the allegations contained in the complaint -- the Plexus Complaint, the Offer Letter, and the Release Agreement.  Due to Chase's attempts to introduce evidence from outside the pleadings, the Court should either refuse to consider the outside matters or treat the motion as one for summary judgment.  See F.R.Civ.P. 12(b)(6).  "Federal Rule of Civil Procedure 12(b) requires conversion from a motion to dismiss to a motion for summary judgment when materials outside the pleadings are considered."  Fagin v. Gilmartin, 432 F.3d 276, 280 (3rd Cir. 2005).  Accordingly, if the Court does consider the evidence of matters outside of the pleadings, then Chase's motion should be treated as a motion for summary judgment and denied as being premature.

As an initial matter, it should be noted that Chase has failed to properly authenticate the outside evidence that they submit in support of its motion.  Under Federal Rule of Evidence 602, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Denise Boyle's Affidavit dated

6

July 10, 2007, submitted in support of Chase's motion, does not even attempt to comply with this rule. Nowhere in her Affidavit does Ms. Boyle affirm that she has personal knowledge of the facts surrounding Keady's allegations in this action, nor does she affirm that she is personally familiar with the documents attached to her affidavit. In fact, Ms. Doyle does not affirm to have been involved in the negotiation, execution, or performance of any of the agreements cited in Chase's motion.

As Chase's own motion demonstrates, there are genuine material issues of fact as to whether or not Keady's claims in the Plexus Litigation were intended to be waived pursuant to the Release Agreement. Thus, if the Court does consider the extraneous evidence cited to by Chase, and Chase's motion is treated as one for summary judgment, that motion must be denied.

7

II.    **KEADY'S CLAIMS IN THE PLEXUS LITIGATION DO NOT VIOLATE THE TERMS OF THE RELEASE AGREEMENT AND, IN ANY EVENT, HAVE NO BEARING ON CHASE'S INSTANT APPLICATION.**

Keady's participation in the Plexus Litigation in no way extinguished, or constituted a forfeiture, of the $375,000 payment due him on or before August 31, 2006, pursuant to the Letter Agreement.

The plain language of the Release Agreement provides that Keady only released claims "from the beginning of the world up to and including the date of execution of this Release. . ." The Release was signed on or about April 16, 2004. Keady's allegations in the Plexus litigation are limited to Chase's conduct <u>after</u> that date which interfered with his entitlement to certain payments which were due him subsequent to his execution of the Release Agreement. That is why the March 21, 2004 Letter Agreement specifically references those later payments. It states as follows:

> "Additionally, pursuant to Sections 2.2 and 2.3 of the Stock Purchase Agreement for Plexus Group, Inc., you shall remain entitled to share in certain incentive payments if certain cumulative revenue targets are achieved by December 31, 2004, December 31, 2005, December 31, 2006 and December 31, 2007."

In fact, the Release agreement specifically notes that Keady was not releasing "any legal obligations of JPMC that, by their terms are to be performed <u>after</u> the date of execution of this Release. . ." (emphasis added).

Keady is not pursuing any claims in the Plexus Litigation based on Chase's conduct prior to April 16, 2004. Accordingly, there is no legitimate basis on which with to withhold the final payment of $375,000 which was due to Keady on or before August 31, 2006.

Chase's arguments focus almost exclusively on the Release Agreement while turning a blind eye to the Letter Agreement, even though the Letter Agreement was negotiated and

8

executed simultaneously and despite its reference in the first few lines of the Release Agreement. As previously noted, the Release Agreement only bars claims which arose prior to the date Keady executed the Release Agreement. The other language from the Release Agreement cited by Chase does not detract at all from the fact that the Release Agreement and Letter Agreement undeniably enable Keady to pursue claims subsequent to April 26, 2004. Any other reading of these documents would be nonsensical. If the intent of the documents was to preclude all claims, regardless of when they arose, the Release Agreement would not have had the caveat that it only cover claims "up to and including the date of execution of this Release" or the language Chase highlights: "including any continuing effects of any acts or practices prior to the date of execution of this Release."

The Plexus Litigation relates to many other plaintiffs in addition to Keady and, therefore, the events going back to 2002 are relevant to their claims. As to Keady, Chase ignores many facts in the Plexus complaint relating to Chase's breaches after Keady signed the Release Agreement, including a key event, Chase's recent sale of Plexus. That decision, in and of itself, damaged Keady (and the other Plexus Plaintiffs), and Kedy was entitled to sue Chase based on this new circumstance notwithstanding the Release Agreement and, in fact, as provided for therein. The Letter Agreement specifically provides that Keady "shall remain entitled to share in certain incentive payments if certain cumulative revenue targets are achieved by December 31, 2004, December 31, 2005, December 31, 2006 and December 31, 2007," and Chase's sale of Plexus, again after Keady executed the Release Agreement, precluded him from realizing these monies.

Finally, it should be noted that the monies due Keady under the Letter Agreement are not bonus or incentive compensation, but monies he previously earned which Chase agreed to

amortize and pay over a number of years.  The Release Agreement itself carves out an exception

for this money, stating as follows:

> ". . .the foregoing does not release:
>
> . ..
>
> any legal claims concerning non-bonus or non-incentive
> compensation related to the payments of wages earned, due and
> owing under any labor or wage statutes;"

Keady painstakingly adhered to his confidentiality and other obligations under the

Release Agreement and did not breach the clear terms of the Release Agreement or the Letter

Agreement by filing the Plexus Litigation.

**III.     IN THE EVENT THE COURT DOES EXCLUDE THE EXTRANEOUS EVIDENCE SUBMITTED BY CHASE YET CONSIDERS CHASE'S MOTION AS A MOTION TO DISMISS, KEADY HAS SUFFICIENTLY PLEAD ALL CLAIMS ASSERTED IN THE COMPLAINT, <u>WARRANTING A DENIAL OF CHASE'S MOTION.</u>**

If the Court refuses to consider the extraneous evidence submitted by Chase, and treats Chases' motion as a motion to dismiss, the motion must be denied because Keady has stated viable causes of action.  In considering a motion to dismiss for failure to state a claim, the Court is to accept as true all of the factual allegations in the complaint.  <u>United States v. Gaubert</u>, 499 U.S. 315, 327, 111 S.Ct. 1267, 1276, 113 L.Ed.2d 335 (1991).  The Court must accept as true all allegations of the complaint and all reasonable inferences that can be drawn therefrom.  <u>See</u> <u>Taliaferro v. Darby Twp. Zoning Bd.</u>, 458 F.3d 181, 188 (3d Cir. 2006)..

A Rule 12(b)(6) motion should be granted in rare instances only when "as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." <u>Neitzke v. Williams</u>, 490 U.S. 319, 326-27, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989).  When reviewing the Complaint under the foregoing standards, Keady has stated viable causes of action under New Jersey law for breach of contract, unjust enrichment and quantum meruit.

Here, Chase does not argue that Keady has failed to adequately plead any of the claims asserted in the Complaint.  Rather, Chase's sole argument in support of its motion to dismiss is centered on language contained in a separate agreement (the Release Agreement) not referenced in the Complaint and which, as set forth in detail above, cannot be considered on a motion dismiss.  Moreover, as detailed in Point II, <u>supra</u>, even if Chase's motion is considered as a motion for summary judgment, Keady's claims in the Plexus Litigation do not violate the Release Agreement and, therefore, Chase's motion must be denied.

11

IV.  **THE FORUM SELECTION CLAUSE CONTAINED IN THE SPA DOES NOT APPLY TO KEADY'S CLAIMS IN THIS ACTION AND, THEREFORE, VENUE SHOULD NOT BE TRANSFERRED.**

Chase's argument that this action should be transferred to the Southern District of New York plainly fails as a matter of law.  Chase does not cite a forum selection clause contained in the single document at issue in this case.  Rather, Chase cites to a forum selection clause contained in the SPA.  The forum selection clause in the SPA cited to by Chase, by its own terms, applies to "any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out or in connection with, [the SPA] or the transactions contemplated [thereby]."  This forum selection clause applies to the claims asserted in the Plexus Litigation and, accordingly, that action was commenced in the Southern District of New York.  However, Chase cannot sincerely argue that Keady's termination and the terms of his severance were "contemplated" by the SPA.  Had Chase included a forum selection clause in the Letter Agreement, such a clause would apply to Keady's claims arising from Chase's breach thereof. This is not the case and the forum selection clause contained in the SPA cannot possibly be stretched so far as to encompass Keady's claims in this action.

The cases cited by Chase to support its overreaching interpretation of the SPA's forum selection clause clearly do not apply here.  For instance, in <u>Schering Corp. v. First Databank, Inc.</u>, 479 F.Supp.2d 468, 470-71 (D.N.J. 2007), the Court held that the "broadly worded" language contained in a forum selection clause applied not only to disputes concerning the agreement itself but to any dispute concerning the products referenced in the agreement. Similarly, in <u>Drucker's, Inc. v. Pioneer Electronics (USA), Inc.</u>, 93-CV-1931, 1993 WL 431162 (D.N.J. Oct. 20, 1993), the court held that a forum selection clause using "transactions contemplated" language applied to claims "derivative of the contractual relationship."  Neither of

12

these cases, however, stretch the language of a forum selection clause to apply to a <u>different</u>

contract without a forum selection clause.  In fact, Chase does not cite a single case within the

Third Circuit to support such a strained interpretation of a forum selection clause.

13

## V.   VENUE SHOULD NOT BE TRANSFERRED PURSUANT TO 28 U.S.C. § 1404.

Chase has failed to provide clear and convincing evidence demonstrating that Keady's choice of forum should be disturbed.  In diversity actions, the plaintiff often is given a choice of several forums in which to institute suit.  See 20 U.S.C.A. § 1391(a).  Plaintiff's choice of venue is presumed to be correct.  American Tel. & Tel. Co. v. MCI Communications, 736 F.Supp. 1294, 1306 (D.N.J. 1990).  Only where the defendant can establish that another district is clearly more convenient than the forum chosen by plaintiff may the court transfer venue.  Coffey v. Van Dorn Iron Works, 796 F.2d 217, 219-20 (7th Cir. 1986).

The defendant has the burden of establishing that the transferee forum is clearly more convenient.  Coffey v. Van Dorn Iron Works, 796 F.2d at 219-20; see also Heller Financial, Inc. v. Midway Powder Co., Inc., 883 F.2d 1286, 1293 (7th Cir. 1989); Security Savings Bank, S.L.A. v. Green Tree Acceptance, 703 F.Supp. 350 (D.N.J. 1989).  The balancing of relevant factors must "weigh heavily" on the side of transfer to order a transfer.  American Tel. & Tel. Co. v. MCI Communications, 736 F.Supp. at 1306, quoting Lacey v. Cessna Aircraft Co., 862 F.2d 38, 34 (3d Cir. 1988).

Venue cannot be transferred simply because one forum may be preferable to another. Venue is transferred only "to prevent a waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense."  American Tel. & Tel. Co. v. MCI Communications, 736 F.Supp. 1294, 1305 (D.N.J. 1990), quoting Van Dusen v. Barrack, 376 U.S. 612, 616 (1964).  In determining whether transfer of venue is appropriate, courts review factors that relate to private and public interests.  American Tel. & Tel. Co. v. MCI Communications, supra.  The pertinent private and public factors are discussed below.

14

### A.     Private Interests.

Private interests include "the plaintiff's choice of forum, the ease of access to sources of proof, availability of compulsory process over unwilling witnesses, the cost of attendance of willing witnesses, obstacles to a fair trial and the possibility of a jury view of the subject of the suit." American Tel. & Tel. Co., 736 F.Supp. at 1306-07. Chase has failed to show that these factors weigh heavily in favor of transferring venue.

The plaintiff's choice of New Jersey as a forum is presumptively correct, particularly because Keady has chosen his home state as the forum. "In the Third Circuit, a plaintiff's choice of forum is 'paramount concern' in deciding a motion to transfer venue . . . . When a plaintiff chooses his home forum, the choice is 'entitled to great deference.'" American Telephone & Telegraph Co., 736 F.Supp. at 1306, citing Sandvik, Inc. v. Continental Ins. Co., 724 F.Supp. 303, 307 (D.N.J. 1989). Moreover, the principal place of business of the plaintiff entity is a factor bearing on whether a transfer is appropriate. Gibbs & Hell, Inc. v. Harbert Intern, Inc., 745 F.Supp. 993, 996 (S.D.N.Y. 1990).

New Jersey is Keady's home forum. The damages suffered by Keady's estate have been felt in New Jersey. Chase knew that its wrongdoing would cause harm in New Jersey and would cause a suit to be instituted in this state.

The second factor -- ease of access to sources of proof -- does not weigh heavily in favor of granting a transfer. As demonstrated above, there is only one contract at issue in this relatively straightforward case. Hence, any document productions will most likely be extremely narrow in scope and very few depositions, if any, appear to be necessary. Moreover, this case may ultimately be ripe for summary judgment, after discovery has been concluded. In the event

that a trial is ultimately necessary, there will be no obstacles to a fair trial if the trial is held in New Jersey.

### B. Public Interests.

Public interests include "court congestion and other administrative difficulties, placing the burden of jury duty on those having the closest ties to the action, local interest in having cases adjudicated at home and familiarity of the forum court with the applicable law." American Tel. & Tel. Co., 736 F.Supp. at 1307. These factors do not weigh in favor of transfer.

It is clear that, since at the time the Letter Agreement was executed, Keady was residing in New Jersey, New Jersey law will apply to the facts of this case. New Jersey courts are most familiar with the law of New Jersey. It is inconsistent for Chase not to challenge the fact that New Jersey law applies and then argue that a court in New York is the more appropriate forum to apply New Jersey law.

16

For the foregoing reasons, it is respectfully submitted that Chase's motion to dismiss or, in the alternative, to transfer venue, be denied in its entirety.

Respectfully submitted,
COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.,
Attorneys for Plaintiff


By: /s/ Steven I. Adler
    Steven I. Adler

DATED:  September 10, 2007

17

Steven I. Adler, Esq.
**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P. O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Attorneys for Plaintiff, Regina M. Keady, as Executrix of the Estate of Michael P. Keady

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| REGINA M. KEADY, as Executrix of the ESTATE OF MICHAEL P. KEADY, )<br><br>Plaintiffs, )<br><br>v. )<br><br>JP MORGAN CHASE & CO., )<br><br>Defendant. ) | Civil Action No.: 07 cv 2752 (SRC)<br><br>**CERTIFICATE OF SERVICE** |

KAREN L. CHIANDUSSE, being of full age, hereby certifies as follows:

1.    I am a paralegal with the law firm Cole, Schotz, Meisel, Forman & Leonard, P.A., attorneys for Plaintiff, Regina M. Keady, as Executrix of the Estate of Michael P. Keady in the above-captioned matter. I am over the age of eighteen (18) years and not a party to this action.

2.    I certify that on September 10, 2007, this office electronically filed Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss Pursuant to F.R.C.P. 12(B)(6), or, in the Alternative, for Transfer Pursuant to 28 U.S.C. 1404(a) with the

United States District Court for the District of New Jersey, and counsel of record for the

Defendant received notice of the above referenced pleading *via electronic service*.

*Karen L. Chiandusse*

KAREN L. CHIANDUSSE

DATED: September 11, 2007

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-------------------------------------------------- x

REGINA M. KEADY, as Executrix of the ESTATE OF
MICHAEL P. KEADY,

                    Plaintiff,

     - against -

JPMORGAN CHASE BANK N.A.,

                 Defendant.

-------------------------------------------------- x

Case No.: 2:07-cv-02752-SRC-CCC

Stipulation

    IT IS HEREBY STIPULATED AND AGREED that the time for JPMorgan

Chase & Co. ("JPMC") to reply to Plaintiff's Opposition to JPMC's Motion to Dismiss the

Complaint in this matter be and hereby is adjourned to September 20, 2007.

Dated: September 12, 2007

COLE, SCHOTZ, MEISEL, FORMAN &
LEONARD, P.A.

By: _____
    Jason Melzer, Esq.
P.O. Box 800
Hackensack, NJ 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Attorneys for Estate of Michael Keady,
Plaintiff

SATTERLEE STEPHENS BURKE &
BURKE LLP

By: /s/ Walter A. Saurack
    Walter A. Saurack
33 Wood Avenue South, 6th Floor
Iselin, NJ 08830
(732) 603-4966
(732) 603-4977 Facsimile
Attorney for Defendant J.P. Morgan

**SO ORDERED**
*s/Claire C. Cecchi*

Claire C. Cecchi, U.S.M.J.

**Date:** 9/18/07

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – X
:
REGINA M. KEADY, as Executrix of the ESTATE OF     :     Case No.: 2:07-cv-02752-SRC-CCC
MICHAEL P. KEADY,                                  :
                                                   :
                               Plaintiff,          :     Hon. Stanley R. Chesler, U.S.D.J.
                                                   :     Hon. Claire C. Checci U.S.M.J.
               - against -                         :
                                                   :
JPMORGAN CHASE & CO.,                              :     Return Date:  September 24, 2007
                                                   :     Oral argument is requested
                               Defendant.          :
                                                   :
– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – X

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF DEFENDANT'S MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(6)
OR, IN THE ALTERNATIVE, FOR TRANSFER PURSUANT TO 28 U.S.C. 1404(a)**

SATTERLEE STEPHENS BURKE & BURKE LLP
33 Wood Avenue South, 6th Floor
Iselin, NJ 08830
(732) 603-4966
(732) 603-4977

*Attorneys for Defendant JP Morgan Chase Bank, N.A.*

706725_1

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................- 1 -

POINT I:     THE COMPLAINT MAY BE PROPERLY DISMISSED
UNDER EITHER F.R.C.P. 12(b)(6) or F.R.C.P. 56 ....................................- 3 -

         A.     The Key Documents on Dismissal May Be Considered
Under Rule 12(b)(6) .............................................................................- 4 -

         B.     In the Alternative, the Complaint May Be Dismissed
Pursuant to Rule 56...............................................................................- 6 -

POINT II     KEADY FORFEITED THE RIGHT TO RECEIVE THE PAYMENT
AT ISSUE BY FILING THE PLEXUS COMPLAINT...................................- 7 -

POINT III     IN THE ALTERNATIVE, DISMISSAL OR TRANSFER BASED
ON THE FORUM SELECTION CLAUSE IS APPROPRIATE ...................- 11 -

CONCLUSION ......................................................................................................- 12 -

# TABLE OF AUTHORITIES

**Page**

**CASES**

American Patriot Ins. Agency, Inc. v. Mutual Risk Mgmt, Ltd.,
   364 F.3d 884 (7th Cir. 2004) ................................................................11

Ben. Guar. Corp. v. White Consol. Indus.,
   998 F.2d 1192 (3d Cir. 1993) ...............................................................5

Carver v. Plyer,
   115 Fed. Appx. 532, 536-37 (3d Cir. 2004) ........................................6

Cuchara v. Gai-Tronics Corp.,
   2005 WL 1030466 (3rd Cir. 2005) ....................................................5, 10

Geco Corp. v. H.D. Smith Wholesale Drug Co.,
   2006 WL 3359652 (D.N.J. Nov. 17, 2006) .........................................5

Hurst v. Merck & Co., Inc.,
   1996 WL 527053 (D.N.J. March 18, 1996) .........................................4, 5

Neuchatel Ins. v. ADT Security Sys., Inc.,
   1997 WL 539687 (E.D. Pa. Aug. 11, 1997) ........................................4

Pryor v. National Collegiate Athletic Ass'n,
   288 F.3d 548 (3d Cir. 2002) ................................................................4

Renz v. Schreiber,
   832 F. Supp. 766 (D.N.J. 1993) ..........................................................5

W. A. Butler Co. v. Colgate-Palmolive Co.,
   1992 WL 278008 (E.D. Pa. Sept. 30, 1992) .......................................6

**STATUTES**

28 U.S.C. § 1404(a) .......................................................................................1, 11

Fed. R. Civ. P. 12(b)6 ...................................................................................1,3, 11

Fed. R. Civ. P. 56..........................................................................................1, 3, 6, 10

Defendant JPMorgan Chase Bank N.A. ("Chase"), sued incorrectly herein as JPMorgan Chase & Co., by its attorneys, Satterlee Stephens Burke & Burke LLP, submits this reply memorandum of law in support of its motion to dismiss the Complaint dated May 7, 2007 (herein, the "Complaint") of plaintiff Regina M. Keady, as Executrix of the Estate of Michael P. Keady ("plaintiff"), pursuant to Fed. R. Civ. P. 12(b)6) or Fed. R. Civ. P. 56 or, in the alternative, for an order transferring this action to the Southern District of New York pursuant to 28 U.S.C. § 1404(a).

## PRELIMINARY STATEMENT

Plaintiff's opposition brief offers no reason why the claims in this case should not be dismissed. Plaintiff does not question the authenticity of the Release Agreement. Nor does plaintiff deny that, if Keady violated the conditions of the Release Agreement, he gave up any right to the $375,000 sought in this action. Yet plaintiff disingenuously asserts, without authority, that because the Release Agreement is not attached to the Complaint it may not be considered on a 12(b)(6) motion – despite the fact that the Release, <u>which is explicitly referenced in the Complaint</u>, is part and parcel of the agreement that plaintiff is suing upon. As demonstrated below, this contention simply ignores the relevant case-law. Indeed, it is well-settled that a plaintiff cannot avoid dismissal by effectively concealing from the Court a document of undisputed authenticity referenced in, or central to, its complaint.

Moreover, plaintiff acknowledges that the Court may, as requested in the alternative in Chase's motion papers, convert this motion to one for summary judgment under Rule 56. Plaintiff argues, however, that dismissal under this rule would be "premature," given that there has been no discovery. Yet plaintiff does not (and cannot) identify any material issue of fact raised by Chase's motion or any discovery that needs to be taken before this motion is

decided. Under these circumstances, summary judgment is entirely appropriate and consistently granted.

Indeed, the <u>only</u> issue on this motion is whether, on its face, the Plexus Complaint filed by Keady (a public record which the Court indisputably may consider) is an action filed, in violation of the Release Agreement, "in connection with any matter concerning my employment relationship with [Chase] and/or the termination thereof " up until April 16, 2004. <u>Plaintiff admits that the alleged wrongdoing alleged and sued upon in the Complaint includes, and explicitly refers to, the termination of Keady's employment on or before April 16, 2004</u>.

Plaintiff's only argument is that the Release Agreement was somehow not violated because the Plexus Complaint is also based on other, later alleged conduct by Chase, along with Keady's termination. This contention is nothing short of frivolous. <u>Nothing</u> in the Release Agreement suggests that Keady may base a claim against Chase on his termination so long as other acts or omissions by Chase are also alleged. On the contrary, Chase agreed to provide Keady with numerous payments and benefits in exchange for his unambiguous promise not to make his employment or termination an issue in <u>any</u> litigation against Chase. After receiving much of this compensation from Chase (including a $375,000 lump-sum payment), Keady broke his promise by alleging in the Plexus Complaint that his termination by Chase constituted misconduct. On the face of the contracts, the Keady Estate's attempt to extract another $375,000 from Chase is barred, and plaintiff's efforts to delay judgment and protract these proceedings should be rejected.

Finally, Chase's motion for transfer has been rendered moot by plaintiff's failure to present meaningful opposition to the motion to dismiss. In any event, plaintiff's contention that the forum-selection clause in the SPA does not apply is contradicted by the language in that

contract – which explicitly provides for Keady's employment and makes the forum-selection clause broadly applicable to any such relationship undertaken pursuant to the SPA.

## POINT I

### THE COMPLAINT MAY BE PROPERLY DISMISSED UNDER EITHER F.R.C.P. 12(b)(6) or F.R.C.P. 56

Plaintiff seeks to avoid expeditious adjudication in this action by claiming that the Court may not consider the Release Agreement, either because it is outside the pleadings or because it has been insufficiently "authenticated." As demonstrated below, there is no authority whatsoever for these arguments (and plaintiff cites none). The courts consistently grant motions to dismiss or for summary judgment based on signed contracts attached to pleadings or motion papers when there is no dispute as to their authenticity. Here there is no such dispute. Plaintiff's brief raises no question whatsoever about the authenticity of the Release Agreement, signed by Keady. On the contrary, plaintiff affirmatively acknowledges that the Release Agreement, exactly as submitted by Chase, was signed by Keady in conjunction with – and in order to render effective – the letter providing for the $375,000 payment at issue:

> Pursuant to the terms of the Letter Agreement, Keady executed a release on or about April 16, 2004 (the "Release Agreement") (a copy of the Release Agreement is annexed as Exhibit A to the Affidavit of Denise Boyle dated July 10, 2007, submitted in support of Chase's motion . . . .)

Plaintiff's Brief in Opposition ("Opp. Br.") at 2.

Given the undisputed authenticity of the Release Agreement, and the points discussed below, this action is clearly ripe for adjudication, whether under Rule 12(b)(6) or Rule 56.

- 3 -

**A.**      **The Key Documents on Dismissal May Be Considered Under Rule 12(b)(6)**

Plaintiff, citing no case-law and ignoring the case-law cited by Chase in its

moving brief ("Chase Br."), at 7 n.4, merely asserts that the Court may not consider the Release

Agreement or the Plexus Complaint because they are not attached to plaintiff's Complaint.  This

is not the law. [1]

It is well-settled that a "trial court has discretion to address evidence outside the

complaint when ruling on a motion to dismiss."  Pryor v. National Collegiate Athletic Ass'n, 288

F.3d 548, 559 (3d Cir. 2002).  Specifically, in addition to documents attached to the complaint,

documents "that the defendant attaches to the motion to dismiss are considered part of the

pleadings if they are referred to in the plaintiff's complaint and are central to the claim . . ."  Id.

at 560 (internal citation omitted).  See also, e.g., Hurst v. Merck & Co., Inc., 1996 WL 527053

(D.N.J. March 18, 1996), at *3 ("If the Complaint specifically references or quotes documents

that are subsequently attached in defendant's motion to dismiss, and there is no dispute as to

their authenticity, a court may consider them without converting the motion to one for summary

judgment"); Neuchatel Ins. v. ADT Security Sys., Inc., 1997 WL 539687 (E.D. Pa. Aug. 11,

1997) (relying on signed contract attached to defendant's motion to dismiss where authenticity

undisputed by plaintiff).

The Release Agreement submitted by Chase is an indisputably authentic, true and

correct copy of the Agreement signed and executed by Keady; as noted above, plaintiff does not

suggest otherwise and, in fact, acknowledges the Agreement's authenticity.  Moreover, the

Release Agreement is explicitly and repeatedly referenced in the Complaint: (i) at paragraph 2B,

plaintiff admits that the Notice Letter provided for certain payments, including the payment at

---

[1]   Contrary to plaintiff's assertion (Opp. Br. at 6), Chase has never suggested that the August 26, 2002 letter
agreement between Chase and Keady – which is relevant to the motion to transfer – has any bearing on the motion
to dismiss.

706725_1

issue, "in exchange for a release"; (ii) Exhibit A to the Complaint, the March 31, 2004 Notice

Letter, states, on page 1, that Mr. Keady's receipt of the payments and benefits set forth in the

letter is conditioned on his execution and return of the "enclosed" Release Agreement.

Indeed, plaintiff cannot – and does not – deny that the Notice Letter (attached to

the Complaint) and the Release Agreement (omitted from the Complaint) were part of a single

contractual arrangement, were executed in conjunction with each other, and must be read

together.  Nor does plaintiff suggest that there is anything remotely prejudicial or surprising

about Chase's introduction of the Release Agreement.  Moreover, plaintiff does not dispute that,

as previously demonstrated (Chase Br. at 6), 12(b)6) motions are granted when the terms of a

signed release bar plaintiff from seeking recovery. See e.g., Cuchara v. Gai-Tronics Corp., 2005

WL 1030466 (3rd Cir. 2005).  Thus, there can be no question that the Release Agreement is

"central" or "pertinent" to plaintiff's claims and can be considered on this 12(b)(6) motion.  A

plaintiff cannot compel a court to consider a document "in a vacuum divorced from . . . other

directly related, contemporaneous" documents.  When plaintiff "fails to introduce a pertinent

document as part of his pleading, defendant may introduce the exhibit as part of his motion

attacking the pleading." Hurst v. Merck, supra at *3, citing Renz v. Schreiber, 832 F. Supp. 766,

771 (D.N.J. 1993), and Charles A. Wright et al., Federal Practice and Procedure § 1327, at 762-

63 (internal quotation marks omitted).

Similarly, there is no colorable dispute as to whether the Court may consider the

Plexus Complaint – a public, filed court document – on this 12(b)(6) motion.  See e.g., Ben

Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993), cert. denied, 510 U.S.

1042 (1994); Geco Corp. v. H.D. Smith Wholesale Drug Co., 2006 WL 3359652 (D.N.J. Nov.

17, 2006).  Again, plaintiff does not dispute the authenticity of this exhibit and, indeed, offers no

rationale (let alone authority) for its exclusion.

## B.  In the Alternative, the Complaint May Be Dismissed Pursuant to Rule 56

The Court may also, in the alternative, convert this motion to a Rule 56 motion

for summary judgment, as requested in Chase's moving papers.  Chase. Br. at 7 n.4.  See, e.g.,

W. A. Butler Co. v. Colgate-Palmolive Co., 1992 WL 278008 (E.D. Pa. Sept. 30, 1992), at *3

(where defendant attached contracts to its motion to dismiss, and plaintiff did not dispute their

authenticity, motion could be decided under 12(b)(6) or, in the alternative, "resolved as a matter

of law, in conformity with Fed.R.Civ.P.56").[2]

Plaintiff's bald contentions that adjudication under Rule 56 would be

"premature," because no discovery has been taken (Opp. Br. at 1, 6-7), are unsupported by any

authority or the record.  There is, of course, no general rule requiring that a discovery period

occur prior to summary judgment.  On the contrary, the Federal Rules provide that a defendant

"may, at any time, move with or without supporting affidavits for a summary judgment in the

party's favor . . . ." Fed. R. Civ. P. 56(b) (emphasis added).  It is the plaintiff's burden either to

demonstrate that issues of material fact preclude summary judgment or submit affidavits

showing that "facts essential to justify the opposition" are as yet unavailable because of the need

for specific discovery.  Fed. R. Civ. P. 56(f).[3]

---

[2]  Thus, plaintiff's desperate suggestion that the Release Agreement was somehow insufficiently "authenticated" by the affidavit of a Chase executive with oversight of the relevant business area (Opp. Br. at 6-7) is irrelevant as well as unsupported by any authority.  As the cited cases demonstrate, no affidavit at all is needed to authenticate a contract signed by the opposing party when, as here, that party raises no dispute as to (and, indeed, admits) its authenticity.

[3]  By offering arguments in opposition to summary judgment, plaintiff effectively acknowledges having received notice of the Court's possible conversion of the 12(b)(6) motion to a Rule 56 motion.  Moreover, when, as here, the moving papers request such a conversion, in the alternative, the adverse party is deemed to have had sufficient notice and opportunity to present opposing papers.  See, e.g., Carver v. Plyer, 115 Fed. Appx. 532, 536-37 (3d Cir. 2004).

706725_1

Plaintiff has identified no factual issue that precludes summary judgment.[4]  Nor has plaintiff identified (even in its brief, let alone, as required, in an affidavit) any discovery necessary for opposing summary judgment.  The Court has before it the two relevant contracts between the parties – the Notice Letter and the Release Agreement.  There is no dispute as to the authenticity of either document, and parol evidence is inadmissible given that there is no contention (let alone a showing) that either agreement is ambiguous.  Also before the Court is the Plexus Complaint, a public court record.  It is for the Court to determine, as a matter of law and contract interpretation, whether Keady's filing of the Plexus Complaint constituted a breach of the Release Agreement – which it clearly did.   Indeed, this is a matter ideally suited for adjudication at the pleading stage, and there is no bar whatsoever to the Court's conversion to – and granting of – a Rule 56 motion.

## POINT II

### KEADY FORFEITED THE RIGHT TO RECEIVE THE PAYMENT AT ISSUE BY FILING THE PLEXUS COMPLAINT

It is undisputed that Keady's right to receive the second $375,000 payment was conditioned on his continuing to abide by the conditions of the Release Agreement.  It is also undisputed that Keady, a named plaintiff in the Plexus Litigation, did "file or assert or permit to be filed or asserted" the Plexus Complaint.   Thus, the only issue on this motion is whether the filing of the Plexus Complaint  constituted a violation of the Release Agreement.  Chase has previously demonstrated that it clearly did so (Chase Br. at 4-8), and plaintiff offers no serious argument to the contrary.

---

[4]  Plaintiff merely asserts, apparently grasping at straws, that "there are genuine issues of fact as to whether or not Keady's claims in the Plexus Litigation were intended to be waived pursuant to the Release Agreement." Opp. Br. at 7.  This is a complete non sequitur, given that Chase has never suggested that "Keady's claims in the Plexus Litigation" were waived.  It is Keady's claim to the second $375,000 payment referenced in the Notice Letter that is barred by the Release Agreement, and that is an issue of law, not fact.

706725_1

Indeed, plaintiff's brief discussion of this central issue (Opp. Br. at 8-9) is a transparent exercise in evasion and distortion. As an initial matter, while quoting other, irrelevant contract provisions, plaintiff simply ignores the key provision in the Release Agreement, which explicitly provides that Chase will not be released from "any legal obligations of JPMC set forth in the [March 31, 2004] notice letter <u>for so long as I adhere to the terms of that letter and of this RELEASE</u>." Release Agreement at 2 (emphasis added). Plaintiff cannot, and does not, deny that this provision governs all purported obligations created by the Notice Letter, including the obligation to pay Keady $375,000 on or before August 31, 2006.

Similarly, plaintiff conspicuously fails to refer to the actual language of the Release, in which Keady promises not to file any civil action:

> <u>in connection with any matter concerning my employment relationship with [Chase] and/or the termination thereof</u> arising from the beginning of the world up to and including the date of execution of this RELEASE (whether known or unknown to me and including any continuing effects of any acts or practices prior to the date of execution of this RELEASE) . . . .

Release Agreement at 2 (emphasis added).

As previously demonstrated by Chase, the Plexus Complaint is based in part on the allegations (i) that Keady was wrongfully "forced out" and terminated; (ii) that this conduct with respect to Keady's employment constituted a breach of the implied covenant of good faith and fair dealing; and (iii) that Chase's breaches – expressly including the "forcing out" of Keady – resulted in Plexus's failure to achieve certain annual revenue thresholds beginning in 2003. <u>See</u>, <u>e.g.</u>, Plexus Complaint ¶ 45 ("Keady, the head of the Plexus sales team, was forced out," leaving "an experienced and decimated sales team at Plexus"); ¶ 53 (Chase "materially breached its obligations under the SPA" by, <u>inter alia</u>, "firing key sales people"); ¶¶ 20, 38, 53 (alleging damages related to revenue thresholds beginning in 2003 due to Chase mismanagement).

- 8 -

Moreover, the Plexus Complaint is also based in part on allegations concerning Keady's employment prior to termination, including the allegation that he was unfairly deprived of employee bonuses in 2002 and after. See ¶¶ 38-39, 43-48, 50 (allegations of pre-2004 conduct resulting in deprivation of employee bonuses in 2002, 2003, and after).

Plaintiff does not dispute any of this. Indeed, plaintiff's brief explicitly acknowledges that the Plexus Complaint alleges that Chase disrupted Plexus's operations and "hampered Plexus's ability to meet it revenue projections" when, inter alia, Chase "forced out or terminated key Plexus employees, including Keady." Opp. Br. at 4 (emphasis added). Plaintiff does not deny that the "forcing out" of Keady occurred prior to April 16, 2004 – and could hardly do so, given that the March 31, 2004 Notice Letter announces Keady's termination and the elimination of his position and the Release Agreement itself (indisputably sent to Keady on or about March 31, 2004) is premised on Keady's termination. Complaint, Exh. A.[5] Moreover, plaintiff admits that the Plexus Complaint is based as well on allegations of other Chase conduct "going back to 2002." Opp. Br. at 4.[6]

Unable to refute Chase's showing that the Plexus Complaint is based on allegations of Chase's conduct with respect to Keady's employment and termination (all prior to April 16, 2004), plaintiff is reduced to arguing that the Release Agreement should not be applied because the Plexus Complaint also involves other allegations of conduct and events that occurred after April 16, 2004. Opp. Br. at 9-10. This contention cannot withstand serious scrutiny.

---

[5] Moreover, the Release Agreement explicitly refers to Keady's promise not to bring any action in connection with the matter of his "termination," rendering absurd any argument that the termination occurred outside the time-frame of matters covered by the promise.

[6] Elsewhere in the brief, in flat contradiction of these admissions, plaintiff makes the patently false assertion that the Release Agreement is not applicable because "Keady is not pursuing any claims in the Plexus Litigation based on Chase's conduct prior to April 16, 2004 . . ." Opp. Br. at 8. The face of the Plexus Complaint, as established above, proves otherwise, and plaintiff does not, and cannot, claim that the action is not based, at least in part, on the cited allegations of Chase's conduct prior to April 16, 2004, including the allegations concerning Keady's employment and termination.

Nowhere in the language of the Release Agreement is there anything to support plaintiff's outlandish suggestion that the Agreement only applies if Keady brings an action <u>exclusively</u> "in connection with," or based on, his employment and termination. Such an interpretation would, of course, render the Release Agreement meaningless, since Keady could always avoid compliance with his promise simply by combining his employment-related allegations with some – any – other allegations. Indeed, in this case, as plaintiff does not deny, Keady could certainly have pursued the Plexus Litigation under the SPA <u>without</u> including claims based on, and allegations in connection with, his termination. Nonetheless, Keady chose to make his termination an issue, and a basis for his claims.

Thus, under any reasonable interpretation of the Release Agreement, the filing of the Plexus Complaint – based in part on Keady's termination and treatment as an employee prior to April 16, 2004 – constitutes a violation of Keady's promise in the Release Agreement (at 2). It is undisputed that such a violation releases Chase from its obligations under the Notice Letter, including the obligation to make the $375,000 payment at issue. Indeed, Keady did <u>precisely</u> what he promised not to do – <u>i.e.</u>, make a claim involving his termination – and there is no colorable basis for arguing that he did not thereby forfeit his right to collect another payment from Chase under the Notice Letter.

As previously demonstrated, and not disputed by plaintiff, under either Rule 12(b)(6) or Rule 56, dismissal of an action is fully appropriate where the terms of a release duly signed by plaintiff bar plaintiff from seeking recovery. <u>See</u> <u>e.g.</u> <u>Cuchara v. Gai-Tronics Corp.</u>, <u>supra</u>. On their face, the three relevant documents in this action – the Notice Letter, the Release Agreement, and the Plexus Complaint – clearly compel dismissal on this ground.

## POINT III

## IN THE ALTERNATIVE, DISMISSAL OR TRANSFER
## BASED ON THE FORUM SELECTION CLAUSE IS APPROPRIATE

Given plaintiff's failure to offer any viable opposition to Chase's motion based on the Release Agreement, dismissal should be granted, rendering unnecessary consideration of Chase's motion, in the alternative, for dismissal or transfer, based on the forum selection agreement in the SPA, under Rule 12(b)(6) or 28 U.S.C. 1404(a).

However, in the event the Court does consider this alternative motion, the motion should be granted for the reasons set forth in Chase's moving papers (Chase Br. at 8-15). Plaintiff does not deny that, if the forum selection clause is applicable here, dismissal or transfer is appropriate. Instead, plaintiff argues that the broadly worded forum selection clause is inapplicable to this action because Keady's termination was not a transaction that was explicitly "contemplated" by the SPA. However, plaintiff ignores the fact that – as previously demonstrated, and not disputed – Keady's <u>employment relationship</u> with Chase was explicitly contemplated, and, indeed, provided for, in the SPA. Plainly, potential termination is an integral part of any employment relationship, and, as such, among the transactions contemplated by the SPA.

Thus, in accordance with the authorities cited by Chase (Chase Br. at 10-12), the forum selection clause applies to this dispute concerning the termination of Keady's employment, and, in the alternative, this action should be dismissed or transferred on that ground.[7]

---

[7] Tellingly, plaintiff makes no attempt to distinguish <u>American Patriot Ins. Agency, Inc. v. Mutual Risk Mgmt. Ltd.</u>, 364 F.3d 884, 888-89 (7th Cir. 2004), in which the court held that a forum-selection clause in a Shareholder Agreement applied to claims concerning other, related contracts that do not contain forum-selection clause.

- 11 -

## CONCLUSION

For the foregoing reasons, and those set forth in defendant's moving papers, the

Complaint should be dismissed or, in the alternative, transferred to the Southern District of New

York.

Dated:     September 20, 2007

Respectfully submitted,

SATTERLEE STEPHENS BURKE & BURKE LLP

By: _____/s/ Christopher R. Belmonte_____
        Christopher R. Belmonte (CB-2163)

33 Wood Avenue South, 6th Floor
Iselin, NJ 08830
(732) 603-4966
(732) 603-4977

*Attorneys for Defendant JPMorgan Chase Bank, N.A.*

- 12 -

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – x

|  |  |  |
|---|---|---|
| REGINA M. KEADY, as Executrix of the ESTATE OF MICHAEL P. KEADY, | : : : : | |
| | Plaintiff, | : : | Case No.: 2:07-cv-02752-SRC-CCC |
| - against - | : : : | |
| JPMORGAN CHASE BANK N.A., | : : : | **NOTICE OF MOTION** |
| | Defendant. | : : : : : | |

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – x

PLEASE TAKE NOTICE THAT upon the accompanying Declaration of Christopher R. Belmonte of Satterlee Stephens Burke & Burke LLP, counsel for defendant JPMorgan Chase Bank N.A. ("JPMC"), dated September 26, 2007, and the exhibits annexed thereto, and upon all prior papers and proceedings, JPMC will move this Court, upon submission, before the Honorable Stanley R. Chessler, United States District Judge, in Courtroom PO 8 of the Martin Luther King, Jr. Federal Building & U.S. Courthouse, 50 Walnut Street, Newark, New Jersey, 07101, in accord with Rule 101.1(c) of the Local Civil Rules of the United States District Court for the District of New Jersey, for an order permitting James J. Coster of Satterlee Stephens Burke & Burke LLP to practice before this Court in connection with all proceedings in this matter.

DATED:
September 26, 2007

1

707546_1

SATTERLEE STEPHENS BURKE & BURKE
LLP

By: /s/ Christopher R. Belmonte
Christopher R. Belmonte
33 Wood Avenue South, 6th Floor
Iselin, NJ 08830
(732) 603-4966
(732) 603-4977 Facsimile
Attorney for Defendant J.P. Morgan Chase
Bank N.A.

2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

– – – – – – – – – – – – – – – – – – – – – – – – – – – x

REGINA M. KEADY, as Executrix of the ESTATE OF
MICHAEL P. KEADY,

                              Plaintiff,

             - against -

JPMORGAN CHASE BANK N.A.,

                          Defendant.

– – – – – – – – – – – – – – – – – – – – – – – – – – – x

Case No.: 2:07-cv-02752-SRC-CCC

**DECLARATION OF CHRISTOPHER R. BELMONTE IN SUPPORT OF MOTION FOR ADMISSION *PRO HAC VICE* OF JAMES J. COSTER**

CHRISTOPHER R. BELMONTE declares as follows:

1.     I am a member in good standing of the Bar of the State of New Jersey and of this Court, and I am a member of Satterlee Stephens Burke & Burke LLP ("Satterlee"), counsel for defendant JPMorgan Chase Bank N.A. ("JPMC"). I submit this declaration in support of JPMC's Motion for an order permitting James J. Coster to practice before this Court in connection with all proceedings in this case.

2.     Mr. Coster is a member of Satterlee and practices in its offices located at 230 Park Avenue, New York, New York, 10169. Mr. Coster is a member of the Bar of the State of New York and is admitted to practice before the United States District Courts for the Southern and Eastern Districts of New York, as well as the United States Court of Appeals, Second Circuit.

3

707546_1

3.      Annexed hereto as Exhibit A is a Declaration by Mr. Coster, dated June

September 26, 2007, bearing the above caption.  JPMC respectfully requests that his Declaration

be considered part of the application for admission *pro hac vice* in this case.

5.      Counsel for Plaintiff has consented to the motion concerning the

application of Mr. Coster.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:
        September 26, 2007


                                /s/ Christopher R. Belmonte
                                Christopher R. Belmonte (CB-2163)

4

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

REGINA M. KEADY, as Executrix of the ESTATE OF
MICHAEL P. KEADY,

                         Plaintiff,

          - against -

JPMORGAN CHASE BANK N.A.,

                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.: 2:07-cv-02752-SRC-CCC

**DECLARATION OF JAMES J. COSTER IN SUPPORT OF MOTION TO ADMIT COUNSEL *PRO HAC VICE***

**JAMES J. COSTER** declares as follows:

      1.     I am a member of the law firm of Satterlee Stephens Burke & Burke LLP, and submit this declaration in support of the motion for admission to practice *pro hac vice* in the above captioned matter on behalf of defendant JPMorgan Chase Bank N.A. ("JPMC").

      2.     Due to my knowledge and experience with the issues in dispute, JPMC has requested that an application be made for my admission *pro hac vice*.

      3.     I am a member in good standing of the following bars with the following dates of admission:

- The State of New York      1992

- U.S.D.C. for the Southern
  District of New York      1994

- U.S.D.C. for the Eastern
  District of New York      1995

5

- U.S. Court of Appeals,
  Second Circuit    2003

4.  There are no pending disciplinary proceedings against me or any previously imposed disciplinary proceedings against me in any State or Federal court. I shall notify the Court immediately of any matter affecting my standing at the bar of any other court.

5.  I will abide by the Local Civil Rules for the District of New Jersey and will make the required payments to the New Jersey Lawyers' Fund for Client Protection and the Clerk of the Court.

6.  Wherefore, your declarant respectfully requests that he be permitted to appear as counsel and advocate *pro hac vice* in this one case.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
   September 26, 2007

      /s/ James J. Coster
      James J. Coster

6

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

– – – – – – – – – – – – – – – – – – – – – – – – – – – – x
         :
         :
REGINA M. KEADY, as Executrix of the ESTATE OF  :
MICHAEL P. KEADY,         :  Case No.: 2:07-cv-02752-SRC-
         Plaintiff,     :  CCC
         :
    - against -       :
         :
JPMORGAN CHASE BANK N.A.,     :  **PROPOSED ORDER**
         :
         Defendant.   :
         :
         :
– – – – – – – – – – – – – – – – – – – – – – – – – – – – x

      **THIS MATTER** having been brought by motion of defendant JPMorgan Chase

Bank N.A., and based upon the declaration of Christopher R. Belmonte of Satterlee Stephens

Burke & Burke LLP, attorney for said defendant, and the declaration of James J. Coster of

Satterlee Stephens Burke & Burke LLP annexed thereto, and with Counsel for Plaintiff having

consented to entry of such an Order and for good cause shown;

      **IT IS HEREBY,**

      ORDERED that the motion for admission to practice *pro hac vice* in the above-

captioned matter is granted.  The admitted attorney, James J. Coster of Satterlee Stephens Burke

& Burke LLP, 230 Park Avenue, New York, New York, 10169, is permitted to argue or try this

particular case in whole or in part as co-counsel or advocate on behalf of defendant JPMC;

      ORDERED that, pursuant to Local Civil Rule 101.1(c)(2), each attorney admitted

to practice *pro hac vice* is required to make payment to the New Jersey Lawyers' Fund for Client

Protection (the "Fund") as provided by New Jersey Court Rule 1:28-2(a), and file an affidavit of

1

compliance, courtesy copy to Chambers, within twenty (20) days of the date of this Order. A copy of this Order shall be forwarded by the Clerk to the Treasurer of the Fund;

ORDERED that, pursuant to Local Civil Rule 101.1(c)(3), each attorney admitted to practice *pro hac vice* is required to make a payment of $150.00 upon admission, payable to the Clerk, USDC;

ORDERED that James J. Coster shall abide by the disciplinary rules of this Court;

ORDERED that James J. Coster shall notify the Court immediately of any disciplinary matter affecting their standing at the Bar of any other court; and

ORDERED that Christopher R. Belmonte shall be responsible for all papers filed consistent with Local Civil Rule 101.1(c)(4), and for the conduct of James J. Coster as co-counsel *pro hac vice* for the above-captioned matter.

Dated:  September ___, 2007

_____
Hon. Stanley R. Chesler
United States District Judge

2

1

# United States District Court
## Southern District of New York

# Certificate of
# Good Standing

I, _____ J. Michael McMahon _____, Clerk of this Court, certify that

_____ JAMES J. COSTER _____, Bar # _____ JC1431 _____

was duly admitted to practice in this Court on

_____ MARCH 18TH, 1994 _____, and is in good standing

as a member of the Bar of this Court.

Dated at    500 Pearl Street
New York, New York          on    SEPTEMBER 26TH, 2007

**J. MICHAEL McMAHON**
Clerk

_____
Deputy Clerk

**UNITED STATES OF AMERICA**
**DISTRICT OF NEW JERSEY**
 **MINUTES OF PROCEEDINGS**

**NEWARK**                                    **September 27, 2007**
**Judge: Chesler**
**COURT REPORTER:KASHMER**                    **Docket No:** <u>07-2752</u>

 <u>**TITLE OF CASE**</u>
Regina M. Keady

v.

J. P. Morgan Chase & Co.

**APPEARANCES:**

Jason Melzer, Esq. Plaintiff

James Coster, Esq. Defendant

**NATURE OF PROCEEDINGS:**

12:10 p.m. until 12:30 p.m.

Court granted pro hac vice motion OTBS'

Hearing on motion to dismiss or in the alternative to transfer

Ordered case transferred and that all pending motions shall be deferred with the case to that Court. OTBS

 Submitted by: s/Theresa C. Trivino, Senior Courtroom Deputy

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-------------------------------- x
                                 :

REGINA M. KEADY, as Executrix of the ESTATE OF    :
MICHAEL P. KEADY,                      :   Case No.: 2:07-cv-02752-SRC-
                       Plaintiff,        :   CCC

        - against -                   :

JPMORGAN CHASE BANK N.A.,           :   **PROPOSED ORDER**

                     Defendant.     :

-------------------------------- x

        **THIS MATTER** having been brought by motion of defendant JPMorgan Chase

Bank N.A., and based upon the declaration of Christopher R. Belmonte of Satterlee Stephens

Burke & Burke LLP, attorney for said defendant, and the declaration of James J. Coster of

Satterlee Stephens Burke & Burke LLP annexed thereto, and with Counsel for Plaintiff having

consented to entry of such an Order and for good cause shown;

        **IT IS HEREBY,**

        ORDERED that the motion for admission to practice *pro hac vice* in the above-

captioned matter is granted. The admitted attorney, James J. Coster of Satterlee Stephens Burke

& Burke LLP, 230 Park Avenue, New York, New York, 10169, is permitted to argue or try this

particular case in whole or in part as co-counsel or advocate on behalf of defendant JPMC;

        ORDERED that, pursuant to Local Civil Rule 101.1(c)(2), each attorney admitted

to practice *pro hac vice* is required to make payment to the New Jersey Lawyers' Fund for Client

Protection (the "Fund") as provided by New Jersey Court Rule 1:28-2(a), and file an affidavit of

1

compliance, courtesy copy to Chambers, within twenty (20) days of the date of this Order. A copy of this Order shall be forwarded by the Clerk to the Treasurer of the Fund;

ORDERED that, pursuant to Local Civil Rule 101.1(c)(3), each attorney admitted to practice *pro hac vice* is required to make a payment of $150.00 upon admission, payable to the Clerk, USDC;

ORDERED that James J. Coster shall abide by the disciplinary rules of this Court;

ORDERED that James J. Coster shall notify the Court immediately of any disciplinary matter affecting their standing at the Bar of any other court; and

ORDERED that Christopher R. Belmonte shall be responsible for all papers filed consistent with Local Civil Rule 101.1(c)(4), and for the conduct of James J. Coster as co-counsel *pro hac vice* for the above-captioned matter.

Dated: September 21, 2007

Hon. Stanley R. Chesler
United States District Judge

2

**CLOSED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                          :
REGINA M. KEADY, as Executrix of the      :
ESTATE OF MICHAEL P. KEADY,               :
                                          :
                    Plaintiff,            :
                                          :        Civ. A. No. 07-2752 (SRC)
v.                                        :
                                          :        **ORDER**
JPMORGAN CHASE & CO.,                     :
                                          :
                    Defendants.           :
_____:


**Chesler, U.S.D.J.**

      This matter having come before the Court on the motion to dismiss pursuant to 12(b)(6),

or in the alternative to transfer venue pursuant to 28 U.S.C. § 1404(a) [docket item 4], filed by

Defendant, JPMorgan Chase Bank, sued incorrectly as JPMorgan Chase and Co.; and the Court

having considered the briefs filed in support of and in opposition to the motion; and the Court

having held oral argument on the motion on September 27, 2007; therefore,

      For the reasons set forth on the record of oral argument of September 27, 2007,

      **IT IS** on this 2nd day of November 2007,

      **ORDERED** that motion to transfer venue pursuant to 28 U.S.C. § 1404(a) is **GRANTED**

[docket item 4]; and it is further

      **ORDERED** that this matter is transferred to the United States District Court for the

Southern District of New York; and it is further

**ORDERED** that the motion to dismiss [docket items 4] remains pending for disposition in the United States District Court for the Southern District of New York.

 s/  Stanley R. Chesler
Stanley R. Chesler, U.S.D.J.

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### OFFICE OF THE CLERK
50 Walnut Street
NEWARK, NEW JERSEY 07101

**CAMDEN OFFICE**
1 John F. Gerry Plaza
CAMDEN, NJ 08101

**WILLIAM T. WALSH**
**Clerk**

**TRENTON OFFICE**
402 EAST STATE STREET
ROOM 2020
TRENTON, NJ 08608

REPLY TO: <u>NEWARK</u>
973 645-4583

**November 5, 2007**

New York Southern District Court
120 Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

**Re:** **KEADY v. J. P. MORGAN CHASE & CO.**
**Civil Docket No. 07-2752(SRC/MAS)**

Dear Clerk :

    The above-captioned case has been transferred to your court pursuant to the enclosed certified copy of the Order filed on 11/5/2007. Also, enclosed is a certified copy of the docket report. You can obtain the original record by accessing CM/ECF through PACER. Kindly acknowledge receipt on the duplicate of this letter, which is provided for your convenience.

                Very truly yours,

                WILLIAM T. WALSH, Clerk

                By:Darlene Carr

                Deputy Clerk

**RECEIPT ACKNOWLEDGED BY:** _____ **DATE:** _____.

**YOUR CIVIL DOCKET NUMBER:** _____.

PKR
11-15-06

1        UNITED STATES DISTRICT COURT
                DISTRICT OF NEW JERSEY
2        CIVIL ACITON NO. 07-02752 (SRC)

3

REGINA M. KEADY, as Executrix
4   of the Estate of Michael P. Keady,

5            Plaintiff,                    ORIGINAL

6            vs.

7   J.P. MORGAN CHASE & CO.

8            Defendant.

9   _____

                        September 27, 2007
10                      Newark, New Jersey

11

12

B E F O R E:   HONORABLE STANLEY R. CHESLER, USDJ
13

14

15  Pursuant to Section 753 Title 28 United States Code, the
    following transcript is certified to be an accurate record as
16  taken stenographically in the above-entitled proceedings.

17  _____
    JACQUELINE KASHMER
18  Official Court Reporter

19

20

21              JACQUELINE KASHMER, C.S.R.
22              OFFICIAL COURT REPORTER
                     P. O. Box 12
23              Pittstown, NJ 08867
                   (908) 229-6496

24

25